```
              UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF LOUISIANA
DE'JUAN THOMAS,
     Plaintiff

     V.                      3:17-cv-01595-SDD-EWD

SALLY GRYDER, JAMES LEBLANC,
JERRY GOODWIN, DOES 1-10
     Defendants
_____
BRIAN McNEAL,
     Plaintiff

     V.                      No. 18-cv-00736-JWD-EWD

LOUISIANA DPS&C, et al
     Defendants
_____
ELLIS RAY HICKS,
     Plaintiff

     V.                      No. 19-108-SDD-RLB

LOUISIANA DPS&C, et al
     Defendants
_____
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
RODNEY GRANT,
     Plaintiff

     V.                      Case No.17-cv-2797-NJB-DEK

MARLIN GUSMAN, et al
     Defendants
```

```
1            DEPOSITION OF SECRETARY JAMES LEBLANC,
2   given in the above-entitled causes, pursuant to
3   the following stipulation, before Raynel E.
4   Schule, Certified Shorthand Reporter in and for
5   the State of Louisiana, at the Louisiana
6   Department of Public Safety and Correction, 604
7   Mayflower Street, Baton Rouge, Louisiana, 70802,
8   commencing at 10:00 o'clock a.m., on Thursday,
9   the 23rd day of May, 2019.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    I N D E X
 2                                          Page
 3   Caption                                 1
 4   Appearances                             3
 5   Agreement of Counsel                    4
 6   Examination
 7         MR. MOST                          5
 8   Reporter's Certificate                108
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1   APPEARANCES:
 2   For the Plaintiffs:
 3   WILLIAM MOST, ESQ.
     Attorney at Law
 4   201 St. Charles Avenue, Suite 114#101
     New Orleans, Louisiana   70170
 5
 6   For the Defendants:
 7   TUNDE M. ANIMASHAUN
     Assistant Attorney General
 8   Section Chief, Civil Rights
     Litigation Division
 9   P.O. Box 94005
     Baton Rouge, Louisiana   70804
10
     and
11
     JAMES "GARY" EVANS
12   Assistant Attorney General
     Litigation Division
13   P.O. Box 94005
     Baton Rouge, Louisiana   70804
14
     and
15
     JEFFERY A. "BEAU" WHEELER, II
16   Assistant Attorney General
     Litigation Division
17   P.O. Box 94005
     Baton Rouge, Louisiana   70804
18
     And
19
     JONATHAN R. VINING
20   General Counsel
     Louisiana Department of Public Safety &
21       Corrections
     P.O. Box 94304
22   Baton Rouge, Louisiana   70804
23   Also Present:  Stephen Geist
24   Reported By:  Raynel E. Schule
                   Certified Shorthand Reporter
25                 State of Louisiana
26
```

S T I P U L A T I O N

It is stipulated and agreed by and among Counsel for the parties hereto that the deposition of SECRETARY JAMES LEBLANC is hereby being taken pursuant to the Federal Rules of Civil Procedure for all purposes in accordance with law;

That the formalities of reading and signing are not specifically waived;

That the formalities of sealing, certification, and filing are hereby specifically waived.

That all objections, save those as to the form of the question and responsiveness of the answer, are hereby reserved until such time as this deposition or any part thereof is used or sought to be used in evidence.

\* \* \* \* \*

Raynel E. Schule, Certified Shorthand Reporter in and for the State of Louisiana, officiated in administering the oath to the witness.

```
1           SECRETARY JAMES LEBLANC, having been
2      first duly sworn by Raynel E. Schule, was
3      examined and testified on his oath as
4      follows:
5                       EXAMINATION
6   BY MR. MOST:
7   Q.   Good morning, Secretary.
8   A.   Good morning.  How are you?
9   Q.   I'm doing well, thanks.  Yeah.  My name as
10       you know is William Most.  I represent the
11       Plaintiffs in the four cases that we're
12       here for today, which is Thomas v Gryder,
13       McNeal v Louisiana Department of Public
14       Safety & Corrections, Hicks v Louisiana
15       Department of Public Safety & Corrections,
16       and Grant v Gusman.
17              MR. MOST:
18                 Mr. Evans, can we stipulate that
19             the deposition was properly noticed,
20             and the court reporter is duly
21             qualified?
22              MR. EVANS:
23                 We can -- we can stipulate that it
24             was properly noticed; however, for the
25             -- for the document requests other than
```

```
 1          and Pardon and Parole Board.  Is that
 2          right?
 3     A.   That's correct, and -- and Juvenile
 4          Services -- OJJ, Juvenile Services.
 5     Q.   So what you operationally over -- oversee
 6          includes corrections, probation and parole,
 7          Prison Enterprises, correct?
 8     A.   Correct.
 9     Q.   Okay.  As Secretary, you're responsible for
10          the inmates sentenced to the custody of the
11          DOC, correct?
12     A.   Correct.
13     Q.   Whether or not they're in a state-run
14          facility, a parish-run facility, or
15          private-facility.  Is that correct?
16     A.   Correct.  That's correct.
17     Q.   And if the Department of Corrections has a
18          legal duty to do something with regards to
19          an inmate, it's your job as Secretary to
20          make sure that happens, correct?
21     A.   Correct.
22     Q.   For example, the Department of Corrections
23          has a legal duty to feed its inmates,
24          right?
25                    MR. EVANS:
```

```
1        you as Secretary?
2   A.   It -- yeah, it does, and but there are
3        other parties that are involved in that
4        responsibility.
5   Q.   It's the Department of Corrections' duty to
6        timely release inmates, correct?
7                 MR. EVANS:
8                 Object to form.
9                 You can answer.
10                THE WITNESS:
11                It -- yeah, it is.  It's -- it's
12           our responsibility along with the Clerk
13           of Courts, along with the Judges, and
14           along with the Sheriffs Association.
15  BY MR. MOST:
16  Q.   And the department is -- of corrections is
17       legally bound to release inmates on their
18       release date, correct?
19                MR. EVANS:
20                Object to form.
21                You can answer.
22                THE WITNESS:
23                Yes.
24  BY MR. MOST:
25  Q.   For example, the Department can't release
```

```
1                    You can answer.
2                    THE WITNESS:
3                    It's -- it's a problem.
4    BY MR. MOST:
5    Q.   Okay.  Thousands of inmates being held past
6         their release date.  Do you not think it's
7         a big problem?
8    A.   I think I just said it's a problem.
9    Q.   It's a problem.  Do you think it's a big
10        problem?
11   A.   I -- I think -- yeah, I mean, I think it's
12        a problem.  I -- I mean, I don't know how
13        you define "big."
14   Q.   In your opinion is this a big problem?
15   A.   What's big?
16   Q.   Just in your own -- in your own belief?
17   A.   I think it's -- yeah, it's a big problem.
18   Q.   Okay.  So look at the next page, which is
19        entitled, "Financial Impact of Reducing
20        Immediate Releases & Transfers."  You see
21        that?
22   A.   Yep.
23   Q.   And you see it says, "The # of Immediate
24        Releases has been reduced to a rate of 1612
25        per year," right?
```

```
 1         Sigma Interventions, we've still got people
 2         being held an average of about two months
 3         past their release date, correct?
 4    A.   Correct.
 5    Q.   Okay.  Now, flip a couple of pages in to
 6         the topic that says, "Lessons Learned."
 7         The third bullet point says,
 8         "Inconsistencies in the quality of the work
 9         today requires 100% review by the
10         Supervisor."  You see that?
11    A.   I do.
12    Q.   So through this Six Sigma investigation,
13         you found out there were problems with the
14         work -- that the quality of the work that
15         the time calculation people were doing,
16         correct?
17    A.   That's what it looks like, yeah.
18    Q.   Okay.  Is that what you learned from this
19         investigation?
20    A.   Well, if it was in there, but remember now,
21         this -- this -- the Chief of Operations,
22         the Deputy Assistants, there's -- I mean,
23         they're more involved in these reports than
24         me.
25    Q.   Sure.
```

```
1          documentation, I can't release them.
2          That's what I learned.
3      Q.  But you learned that thousands of people in
4          the custody of the Department of
5          Corrections for whatever reason were being
6          held past their release date, correct?
7      A.  I did.
8      Q.  Did anyone get fired at the Department of
9          Corrections because of that?
10     A.  No, because it -- it wasn't -- you know,
11         people have been fired over time because of
12         -- of miscalculations, but no, nobody got
13         fired over that because it wasn't just our
14         fault.
15     Q.  Did anyone get demoted?
16     A.  Not that I'm aware of.
17     Q.  Anyone get their dock -- their pay docked?
18     A.  I mean, since -- you're -- you're talking
19         about that day?
20     Q.  As a result of this investigation.
21     A.  No, no, not -- that wasn't an
22         investigation.
23     Q.  What do you call the --
24     A.  That's a study.
25     Q.  Okay.  Did anyone get their pay docked as a
```

```
1          result of this study?
2    A.    No.
3    Q.    A reprimand of any kind?
4    A.    No.
5    Q.    Okay.
6    A.    Again, not that I'm aware of.  There's --
7    Q.    Sure.
8    A.    -- four people between me and -- and that
9          group, so if they did, I wasn't aware of
10         it.
11   Q.    Okay.
12   A.    That's probably a better answer.  I'm not
13         aware of anybody being --
14   Q.    Yep, and I can only ask you what you're
15         aware of so.  Okay.  So let's try and
16         figure out from this document where the
17         delay came from.  Will you look at that
18         page that says, "Statewide Vitals Pre &
19         Post LSS."
20   A.    Where are you in the document?
21   Q.    It's sort of in the -- the middle.  It's --
22   A.    Statewide Vitals again?
23   Q.    Yeah, the first page that says, "Statewide
24         Vitals."
25   A.    All right.
```

```
1         were dealing -- during -- during between
2         2008 and 2016, '17, we -- we were taking
3         200 million dollars in cuts and lost four
4         prisons and 2000 employees.  My focus is --
5         is surviving, you know, and, you know,
6         there's a lot of things going on besides
7         figuring time for me.  I mean, you know,
8         you have -- I hope you understand that, and
9         but, you know, it's not like we -- we're
10        trying to avoid this issue.  We want to --
11        we want to fix this issue, and we -- we
12        have made every attempt at -- at fixing
13        this issue so --
14   Q.   And one thing you said that you may do in
15        the future, but haven't done in the past is
16        send -- is actually go out and get the
17        paperwork --
18   A.   Yeah.
19   Q.   -- the Department of Corrections itself?
20   A.   Yeah, that's right.  That's right, and --
21        and we -- we need reception centers to do
22        that.  I opened a new reception center to
23        -- to take in the five, but there -- it
24        wasn't just about the paperwork.  It was
25        about bringing people in and evaluating who
```

```
1    A.    Good.
2    Q.    And we'll definitely have you out of here
3          for your GOHSEP meeting for sure with time
4          to spare.
5    A.    Couple of these I've circled I want.
6              MR. EVANS:
7                  Well, these are our copies.
8              MR. VINING:
9                  We -- we can talk when it's over.
10             THE WITNESS:
11                 Yeah.
12   BY MR. MOST:
13   Q.    Okay.  So this is a document that says,
14         "Frequently Asked" corrections, right --
15         "Questions."
16   A.    Okay.
17   Q.    Does this appear to be the frequently asked
18         questions webpage from the Department of
19         Public Safety's website?
20   A.    It does, but let me say this that we are
21         developing a new website.
22   Q.    Okay.
23   A.    It's being rebuilt as we speak.  We have
24         hired somebody, and we're hoping this is
25         going to be a much improved website once we
```

```
1        finish it, even though Senator Claitor
2        always brags on our -- our website, but --
3        he brags on information that he get's off
4        of our website.
5    Q.  Huh-huh.
6    A.  But anyway, I'm -- I'm sorry, go ahead.
7    Q.  So Page 3, at the top of Page 3 --
8    A.  Yeah.
9    Q.  -- it says, "If a person has recently been
10       sentenced to DOC custody, it can take up to
11       12 weeks to calculate a date as the
12       Department has to receive official
13       paperwork from the sentencing court in
14       order to calculate the offender's release
15       date."  Do you see that?
16   A.  I do.
17   Q.  Do you have any reason to believe that's
18       wrong?
19   A.  Well, I have reason to believe that's in
20       there because it's -- it's for those people
21       that might have 20 years to do and that we
22       get the phone calls from family members
23       that just over -- you know, just inundates
24       us with -- with requests for when they're
25       going to get out, and I'm not sure that
```

```
1         that -- that -- 12 weeks is ridiculous.  I
2         mean, I -- I saw this somewhere.  I -- I've
3         seen this before, and I haven't fixed that
4         yet, but that's something we need to
5         address too.  I mean, that's just absurd.
6   Q.    Do you have any reason to believe that
7         short timers' time computation is
8         prioritized a lot of times?
9   A.    You know, I -- I -- I thought it was.  I
10        mean, to my understanding that it is, but I
11        -- you know, again, I -- I have to defer to
12        Chief and -- and Derrick the assistant --
13        the Deputy Assistant Secretary and them.
14  Q.    And if it's not prioritized, that would be
15        a problem?
16  A.    Yeah, I mean, I think it is.  Yeah, I mean,
17        obviously they -- those are the ones that
18        we need to put on top the stack if you
19        will.
20  Q.    Okay.  That was part of the problem in the
21        Six Sigma report is that you had a stack
22        that was 1400 inmates high, right?
23  A.    Yeah.
24  Q.    Okay.  Okay.  Do you recall that in 2003,
25        the State of louisiana paid $125,000 to an
```

```
 1              they -- they try to say that we were -- but
 2              we -- we -- we balance that every month
 3              paying wise.  When we pay our bills, we
 4              make sure we're not double paying, and --
 5              and so all that's reconciled at -- at some
 6              point, but it is -- it's -- it's a
 7              challenge to keep up with them at the local
 8              level, and I think we have a handle on it.
 9         Q.   So it's relatively common that the
10              Department of Corrections thinks an inmate
11              is in one place, but actually they're in
12              another, correct?
13         A.   Well, I mean, I -- you know, I'm not sure
14              that we're thinking about where an inmate
15              is at the local level.  We know that he's
16              in a jail somewhere and locked up.  I mean,
17              he's -- he's okay.  It's not a public
18              safety issue.  So, you know, yeah, I mean,
19              I guess the answer to that question would
20              be yes, but it's not something that we
21              perceive as a major problem.
22         Q.   Okay.  So one of the things you mentioned
23              today that the DOC could do to mitigate the
24              problem of people being held past their
25              release date is for the DOC to go out and
```

|   |    |                                                          |
|---|----|----------------------------------------------------------|
| 1 |    | get the paperwork itself rather than just                |
| 2 |    | waiting to receive it, right?                            |
| 3 | A. | For DOC to get it versus a sheriff, not                  |
| 4 |    | really concerned about it.  You know, and                |
| 5 |    | that's -- that's -- that's the difference.               |
| 6 | Q. | Right.                                                   |
| 7 | A. | Yeah.  So yes.                                           |
| 8 | Q. | What other things could be done to mitigate              |
| 9 |    | this problem?                                            |
| 10|    |     MR. EVANS:                       |
| 11|    |     Object to form, but you can      |
| 12|    | answer.                                                  |
| 13|    |     THE WITNESS:                     |
| 14|    |     Well, I -- I think the           |
| 15|    | modernization of our system is -- is --                  |
| 16|    | is going to help a great deal.  I think                  |
| 17|    | the Uniform Commitment Order, I -- I                     |
| 18|    | think that -- I mean, to me that's the                   |
| 19|    | way to resolve this if we could get                      |
| 20|    | everybody on the same page, and we get                   |
| 21|    | a Uniform Commitment Order, not have to                  |
| 22|    | worry about what the sentencing minutes                  |
| 23|    | say and what this says and trying to                     |
| 24|    | compare, and they don't ever agree                       |
| 25|    | seems like most of the time, and that's                  |

```
 1        know, I mean, to me that -- that -- that --
 2        that's -- that's a -- that's part of the
 3        resolution, and -- and I think this web
 4        portal with this grant where we can
 5        communicate, where, you know, everybody
 6        right now is on different systems, and you
 7        know that better than I do probably, but --
 8        but getting everybody in a portal, and I
 9        don't understand web-based portals, but if
10        everybody can communicate electronically to
11        us, then that along with the Uniform
12        Commitment Order, I think that would be a
13        -- a -- a fix in my opinion.
14   Q.   Do you talk to other heads of other states'
15        departments of corrections?
16   A.   You know, I haven't -- the -- the issue
17        with, and -- and I'm -- no, I haven't and
18        -- and -- and we are looking at -- right
19        now we are looking at what software is
20        being used in other states.  We -- we --
21        we've began that process, and we probably
22        maybe should have started that a little
23        sooner, but their -- their issues are not
24        nearly as complex or challenging as ours
25        because of the local jail situation.  I
```

|    |    |                                                         |
|----|----|---------------------------------------------------------|
| 1  |    | think Kentucky is the closest one to us                 |
| 2  |    | that has people in local jails, but                     |
| 3  |    | ultimately they end up in a state facility.             |
| 4  |    | They don't leave them there and discharge               |
| 5  |    | from there.  So our -- our challenges with              |
| 6  |    | time computation is so much different than              |
| 7  |    | -- than the other states, but ==there's no==            |
| 8  |    | ==reason why we can't at least see what's==             |
| 9  |    | ==going on== and -- and if we can't -- I think          |
| 10 |    | this web portal thing is maybe when we                  |
| 11 |    | start looking around, and -- and finding                |
| 12 |    | out what's going on, but I don't know how               |
| 13 |    | much information we've gotten so far, but               |
| 14 |    | we are looking at other states right now.               |
| 15 | Q. | Do you know of any other state that has the             |
| 16 |    | magnitude of an issue with people being                 |
| 17 |    | held past their release dates that                      |
| 18 |    | Louisiana has?                                          |
| 19 | A. | No, and I -- I think -- I think the                     |
| 20 |    | majority of these cases is going to be in               |
| 21 |    | local jails.                                            |
| 22 | Q. | Okay.                                                   |
| 23 | A. | And that's -- that's -- that's the                      |
| 24 |    | difference.                                             |
| 25 | Q. | You had a meeting on March 25th with the                |