UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

DE'JUAN THOMAS,
    Plaintiff,

  V.                     3:17-cv-01595-SDD-EWD

SALLY GRYDER, JAMES LEBLANC,
JERRY GOODWIN, DOES 1-10,
    Defendants.

_____

BRIAN McNEAL,
    Plaintiff,
  V.                     No. 18-cv-00736-JWD-EWD

LOUISIANA DPS&C, et al.
    Defendants.

_____

ELLIS RAY HICKS,
    Plaintiff,
  V.                     No. 19-108-SDD-RLB

LOUISIANA DPS&C, et al.
    Defendants.

_____

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

RODNEY GRANT,
    Plaintiff,

  V.       Case No. 17-cv-2797-NJB-DEK

MARLIN GUSMAN, et al.
    Defendants.

_____

```
 1          30(b)(6) DEPOSITION OF THE LOUISIANA
 2  DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS,
 3  through its designated representative, DEREK ELLIS,
 4  given in the above-entitled cause, pursuant to the
 5  following stipulation, before Sandra P. DiFebbo,
 6  Certified Shorthand Reporter, in and for the State
 7  of Louisiana, at the Louisiana Department of Public
 8  Safety & Corrections, 504 Mayflower Street, Baton
 9  Rouge, Louisiana, on the 31st day of May, 2019,
10  commencing at 11:20 a.m.
11  APPEARANCES:
12
            WILLIAM MOST,
13          ATTORNEY AT LAW
            201 St. Charles Avenue
14          Suite 114, #101
            New Orleans,Louisiana  70170
15          Representing the Plaintiffs
16
17          LOUISIANA DEPARTMENT OF JUSTICE
            OFFICE OF THE ATTORNEY GENERAL
18          BY:  JAMES "GARY" EVANS, ATTORNEY AT LAW
            JEFFERY "BEAU" WHEELER, ATTORNEY AT LAW
19          HEATHER HOOD, ATTORNEY AT LAW
            ELIZABETH DESSELLE, ATTORNEY AT LAW
20          1885 N. Third Street
            Baton Rouge, Louisiana  70802
21          Representing the Defendants
22
    Reported By:
23
            Sandra P. DiFebbo
24          Certified Shorthand Reporter
            State of Louisiana
25
```

```
 1       E X A M I N A T I O N           I N D E X
 2
 3                                          Page
 4    BY MR. MOST:                            5
 5
 6
 7
 8       E X H I B I T                   I N D E X
 9
10                          Page
11
12    Exhibit D                              28
13
14
15
16
17
18
19
20
21
22
23
24
25
```

S T I P U L A T I O N

It is stipulated and agreed by and between Counsel for the parties hereto that the deposition of THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, through its designated representative, DEREK ELLIS, is hereby being taken pursuant to the Federal Rules of Civil Procedure for all purposes in accordance with law;

That the formalities of reading and signing are specifically reserved;

That the formalities of sealing, certification, and filing are hereby specifically waived.

That all objections, save those as to the form of the question and responsiveness of the answer are hereby reserved until such time as this deposition or any part thereof is used or sought to be used in evidence.

\* \* \* \* \*

Sandra P. DiFebbo, Certified Shorthand Reporter, in and for the State of Louisiana, officiated in administering the oath to the witness.

1                  DEREK ELLIS, 504 Mayflower Street,
2      Baton Rouge, Louisiana, 70802, having been
3      first duly sworn, was examined and testified
4      on his oath as follows:
5  EXAMINATION BY MR. MOST:
6      Q.   I'm William Most.  I represent the
7  plaintiffs in the four cases we're here for today.
8  Could you give your name and title for the record?
9      A.   Derek Ellis, Deputy Assistant Secretary.
10     Q.   Mr. Ellis, have you ever given a
11 deposition before?
12     A.   Yes.
13     Q.   So you realize that you are under oath
14 here today?
15     A.   Yes.
16     Q.   You realize your answers here today have
17 the same force as if we were in a courtroom with a
18 judge and jury?
19     A.   Yes.
20     Q.   Is there anything that will prevent you
21 giving me your full attention or full and truthful
22 answers?
23     A.   No.
24     Q.   Are you taking any medications or
25 suffering from any illness or anything else that

```
 1   what benefits they're eligible for.  Are you
 2   prepared to testify about that topic?
 3        A.   Yes.
 4        Q.   Did you look at any or receive any
 5   documents about that?
 6        A.   I did not look or receive any documents,
 7   but that is one of the conversations I had with our
 8   HR manager, Tanisha Matthews, regarding preparing
 9   for this.
10        Q.   Let's get into the content.  Let's look
11   at the first topic.  There is a statement on the
12   DOC's voicemail system that it "takes at least 90
13   days after sentencing" for the department to
14   calculate how much time a person must serve of
15   their sentence, correct? There is that voicemail on
16   the DOC's voicemail system?
17        A.   I think there was.
18        Q.   You think there was or there was?
19        A.   There was.  I don't think it's still
20   there.
21        Q.   Do you know when it was taken down?
22        A.   I want to say within the last 60 days, 60
23   to 90 days.  I don't remember a specific date, no.
24        Q.   Do you know why it was taken down?
25        A.   It was not a good -- for the current
```

1  practices, it wasn't a good statement.
2      Q.   What do you mean by that?
3      A.   What I mean is that I struggle with the
4  words "at least 90 days."  That's not necessarily
5  an accurate statement.
6      Q.   What would be an accurate statement?
7      A.   No time frames.  We didn't replace that
8  with a time frame.  ==We just removed the time frame.==
9      Q.   Where did that statement come from?
10     A.   Best I could tell, and that's part of the
11 stuff I looked at and scripted.  I don't know
12 specifically, but best I can tell, based on some
13 correspondence with OTS, which is the people who
14 manage the -- it may not be OTS.  It's the
15 telephone people for the state.  They manage
16 voicemails.
17          The script was created somewhere in 2013.
18 It was adjusted with a new system I think in 2014,
19 and it was maintained, that script, until recently.
20 So taking that in consideration and evaluating what
21 was going on at the time, it appears that this was
22 put together at about the time that PreClass was
23 centralized and all brought here, and as they were
24 building this new mechanism for PreClass, that was
25 put on there.  I'm not 100 percent sure why.  Best

```
 1        Q.   To tell people's families, to tell
 2   inmates' families, hey, it may take months for an
 3   inmate's time to get computed after their sentence,
 4   so you don't need to call us about it, right?
 5        A.   Giving them parameters of how long it may
 6   take, yes.
 7        Q.   So it reflected an awareness that it can
 8   take months for an inmate's time to be calculated
 9   after their sentence, correct?
10        A.   It could have.  I'm not sure.  I didn't
11   create it.
12        Q.   Let's talk about Topic Number 7, which
13   is, "What the DOC has done to prevent inmates being
14   held past their legal release date."  There is a
15   lot of inmates in the Louisiana Department of
16   Corrections' custody who have been held past their
17   release date, right?
18             MR. EVANS:
19                  Object to form.  You can answer.
20             THE WITNESS:
21                  I don't know. I guess you'd have to
22             define a lot.
23   BY MR. MOST:
24        Q.   You've looked at the Six Sigma report,
25   right?
```

1  overdue meaning what, I guess, is what I would need
2  to know to answer that.  Is overdue under any
3  circumstances or overdue because of specific
4  reasons? How are we talking about this is overdue?
5           MR. MOST:
6                Let's go off the record for a
7           second.
8                {OFF-THE-RECORD DISCUSSION}
9  BY MR. MOST:
10      Q.   So in 2012, the DOC's Six Sigma
11  investigation found an average of 2,252 cases of
12  immediate release per year with an average of 71.7
13  overdue days per case; is that right?
14      A.   Yes.
15      Q.   This is inmates being held past their
16  legal release date, correct?
17      A.   Yes.
18      Q.   So what has the DOC done since 2012 to
19  prevent inmates from being held past their legal
20  release date?
21      A.   I'm going to ask this again, if it's all
22  right, a definition of the legal release date.  I
23  know I just said yes to the previous question, but
24  I hung up on it as well.  Is a legal release date a
25  specific date in time that when you just crunch the

```
1    had been held an average of 49 days past the end of
2    their sentence, right?
3         A.    Yes.
4         Q.    The next sentence talks about how much
5    money this costs, right?
6         A.    Yes.
7         Q.    So people being held past the end of
8    their sentence are costing, in 2017, 2.8 million
9    dollars per year in housing costs alone, right?
10        A.    Yes, according to this.
11        Q.    Well, is that true?
12        A.    Yes.
13        Q.    Because when you hold people past the end
14   of their sentence, you are spending money on them
15   that the DOC should not have to spend, right?
16        A.    Yes.
17        Q.    That's taxpayer money, right?
18        A.    Yes.  May I write on this?
19        Q.    Yeah.  How did they come up with that
20   number, the 200 cases per month?  Where did that
21   come from?
22        A.    I don't know.  One of our data analysis
23   persons I would suspect pulled a report, but I
24   don't know.  I guess the other part of it as well
25   is of those 49 days, again, we can be including,
```

```
 1   statement in 2017 DPS&C had an average of 200 cases
 2   per month considered immediate release due to these
 3   deficiencies?
 4        A.   Right.
 5             MR. MOST:
 6                  Off the record.
 7                  {BRIEF RECESS}
 8   BY MR. MOST:
 9        Q.   So during the break we just took, you did
10   a little more investigation into the basis for the
11   statements in the DSN grant application, right?
12        A.   Yes.
13        Q.   And you found out some information about
14   the basis for the statements on Page 4 of the grant
15   application about 200 cases per month and 49 days,
16   correct?
17        A.   Yes.
18        Q.   So it's a true statement that the DOC
19   found that in 2017 it had an average of 200 inmates
20   per month held an average of 49 days past the end
21   of their sentence, correct?
22        A.   Yes.
23        Q.   That is both what the DSN grant means,
24   and it's a true statement, correct?
25        A.   Yes.
```