## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JOEL GIROIR, on behalf of himself and all similarly situated individuals,<br><br>    Plaintiff,<br><br>    v.<br><br>JAMES LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections; and THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS,<br><br>    Defendants. | CIVIL ACTION NO. 3:21-cv-108-JWD-SDJ |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFF'S MOTION TO CERTIFY CLASS

### I.    Introduction

For at least nine years, the Louisiana Department of Public Safety & Corrections ("the DOC") has been unlawfully and knowingly overdetaining thousands of Louisiana residents in its custody every year. In 2012, Defendant James LeBlanc, Secretary of the DOC, learned that every year, thousands of people in the custody of the DOC were being held past their release dates. Dep. of Sec. LeBlanc, ECF No. 1-2 at 48. Indeed, in 2012 Secretary LeBlanc was alerted to an internal investigation revealing pervasive overdetention of individuals sentenced to DOC custody. DOC Lean Six Sigma 2012 PreClassification, ECF No. 1-7. Secretary LeBlanc has admitted that the DOC is "legally bound" to release people on time and that the DOC's chronic, unlawful overdetention is a "big problem." Dep. of Sec. LeBlanc, ECF No. 1-2 at 41. Yet the DOC has done little to fix this big problem in the intervening years, and it continues to overdetain thousands of people every year. Through longstanding indifference to the overdetention of Louisianans as a matter of policy, the DOC is falsely

1

imprisoning thousands of people and imposing punishment on them that was never ordered by any court.

Many of these people are sentenced by a court to "time served" or an equivalent sentence that legally entitles them to immediate release at the moment they are sentenced. While the court is responsible for determining a person's sentence, "a jailer has a duty to ensure that inmates are timely released from prison." *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011). According to Defendants, "[The DOC] is legally responsible for ensuring that all offenders sentenced to its custody serve the sentences imposed upon them by the courts and are timely released upon completion of their sentences." Ex. 1, Def. Responses to Pl. First Set of Interrogatories (*Humphrey v. LeBlanc*) at 10-11.

The Supreme Court held in *County of Riverside v. McLaughlin* that jailers have a reasonable time, not to exceed 48 hours, to process and release an individual who is entitled to release. 500 U.S. 44, 57-59 (1991). That decision "forged a bright line rule in the case of systemic challenges . . . ." *White v. Taylor*, 959 F.2d 539, 546 (5th Cir. 1992). Under *McLaughlin*, "[j]urisdictions [that release persons] within 48 hours [after they are entitled to release] are 'immune from systemic challenges.' Those that do not are not." *Deaton v. McMillin*, No. 3:08cv763-DPJ-FKB, 2012 U.S. Dist. LEXIS 13806, at *14-15 (S.D. Miss. Feb. 6, 2012) (quoting *McLaughlin*, 500 U.S. at 56). As the Supreme Court explained, where "the [jailer's] regular practice exceeds the 48–hour period we deem constitutionally permissible, . . . the [jailer] is not immune from systemic challenges, such as [a] class action." *McLaughlin*, 500 U.S. at 58-59. Most states abide by *McLaughlin*'s constitutional bright line, processing people's paperwork, calculating their sentences, and releasing them within hours or at most a day or two. But the Louisiana DOC comes nowhere close to meeting the constitutional bright line; the DOC regularly takes *more than a month* to calculate an individual's sentence and release them.

As a result of these widespread practices, individuals who have completely served their sentence remain in custody, waiting for weeks or even months with no idea of when the DOC will get

around to processing their paperwork and releasing them. The DOC, in other words, falsely imprisons thousands of people every year, imposing punishment that was not ordered by any court, upending lives, and creating uncertainty and misery for families across the state. Although rampant overdetention by the DOC has captured the attention of judges (ECF No. 1-11, Email from Judge Edwards of the 15th JDC), the legislature,[1] and the media,[2] Defendants have failed to implement a policy or policies to ensure the timely release of people in their custody.

Named Plaintiff Joel Giroir seeks injunctive and declaratory relief against this false and unlawful overdetention. He seeks to represent a class of **all persons who have been, or will be, sentenced to the custody of the Louisiana DOC, and who were, or will be, entitled to release at the time of their sentencing, but who nevertheless remain in custody, now or in the future, for more than 48 hours past their sentencing dates.** For the reasons below, Plaintiff respectfully requests that this Court grant his motion and certify the proposed class.

## II.     Statement of Facts

### A.     The DOC Has a Pattern and Practice of Overdetaining People in Its Custody

False imprisonment through overdetention is the standard practice of the DOC—a standard practice that Defendants have known about for at least nine years, yet have failed to change. Defendants have been aware of the problem of overdetention in Louisiana since at least 2012. Dep. of Sec. LeBlanc, ECF No. 1-2 at 45, 48-49.

The DOC is responsible for a person's overdetention from the day of sentencing, even if the person is not yet in a DOC facility. Dep. of DOC 30(b)(6) Representative Melanie Gueho, ECF No. 1-6 at 53. Under Louisiana law, "any individual subject to confinement in a state adult penal or

---

[1] Testimony of Debbie Hudnall, Louisiana House of Representatives, Judiciary Committee, Jan. 15, 2020, at 1:03:35, available online at http://house.louisiana.gov/H_Video/VideoArchivePlayer.aspx?v=house/2019/dec/1212_19_JU.
[2] Emily Lane, *2 Freed After Being Illegally Jailed, but 'Over 100' others Affected by Missing Paperwork: Lawyers*, TIMES-PICAYUNE (Jan. 14, 2017 4:00 AM), https://www.nola.com/news/crime_police/article_969c5f74-e32d-56d7-adc4-55c591d85998.html.

correctional institution shall be committed to the Department of Public Safety and Corrections and not to any particular institution within the jurisdiction of the department." La. R.S. §15:824(A).[3] Secretary LeBlanc agrees that he is "responsible for the inmates sentenced to the custody of the DOC," whether they are in "a state-run facility, a parish-run facility, or private-facility." Dep. of Sec. LeBlanc, ECF No. 1-2 at 13.

The DOC recognizes that a person who (1) has spent time in custody pretrial, (2) is given a sentence with credit for time served, and (3) has a sentence that is less than or equal to their period of pretrial custody is entitled to release on the day of their sentencing. *See* Dep. of DOC 30(b)(6) Representative Angela Griffin (May 31, 2019), ECF No. 1-5 at 30-31. That is, a person who spent two months in jail awaiting sentencing, and is then sentenced to thirty days with credit for time served, is entitled to release on the day of his sentencing. The DOC admits that it is "legally bound to release inmates on their release date." Dep. of Sec. LeBlanc, ECF No. 1-2 at 15.  Secretary LeBlanc has stated that he first learned "that thousands of people in the custody of the Department of Corrections for whatever reason were being held past their release date" in 2012. *Id.* at 48.

But every investigation into the matter has confirmed that the problem continues. In 2012, a team of DOC staff (including "project champion" Secretary LeBlanc) performed a "Lean Six Sigma" review of its time calculation processes, which revealed a widespread pattern of people being held past their legal release dates.[4] DOC Lean Six Sigma 2012 PreClassification, ECF No. 1-7; Ex. 2, CTQ Project Charter. Specifically, the investigation found that when the DOC calculated the release dates of inmates, 83% were eligible for "immediate release . . . due to an earlier release date." DOC Lean Six Sigma 2012 PreClassification, ECF No. 1-7 at 4. The DOC learned through this investigation that

---

[3] *See also* La. R.S. §15:824(C) ("Notwithstanding any provision of law to the contrary, only individuals actually sentenced to death or confinement at hard labor shall be committed to the Department of Public Safety and Corrections.").

[4] "Lean Six Sigma is a team-focused managerial approach that seeks to improve performance by eliminating waste and defects." Will Kenton, *Lean Six Sigma*, Investopedia.com (Feb. 5, 2018).

it was overdetaining over 2,000 people each year, with an average of 71.69 "overdue days" per person who was overdetained. Dep. of DOC 30(b)(6) Representative Derek Ellis, ECF No. 1-8 at 20. The DOC has admitted that this is "a lot of overdetention." Dep. of DOC 30(b)(6) Representative Angela Whittaker, ECF No. 1-9 at 33. The 2012 review found that some of the delay was caused by the time it took for the DOC to receive documents from the clerks' and sheriffs' offices, and the remainder was caused by the DOC itself taking an average of approximately 79 days to calculate sentences after it had the sentencing documents in hand. *Id.*[5]

No alarm was raised, however, following the 2012 study. After making its 2012 findings, the DOC did not eliminate or even meaningfully mitigate the problem of overdetention; Secretary LeBlanc recently testified that he understood that "people [are still] being held [in DOC custody] an average of about two months past their release date." Dep. of Sec. LeBlanc, ECF No. 1-2 at 45. Indeed, five years after the 2012 investigation, in 2017, another internal investigation reported that the DOC had "an average of 200 inmates per month held an average of 49 days past the end of their sentence." Dep. of DOC 30(b)(6) Representative Derek Ellis, ECF No. 1-8 at 38.[6] So many people were being overdetained under this practice that it cost the state "$2.8M per year in housing costs alone." DOC Grant Application, ECF No. 1-3 at 4. Secretary LeBlanc testified that in 2017, it was "costing the state $239,022 per month" to hold "people who should be out." Ex. 3, Dep. of Sec. LeBlanc at 58–59. According to the DOC, this is "taxpayer money" that the "DOC should not have to spend" on people whose sentences are complete. Dep. of DOC 30(b)(6) Representative Derek Ellis, ECF No. 1-8 at 35.

---

[5] "Q. So this approximately 79-day number represents the DOC's, to the best of its knowledge in 2012, about how long it was taking for documents to wait at the DOC to be calculated? A. Correct.".

[6] "Q. So it's a true statement that the DOC found that in 2017 it had an average of 200 inmates per month held an average of 49 days past the end of their sentence, correct? A. Yes.".

Also in 2017, the Louisiana Legislative Auditor released a report describing a litany of problems with time computation and offender location tracking at the DOC. Ex. 4, Legislative Auditor Report. The Legislative Auditor found that "DOC does not have adequate policies and procedures to manage offender data. *Id.* at 6. Secretary LeBlanc testified that he was personally involved in "the back-and-forth with the auditor" leading up to the report. Ex. 3, Dep. of Sec. LeBlanc at 61. But the 2017 investigation and legislative findings did not fix things either. As recently as 2019, the DOC compiled a set of data and found that it had held 231 individuals past their legal release dates in a single month (February of 2019) for an average of 44 extra days. *See* Feb. 2019 Pull Doc., ECF No. 1-10. This suggests that over 2,000 people per year are still being overdetained well beyond 48 hours after they are entitled to be released, more than seven years after the DOC first identified the problem.

Instead of trying to find a solution, the DOC institutionalized the problem in its public-facing communications. On its website, the DOC posted a statement: "If a person has recently been sentenced to DOC custody, it can take up to 12 weeks to calculate a date as the Department has to receive official paperwork from the sentencing court in order to calculate the offender's release date." Dep. of Sec. LeBlanc, ECF No. 1-2 at 88-90 (admitting that "12 weeks is ridiculous" and "just absurd."). On the telephone number for family members to contact the DOC regarding their incarcerated loved ones, the DOC recorded a voicemail greeting explaining that it "takes at least 90 days after sentencing" for the department to calculate how much time a person must serve. *See* Dep. of DOC 30(b)(6) Representative Derek Ellis, ECF No. 1-8 at 12-13. The DOC's Rule 30(b)(6) witness testified that the DOC had posted these statements online and on voicemail to reduce the number of calls asking about why a family member was still being held in prison past their release date. *Id.* at 18.[7]

---

[7] "Q. [The purpose was to] tell people's families, to tell inmates' families, hey, it may take months for an inmate's time to get computed after their sentence, so you don't need to call us about it, right? A. Giving them parameters of how long it may take, yes."

And when offered help, the DOC declined it. For example, Secretary LeBlanc had multiple meetings with Debbie Hudnall, Executive Director of the Louisiana Clerks of Court Association, starting in the fall of 2016. ECF No. 3-2, LeBlanc Letter; ECF No. 3-3, Hudnall Dep. at 17. At the first meeting, Secretary LeBlanc complained that "the process of getting documents to the DOC is slow, and so people are being over-detained." ECF No. 3-3, Hudnall Dep. at 22. Also at that meeting, Debbie Hudnall proposed a solution: the clerks of court could email the relevant documents "directly to the DOC." *Id.* at 25. The idea was that "if the DOC was saying the problem was things are getting to us too slow, the Clerks of Court can make sure that happened very quickly by emailing it." *Id.* Ms. Hudnall stated that Secretary LeBlanc declined that solution, saying "they would not be set up to accept [the documents] electronically" because they did not have "the capability to receive the documents via email." *Id.* at 26-27. But as Ms. Hudnall explained, the DOC was not claiming they literally could not receive the documents; they objected to the proposal because it would "cause more work for them." *Id.* at 28.

After his first meeting with Ms. Hudnall, Secretary LeBlanc said that he would "develop an action plan with [her] and the Sheriffs' Offices in these areas to improve upon this turnaround time" and "look at the feasibility of receiving the UCO and Bill of Information documents electronically." ECF No. 3-4, LeBlanc Email Follow-Up. But Secretary LeBlanc never developed that action plan.[8] And he never conducted the feasibility study.[9] Nor did he even set goals about fixing the overdetention problem in the DOC's strategic plan for any of the years from 2008 to 2019.[10] By contrast, Secretary LeBlanc set goals in a variety of other areas, such as:

- Receive 100% of possible credit from the Office of Risk Management on annual

---

[8] ECF No. 3-5, Phyllis Glazer Email ("There are no responsive documents to your request to 'produce the 'action plan' described at 589 and documents related to the 'feasibility' study described at 588.").
[9] *Id.*
[10] ECF No. 3-6 (Strategic Plan FY 2008-2009 to 2012-2013); ECF No. 3-7 (Strategic Plan FY 2011-2012 to 2015-2016); ECF No. 3-8 (Strategic Plan FY 2014-2015 to 2018-2019).

premiums.[11]
- Have 100% on-time deliveries by 2013.[12]
- Increase sales dollars by 5% by 2019.[13]
- Maintain the adult offender institution population at a minimum of 99% of design capacity through 2019.[14]

In sum, the evidence shows that Secretary LeBlanc and the DOC:

1)  learned that thousands of DOC inmates are held past their release dates each year;

2)  did not set a goal of fixing the problem;

3)  did not take the steps necessary to fix the problem;

4)  refused help when offered; and

5)  never even developed the "action plan" the Secretary promised.

One district court in this state characterized the factual record as providing a "staggering volume of factual evidence of incompetence and indifference [to overdetention] in the Department headed by LeBlanc." *Traweek v. Gusman*, 19-cv-01384-MLCF-JVM, R. Doc. 129 at 13 (E.D. La., Jan. 20, 2021). Another found that "ample evidence . . . demonstrates that administrative bottlenecks between the DOC, the sheriffs, and the state courts have resulted in a pattern of delays in procuring and processing paperwork for inmates who should be released on the day they are sentenced to time served, resulting in prolonged and unjustified physical imprisonment." *Grant v. Gusman*, No. 17-cv-02797-NJB-DMD, R. Doc. 231 at 24 (E.D. La. Mar. 31, 2021). In denying qualified immunity to Secretary LeBlanc, the district court in *Grant* found that "[d]espite having actual knowledge of this pattern of delays since 2012, and despite being aware of the archaic processes that contribute to them, Secretary LeBlanc failed to implement policies that would allow the DOC to obtain and process paperwork in a timely way to effectuate the timely release of individuals in DOC custody." *Id.* And

---

[11] ECF No. 3-6 at 10.
[12] *Id.* at 36.
[13] ECF No. 3-8 at 35.
[14] *Id.* at 12.

this Court held that the "state of affairs at the DOC, where DOC's staff were passive and essentially flying blind unless contacted by a concerned family member, evinces a reckless disregard for the likelihood of overdetention in the DOC system." *Crittindon v. Gusman*, No. 17-512-SDD-EWD, 2020 U.S. Dist. LEXIS 63829, at *45 (M.D. La. Apr. 13, 2020).

But the problem has not been fixed. Nor is there any indication that the DOC is seeking a solution. Accordingly, court intervention is necessary, and class certification is appropriate.

### B.    Plaintiff Joel Giroir's Overdetention

Plaintiff Joel Giroir was eligible for immediate release upon his resentencing on January 26, 2021. Giroir Decl., ECF No. 1-4. Yet he was illegally detained for 27 days at St. Tammany Parish Jail until February 22, 2021.

On the day of his resentencing, January 26, 2021, Mr. Giroir had served enough jail time to be eligible for immediate release. Giroir Decl., ECF No. 1-4 ¶ 4. He was held in St. Tammany Parish Jail on an attachment with no bond in case number 589-169 and held on a $5,000 bond in case number 589-855 from January 30, 2018, to March 13, 2018. *Id.* He was held with no bond on case numbers 589-855 and 589-169 from June 12, 2018 until July 19, 2018. *Id.* On July 19, 2018, he was sentenced to 90 days in DOC custody in lieu of revocation, and he served 110 days in Concordia Parish Jail. *Id.* He turned himself in to St. Tammany Parish Jail on January 22, 2021, and was incarcerated there until his revocation hearing date on January 26, 2021. *Id.*

On January 26, 2021, Mr. Giroir had a probation revocation and resentencing hearing. He was sentenced to one year in DOC custody. *Id.* at ¶ 5. Under Louisiana's "good time" law, Mr. Giroir was entitled to a diminution of sentence. La. Rev. Stat. § 15:571.3(B)(1)(a). Because of his good behavior and because he was not convicted of a crime of violence, he was required to serve only 35 percent of his one-year sentence, or 128 days. Giroir Decl., ECF No. 1-4 at ¶ 6. As of the date of his revocation

and sentencing on January 26, 2021, Mr. Giroir had served at least 192 days in jail on his one-year sentence. Thus, on the date of his sentencing, he was eligible for immediate release. *Id.* at ¶ 7.

Nevertheless, Mr. Giroir was not immediately released on January 26, 2021, even though he had already served at least 64 days over his sentence. When Mr. Giroir moved for class certification on February 19, 2021, he still had not been released from DOC custody. Motion for Class Cert., ECF No. 3. Mr. Giroir was finally released on February 22, after having served at least 27 days over his sentence.

## III. Legal Standard

To proceed as an injunctive class, Plaintiff must satisfy the requirements of Federal Rule of Civil Procedure 23(a)—numerosity, commonality, typicality, and adequacy of representation—and (b)(2). *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012). Rule 23 does not require Plaintiff to show that questions common to the class "will be answered, on the merits, in favor of the class." *Cole v. Livingston*, No. 4:14-CV-1698, 2016 U.S. Dist. LEXIS 77435, at *9 (S.D. Tex. June 14, 2016) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 459 (2013)). To the contrary, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc.*, 568 U.S. at 466; *see also In re Deepwater Horizon*, 739 F.3d 790, 811 (5th Cir. 2014) ("Rule 23 does not . . . become a dress rehearsal for the merits."). "The decision to certify is within the broad discretion of" this Court. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996).

## IV. Argument

Plaintiff's instant motion for class certification should be granted because (A) the proposed class satisfies the requirements of numerosity, commonality, typicality, and adequacy under Rule 23(a); (B) the proposed class satisfies the requirements of Rule 23(b)(2); and (C) the proposed class is

ascertainable. In addition, undersigned counsel should be appointed class counsel pursuant to Rule 23(g) because they will fairly and adequately represent the interests of the class.

### A.    The Proposed Class Satisfies the Numerosity, Commonality, Typicality, and Adequacy Requirements of Rule 23(a)

The proposed class satisfies the requirements of (i) numerosity, (ii) commonality, (iii) typicality, and (iv) adequacy.

### i.    Numerosity

Rule 23(a)(1) is satisfied because the class is so numerous that joinder of all members is impracticable. Indeed, joinder is impracticable for a number of reasons.

Plaintiff estimates a current class size of more than 200 members. Classes of more than 40 members are generally large enough to warrant certification. *See Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 624 (5th Cir. 1999); *see also Lewis v. Cain*, 324 F.R.D. 159, 168 (M.D. La. 2018). The most recent overdetention data from the DOC (from February of 2019) show that more than 200 individuals were overdetained in a single month, suggesting that the DOC overdetains more than 2,000 individuals over the course of a year. Feb. 2019 Pull Doc., ECF No. 1-10. This 2019 count was consistent with data from 2017, which showed that the DOC had "an average of 200 inmates per month held . . . past the end of their sentence." Dep. of DOC 30(b)(6) Representative Derek Ellis, ECF No. 1-8 at 38.[15] There is no evidence that the DOC has implemented any meaningful changes that might have significantly mitigated the rate of overdetention that was captured in the February 2019 snapshot. Plaintiff therefore estimates a current class size of at least 200 current members, with over 2,000 estimated individuals who will become class members over the next year.

The proposed class, moreover, is fluid due to the ever-changing populations of prisons and jails, which "counsels in favor of including certification of all present and future members," *Lewis*, 324

---

[15] "Q. So it's a true statement that the DOC found that in 2017 it had an average of 200 inmates per month held an average of 49 days past the end of their sentence, correct? A. Yes."

F.R.D. at 168, and the indeterminate number of future class members makes joinder impracticable, *see Nelson v. Constant*, No. 17-14581, 2018 U.S. Dist. LEXIS 164853, at *9 (E.D. La. Sep. 25, 2018). And because the proposed class includes all individuals overdetained now or in the future anywhere in the state of Louisiana, the class members are "likely to be geographically dispersed" across the state in state prisons and parish jails, "further indicating that joinder is impracticable." *Morrow v. Washington*, 277 F.R.D. 172, 191 (E.D. Tex. 2011).

Finally, class members are incarcerated, limiting their ability to institute individual lawsuits, particularly in light of the DOC's reduced or eliminated visitation and court closures in Louisiana instituted to address COVID-19 concerns. Accordingly, the numerosity requirement is easily satisfied.

### ii.    Commonality

Plaintiff's proposed class satisfies Rule 23(a)(2)'s commonality requirement because the class presents common factual and legal questions that will be answered in common fashion as to all members of the class.

Commonality requires that the proposed class's claims "depend upon a common contention" that "is capable of classwide resolution" such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The common question (or questions) need not address every aspect of the putative class's claims—instead, "even a single common question will do." *Yates*, 868 F.3d at 365 n.6 (citing *Wal-Mart*, 564 U.S. at 359). Accordingly, "a single contention regarding the class members' injury is sufficient to satisfy Rule 23(a)(2), as long as the party seeking certification can show that this contention is common to all class members, is central to the validity of their claims, and is capable of class-wide resolution, even where the resulting injurious effects . . . are diverse." *Boudreaux v. Sch. Bd. of St Mary Par.*, No. 6:65-CV-11351, 2020 U.S. Dist. LEXIS 163838, at *15 (W.D. La. Sept. 8, 2020) (citing *In re Deepwater Horizon*, 739 F.3d at 810-11).

Plaintiff's proposed class in this case satisfies Rule 23's commonality requirement. The central question driving this case is whether Defendants' pattern and practice of overdetaining individuals in DOC custody violates Plaintiff's rights and the rights of the proposed class members. That is, "all members of the proposed class share [the] common claim" that Defendants' pattern and practice of overdetention across the state violates their rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution; violates their rights under Article One, Section Two of the Louisiana Constitution; subjects them to the state tort law of false imprisonment; amounts to negligence; and intentionally inflicts emotional distress. Thus, commonality is satisfied.

Questions of fact that are common to all members of the class include, but are not limited to:

- Whether Defendants have a pattern or practice of detaining people in DOC custody more than 48 hours past the time they become legally eligible for release;
- Whether Defendants are deliberately indifferent to the overdetention of people in DOC custody who are eligible for release at the time of their sentencing but are instead detained for 48 hours or more beyond their sentencing date;
- Whether Defendants have failed to adopt a policy or policies to mitigate overdetention.

Questions of law that are common to all members of the class include, but are not limited to:

- Whether the DOC has the legal authority to hold class members past their sentencing dates under the United States Constitution;
- Whether class members have a liberty interest in their immediate release upon sentencing under the United States Constitution;
- Whether Defendants' failure to adopt a policy or policies to mitigate overdetention constitutes deliberate indifference;
- Whether class members have a liberty interest in their immediate release upon sentencing under the Louisiana Constitution; and
- Whether the DOC's detention of class members past their legal release dates constitutes false imprisonment under state law.

The answers to these common questions (and others) are central to all class members' claims and—crucially—all these common questions are "amenable to a common answer." *Jones v. Gusman*, 296 F.R.D. 416, 466 (E.D. La. 2013). The putative class's federal claims center on the deliberate indifference that Defendants exhibit toward them as a *group*, and resolution of those claims will require

the factfinder to look at evidence of Defendants' actions and inaction as to the class as a whole, rather than as to particular members individually. *See In re Deepwater Horizon*, 739 F.3d at 811 (recognizing that commonality may rest on common questions that focus on "the defendant's injurious conduct"); *see also Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (setting forth the standard for supervisory liability). The putative class's state-law claims similarly center on the conduct of Defendants toward the class as a whole in uniform fashion. *See, e.g., Kyle v. City of New Orleans*, 353 So.2d 969, 971 (La. 1977) (describing the elements of Louisiana's false imprisonment tort).

Although class members will have been overdetained for varying amounts of time, the Supreme Court in *McLaughlin* established a "bright line" 48-hour limit for purposes of the Due Process Clause which all class members will meet or exceed, ensuring that the constitutionality of their overdetention can indeed be amenable to resolution on a class-wide basis. 500 U.S. at 57-59; *see also Yates*, 868 F.3d at 363 (affirming a finding of commonality because the evidence "calls into serious question the adequacy" of the defendant's conduct with respect to the health and safety of all class members).

As discussed in detail in Plaintiff's Statement of Facts, the evidence that Plaintiff and the class will rely upon to answer those common questions will be uniform as to the class. For example, the DOC's responsibility for timely release of individuals in its custody is uniform for each class member. And there can be no dispute that the investigations taken—and the recommendations that were generated and disregarded afterward—were applicable in uniform fashion to each member of the proposed class. In other words, those common questions that Plaintiff has identified will be susceptible to answers—whether in Plaintiff's or Defendants' favor—that are common to the class as a whole and will drive resolution of this lawsuit. Rule 23(a)(2)'s commonality requirement is thus satisfied.

14

Notably, federal courts throughout the country have found that commonality exists in cases like this one seeking injunctive relief for allegedly unconstitutional policies or practices related to the conditions of plaintiffs' confinement or their timely release. *See, e.g.*, *Rodriguez v. Hayes*, 591 F.3d 1105, 1122-24 (9th Cir. 2010) (finding commonality even though class members were detained pursuant to different statutes and under different factual circumstances because a single question, whether a bond hearing was required for individuals detained longer than six months, was "posed by the detention of every member of the class and their [individual claims would] largely be determined by its answer."); *see also Dunn v. City of Chicago*, 231 F.R.D. 367, 375-76 (N.D. Ill. 2005) (certifying class of detainees who were held more than 48 hours after arrest without judicial approval); *Jones v. Murphy*, 256 F.R.D. 519, 522-23 (D. Md. 2009) (same). In *O'Donnell v. Harris County*, the court certified a class of individuals detained pre-trial on misdemeanor charges "for whom a secured financial condition of release has been set and who cannot pay the amount necessary for release on the secured money bail because of indigence," finding that commonality was satisfied because "every misdemeanor arrestee who is detained because he or she is unable to pay the bail on a secured basis is harmed in the same way and for the same reason." No. H-16-1414, 2017 U.S. Dist. LEXIS 65444, at *15-16, 23 (S.D. Tex. Apr. 28, 2017). This Court should reach the same conclusion as these other courts and determine that the proposed class satisfies the commonality requirement of Rule 23(a)(2).

### iii.    Typicality

Named Plaintiff satisfies the typicality requirement because he is a member of the proposed class and he shares the same claims. To satisfy the typicality requirement, "[t]he claims of all class members need not be identical," but instead must merely "arise from a similar course of conduct and share the same legal theory." *Lewis v. Cain*, 324 F.R.D. 159, 169 (M.D. La. 2018) (quotation omitted); *see also Lightbourn v. Cty. of El Paso, Tex.*, 118 F.3d 421, 426 (5th Cir. 1997)*; Lewis*, 324 F.R.D. at 169

("Typicality requires showing that, in fact, the proposed representatives have that claim [that is shared by all members of the proposed class].") (citations omitted).

Those criteria are satisfied here. Named Plaintiff's situation may differ factually from that of other class members in terms of the location of detention, the underlying criminal charges, and how long past 48 hours each person has been overdetained. But the basis of liability in this case is not dependent upon such individual circumstances. Rather, Named Plaintiff's claims "arise from a similar course of conduct and share the same legal theor[ies]" as class members' claims, and are therefore typical of class members' claims. *Lewis*, 324 F.R.D. at 169 (quoting *James v. City of Dall.*, 254 F.3d 551, 571 (5th Cir. 2001)). Specifically, Plaintiff's overdetention claims—like those of the class members he seeks to represent—turn on whether Defendants maintain a pattern and practice of detaining individuals well past their legal release dates. And those claims are based on a "staggering volume of factual evidence of incompetence and indifference [to overdetention] in the Department headed by [Secretary] LeBlanc," *Traweek v. Gusman*, No. 19-cv-01384-MLCF-JVM, R. Doc. 129 at 13 (E.D. La., Jan. 20, 2021), which led to the widespread and systemic overdetention practices at issue in this case. The typicality requirement is therefore satisfied.

### iv. Adequacy

Named Plaintiff is an adequate representative of the class because his interests in the vindication of the legal claims raised here are entirely aligned with the interests of the other class members, who each have the same basic constitutional claims. Named Plaintiff is a member of the class, and his interests coincide with, and are not antagonistic to, those of the other class members. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). ("The adequacy inquiry . . . serves to uncover conflicts of interest between named parties and the class they seek to represent.").

No conflict of interest exists between Named Plaintiff and other class members. Named Plaintiff and class members are suffering the same harms.[16] They assert the same legal claims, seek the same litigation outcomes, and would benefit from the same declaratory and injunctive relief requiring Defendants to calculate sentences and release persons within a time not to exceed 48 hours, for all persons sentenced to the custody of the DOC who are eligible for immediate release upon sentencing. Named Plaintiff is not seeking monetary relief through this action, so no financial conflict can arise between the claims of Named Plaintiff and those of other class members. Named Plaintiff is committed to a class-wide resolution, and he will fairly and adequately protect the interests of the class. Giroir Decl., ECF No. 1-4 at ¶ 9. The adequacy of counsel to represent the class is addressed *infra*. Thus, adequacy is satisfied.

### B.    The Proposed Class Satisfies the Requirements of Rule 23(b)(2)

"The claims at issue present a paradigmatic case for Rule 23(b)(2) relief." *Jones*, 296 F.R.D. at 465. Certification under Rule 23(b)(2) is appropriate because "[Defendants] [have] acted [and] refused to act on grounds that apply generally to the class, so that final injunctive relief [and] corresponding declaratory relief [are] appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Moreover, all class members are "harmed in essentially the same way" and seek only "specific" injunctive relief. *M.D.*, 675 F.3d at 845; *see also Dockery v. Fischer*, 253 F. Supp. 3d 832, 855 (S.D. Miss. 2015).

The Fifth Circuit has made clear that courts should follow a "general rule encouraging liberal construction of civil rights class actions." *Jones v. Diamond*, 519 F.2d 1090, 1100 (5th Cir. 1975). In *Jones*, the Fifth Circuit reversed a denial of class certification in a case brought under § 1983 by a prisoner seeking to enjoin unsanitary conditions in a jail. *Id.* at 1093. The Court reasoned that "[s]ince it is not necessary that the members of the class be so clearly identified that any member can be

---

[16] Although Mr. Giroir has since been released from custody, he first moved for class certification on February 19, 2021, while he was still being held by the DOC past his legal release date. ECF No. 3.

presently ascertained, the 23(b)(2) class action is an effective weapon for an across-the-board attack against systematic abuse." *Id.* at 1100; *see also Davis v. Weir*, 497 F.2d 139, 146 (5th Cir. 1974) (Rule 23(b)(2) "does not mandate that all members of the (b)(2) class be aggrieved by or desire to challenge the defendant's conduct" but does require "that the conduct or lack of it which is subject to challenge be premised on a ground that is applicable to the entire class."); *J.D. v. Nagin*, 255 F.R.D. 406 (E.D. La. 2009); *Cooper v. Kliebert*, No. 14-507-SDD-SCR, 2014 U.S. Dist. LEXIS 176220, at *5 (M.D. La. Dec. 22, 2014) ("The Fifth Circuit cautions the need to read Rule 23(a) liberally in the context of civil rights suits where plaintiffs seek injunctive relief on behalf of past, present, and future class members.").

The same reasoning that establishes commonality, discussed above, satisfies the first requirement of Rule 23(b)(2)—that all class members are harmed in essentially the same way—because "[i]n establishing commonality [Named Plaintiff] [] [has] identified a common practice or policy that is the source of the class members' harm. So, if [Named Plaintiff] prevails on the merits, a single injunction barring or modifying that course of that behavior will, in the ordinary course of things, provide relief to the members of the class." *Dockery*, 253 F. Supp. 3d at 839. Defendants' practice of failing to release people on time is not targeted at particular individuals, but rather is a general practice that affects all persons sentenced to DOC custody who are eligible for immediate release but remain incarcerated. This pattern and practice apply to all class members by definition, without regard to the various circumstances of their underlying criminal charges or any other differences among them. Because Defendants' failure to ensure that people are released on time when they are eligible for immediate release upon sentencing is the result of a sustained pattern of deliberate indifference, an injunction would provide relief to all members of the class.

Additionally, the Rule 23(b)(2) class is "the paradigm vehicle for addressing transient claims," that are "capable of repetition yet evading review." *O'Donnell*, No. H-16-1414, 2017 U.S. Dist. LEXIS

65444, at *10. Claims fall into this category when (1) the challenged conduct giving rise to the claim is of a fleeting or temporary nature, (2) uncertainty exists at the outset as to the duration of each plaintiff's exposure to the allegedly harmful conduct, (3) it is unlikely that any given individual plaintiff could see his claim to fruition prior to the claim becoming moot, and (4) there exists a constant group of people suffering the harm alleged by the plaintiffs. *Ward v. Hellerstdet*, 753 F. App'x 236, 242 (5th Cir. 2018) (collecting cases); *see also Tellis v. LeBlanc*, No. 18-cv-0541, 2020 U.S. Dist. LEXIS 44767, at *18-19 (W.D. La. Mar. 13, 2020). The challenged conduct in this case is of a temporary nature, and it is unlikely that any given individual plaintiff could see his claim to fruition prior to the claim becoming moot, since the average length of overdetention is 49 days. *See* Dep. of DOC 30(b)(6) Representative Derek Ellis, ECF No. 1-8 at 38. Uncertainty exists at the outset as to the duration of each plaintiff's overdetention since the amount of time it takes for the DOC to calculate a person's time and release them varies substantially. Finally, there exists a constant group of people suffering the harm of overdetention because thousands of people are sentenced in Louisiana each year, and many are eligible for immediate release upon sentencing but are not released within 48 hours. For these reasons, the Rule 23(b)(2) class action device has been frequently approved in cases challenging relatively short periods of detention or detention of those with conditions yet to be ascertained, such as disability or indigence. *Id.*; *see also Gerstein v. Pugh*, 420 U.S. 103, 110-11 (1975); *Hernandez v. County of Monterey*, 305 F.R.D. 132, 149 (N.D. Cal. 2015); *Bumgarner v. NCDOC*, 276 F.R.D. 452, 454 (E.D.N.C. 2011); *Cole v. Livingston*, Civil No. 14-1698, 2016 U.S. Dist. LEXIS 77435; *Walker v. City of Calhoun*, Civil No. 15-170, 2016 U.S. Dist. LEXIS 12306 (N.D. Ga. Jan. 28, 2016).

As this Court noted in *Lewis*, moreover, class claims can "be based on an allegation that the State engages in a pattern or practice of agency action or inaction—including a failure to correct a structural deficiency within the agency, such as insufficient staffing—'with respect to the class,' so long as declaratory or injunctive relief 'settling the legality of the State's behavior with respect to the

class as a whole is appropriate.'" *Lewis*, No. 15-cv-318, Dkt. No. 394 at 21 (quoting *Perry*, 675 F.3d at 847-48). Here, the entire class seeks a declaratory judgment that Defendants violate class members' rights by failing to ensure that they are released on time and an injunction requiring Defendants to take the steps necessary to ensure timely releases. Among other relief, Named Plaintiff asks that this Court order Defendants to establish procedures to prevent all overdetention and to calculate sentences and release persons within a time not to exceed 48 hours, for all persons sentenced to the custody of the DOC who are eligible for immediate release upon sentencing. *See* Compl., ECF No. 1 at 20. This relief would apply equally to the entire class. *See Dockery*, 253 F. Supp. 3d at 856 ("As the types of injunctive relief requested by Plaintiffs would not require that the Court adjudicate the individual class members' needs or circumstances, . . . the injunctive relief requested by Plaintiffs satisfies Rule 23(b)(2)."). Therefore, certification under Rule 23(b)(2) is appropriate.

### C.    The Proposed Class Is Ascertainable

Plaintiff's proposed class satisfies the sometimes implied requirement of ascertainability under Rule 23. This requirement does not necessarily apply to classes seeking injunctive relief under Rule 23(b)(2), according to many circuit courts. *See, e.g.*, *Yaffe v. Powers*, 454 F.2d 1362 (1st Cir. 1972); *Shelton v. Bledsoe*, 775 F.3d 554 (3d Cir. 2015); *Cole v. City of Memphis*, 839 F.3d 530 (6th Cir. 2016); *Shook v. El Paso Cty.*, 386 F.3d 963 (10th Cir. 2004). Although the Fifth Circuit has never definitively spoken on this question, courts in this Circuit have found or suggested that "the strict ascertainability requirements for a proposed damages class action do not apply to a Rule 23(b)(2) class seeking prospective relief under the Fifth Circuit's standard for civil rights litigation." *O'Donnell*, No. H-16-1414, 2017 U.S. Dist. LEXIS 65444, at *9; *see also Vita Nuova, Inc. v. Azar*, Civil Action No. 4:19-cv-00532-O, 2020 U.S. Dist. LEXIS 250182, at *6 n.3 (N.D. Tex. Dec. 2, 2020) ("Ascertainability may not be applicable in the Rule 23(b)(2) context."); *Boudreaux*, No. 6:65-CV-11351, 2020 U.S. Dist. LEXIS 163838, at *6 n.5.

In any event, Plaintiff's proposed class is ascertainable because "the class sought to be represented [is] adequately defined and clearly ascertainable." *Seeligson v. Devon Energy Prod. Co.*, 761 F. App'x 329, 333 (5th Cir. 2019); *see also A.A. v. Phillips*, No. 19-00770-BAJ-SDJ, 2021 U.S. Dist. LEXIS 98189, at \*21 (M.D. La. May 25, 2021). Plaintiff's proposed class sets forth an objective definition for membership: those individuals who are (or will be) entitled to release at the time of their sentencing but who nevertheless remain in custody (now or in the future) for more than 48 hours beyond their sentencing dates. *See A.A.*, No. 19-00770-BAJ-SDJ, 2021 U.S. Dist. LEXIS 98189, at \*21 ("An identifiable class exists if its members can be ascertained by reference to objective criteria.").

The Court and the Parties, including class members themselves, will thus be able to determine an individual's membership in the class by answering two objective questions: (1) Was the individual entitled to release at the time of their sentencing? and (2) Is the individual being detained more than 48 hours past the date of their sentencing? Question 1 can be answered by a simple calculation of the individual's time served compared to their sentence, and if Question 1 is answered affirmatively, then Question 2 must also be answered affirmatively if the date of the person's sentencing is more than 48 hours past. Indeed, Plaintiff's counsel readily determined that Named Plaintiff Giroir was being overdetained based on this exact analysis. Ex. 5, Letter from Caroline Gabriel to Angela Griffin.

The fact that Plaintiff's proposed class definition includes individuals who will be sentenced and overdetained in the future does not defeat ascertainability. In *DeOtte v. Azar*, 332 F.R.D. 188, 196-97 (N.D. Tex. 2019), the district court determined that a class remains ascertainable even if its definition includes individuals who will not become members until the future, so long as those future members qualify as class members through the same objective criteria that is required for all class members. *See also Yates v. Collier*, 868 F.3d 354, 359 (5th Cir. 2017) (affirming certification of class that includes individuals who will be subjected to certain prison conditions in the future). What matters instead is that the Court be able to ascertain the identities of class members at some point, and that

membership is defined by objective criteria (rather than subjective criteria). *Frey v. First Nat'l Bank S.W.*, 602 F. App'x 164, 168 (5th Cir. 2015) ("[T]he [C]ourt need not know the identity of each class member before certification; ascertainability requires only that the [C]ourt be able to identify class members at some stage of the proceeding."). Both are true of Plaintiff's proposed class, and ascertainability is thus satisfied.

## V.   Undersigned Counsel Should Be Appointed Class Counsel under Rule 23(g)

Finally, the Federal Rules require that the Court appoint class counsel, considering "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g). These factors strongly support appointing the Promise of Justice Initiative ("PJI"), Loevy & Loevy, and Most & Associates as class counsel.

Plaintiff's counsel satisfy all four criteria. As reflected in the complaint, Plaintiff's counsel have already devoted substantial time investigating the factual and legal issues in this case and will continue do so throughout the pendency of the litigation. All proposed class counsel are currently counsel in *Humphrey v. LeBlanc*, 20-cv-233 (M.D. La), a case that focuses on the same overdetention issues and facts as the instant case, but requests damages as relief instead of injunctive and declaratory relief.

All proposed class counsel are experienced in handling class actions and other complex litigation. PJI is dedicated to ensuring constitutional conditions for institutionalized individuals and PJI's attorneys are highly knowledgeable in the applicable law. Montagnes Decl., ECF No. 3-9. Loevy & Loevy is one of the nation's largest and most successful civil rights law firms with extensive experience as class counsel in civil rights class actions. Grady Decl., ECF No. 3-10. Most & Associates have litigated numerous lawsuits in Louisiana related to overdetention on behalf of individuals. Most Decl., ECF No. 3-11. Collectively, counsel has significant experience in the areas of criminal law,

constitutional law, and class action litigation. Class counsel have a detailed understanding of local law and practices as they relate to federal constitutional requirements.

Class counsel have no known conflicts of interests that would prevent them from providing zealous representation of Named Plaintiff or the class. Undersigned counsel should therefore be appointed class counsel.

## VI.   Conclusion

For these reasons, Plaintiff respectfully requests that this Court grant his motion and certify the proposed class of all persons who have been, or will be, sentenced to the custody of the DOC, and who were, or will be, entitled to release at the time of their sentencing, but who nevertheless remain in custody, now or in the future, for more than 48 hours past their sentencing dates.

Respectfully submitted this 10th day of September, 2021.

<div style="margin-left:50%">

/s/ *Mercedes Montagnes*
Mercedes Montagnes, La. Bar No. 33287
Nishi Kumar, La. Bar No. 37415
Rebecca Ramaswamy, La. Bar No. 39524
The Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117
Telephone: (504) 529-5955
Facsimile: (504) 595-8006
Email: mmontagnes@defendla.org

Sarah Grady (*pro hac vice*)
Stephen H. Weil (*pro hac vice*)
John Hazinski (*pro hac vice*)
Loevy & Loevy
311 N. Aberdeen
Chicago, IL 60607
Telephone: (312) 243-5900
Facsimile: (312) 243-5902
Email: sarah@loevy.com

William Most, La. Bar No. 36914
Most & Associates
201 St. Charles Avenue, Suite 114, #101

</div>

New Orleans, LA 70170
Telephone: (504) 509-5023
Email: williammost@gmail.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

Dated: September 10, 2021

*/s/ Rebecca Ramaswamy*
Rebecca Ramaswamy
Attorney, La. Bar No. 39524