## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JOEL GIROIR, on behalf of himself and all similarly situated individuals, | * * * | CIVIL ACTION |
| | * | NO.:  3:21-cv-00108-JWD-SDJ |
| VERSUS | * | |
| | * | JUDGE: |
| JAMES LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections | * * | JOHN W. deGRAVELLES |
| | * | MAGISTRATE JUDGE: |
| | * | SCOTT D. JOHNSON |

*******************************************************************************

### MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO CERTIFY CLASS

Defendants James LeBlanc, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections (hereinafter "James LeBlanc"), and the Louisiana Department of Public Safety & Corrections (hereinafter, "DPS&C") (collectively, James LeBlanc and DPS&C are referred to as "Defendants"), respectfully submit this opposition to Plaintiff's Motion to Certify Class. (R.Doc. 25).

### I.  Summary of the Argument

Plaintiff seeks to certify this purported class action, seeking injunctive relief only, under Federal Rule of Civil Procedure 23(b)(2), which requires a showing that: (1) Plaintiff and all purported class members are subject to the same specific policy that harmed all class members in the same way; and (2) specific injunctive relief regarding that specific policy that can be defined and/or enforced by the court, which requires more than a general request for Defendants to stop violating Plaintiff's rights. Plaintiff cannot meet these requirements.

Instead of identifying a specific policy that caused harm to all purported class members, Plaintiff only offers conclusory assertions that Defendants have a general "pattern of overdetention." Plaintiff fails to identify any specific policy that resulted in his alleged untimely release, or whether that a specific policy, if changed, would have prevented the harm he alleges.

Instead, Plaintiff seeks an injunction from this Court vaguely ordering "Defendants to establish procedures to prevent all overdetention and to calculate sentences and release persons within a time not to exceed 48 hours." R.Doc. 25-1, p. 20. The injunctive relief as requested by Plaintiff is not specific, and would be impossible to comply with or enforce. DPS&C cannot be obligated to release an offender whose arrest, pre-trial incarceration, and outcome of sentencing are unknown to DPS&C.

The types of offenders contemplated in Plaintiff's proposed class definition are those offenders who likely served time as a pre-trial detainee prior to their sentencing date. DPS&C has no connection to, or knowledge of, pre-trial detainees, their sentencing date, or the outcome of their sentencing until the local facility housing such an individual notifies DPS&C that the individual was sentenced to a felony, and therefore within the custody of DPS&C. There is unavoidable delay in this process, which is completely out of the control of DPS&C. Louisiana law obligates the local facilities to provide DPS&C with all necessary paperwork for all offenders sentenced to DPS&C custody. DPS&C cannot process time computation until all paperwork required under the law is received. Then DPS&C must follow all necessary steps and time computation processes, and the law, to ensure that the offender is in fact entitled to release.

As shown by facts specific and unique to Plaintiff, DPS&C had no knowledge that Giroir was sentenced to DPS&C time until 17 days after his sentencing. Even after DPS&C received the necessary paperwork, the sentencing documents contained serious discrepancies, which precluded DPS&C from moving forward with the time computation process. Then, an ice storm hit Louisiana, closing down state offices for many days. Using the named Plaintiff's specific circumstances, requiring DPS&C to calculate and release him within 48 hours after his sentencing

2

date would be impossible, where DPS&C had no knowledge of his sentence until 17 days later and other unforeseen events prevented the completion of the time computation process.

Every inmate's time computation process is unique. Given that the DPS&C must rely on 102 local jail facilities located throughout the state to provide DPS&C with notice of an offender's sentencing outcome, individualized issues necessarily arise with respect to Plaintiff's claims. While Plaintiff generally alleges a "pattern of overdetention," no policy, standards or procedures have been identified, and Plaintiff has not shown that specific injunctive relief can apply on a class-wide basis. As such, Plaintiff fails to meet the requirements of Rule 23 and his Motion to Certify Class must be denied.

## II. Factual Background

### A. Time Computation

The process of time computation to determine if an inmate is eligible for release is complex and involves many steps. At the outset, when an individual is arrested, and is in the custody of a local facility, that individual is a pre-trial detainee. DPS&C does not have custody of pre-trial detainees.[1] Further, DPS&C has no knowledge of the existence of pre-trial detainees, their sentencing dates, or the results of their sentencing until the local facility provides that information. If a pre-trial detainee remains in the custody of the local facility, and is later convicted of the crime(s), the pre-trial detainee may be entitled to various credits while serving in the local facility.[2]

---

[1] La. R.S. 15:824.

[2] A pre-trial detainee, upon sentencing, may be entitled to jail credits for the time spent in custody prior to sentencing. *See* La. C.Crim.P. art. 880. An offender may be entitled to Certified Treatment and Rehabilitative Credits (CTRP) by participating in education, job skill training, faith-based initiatives and treatment programs. These credits can be earned by a pre-trial detainee in a local facility. See Exhibit 3 B-04-003 Programs.

Here, Plaintiff alleges that once a pre-trial detainee is sentenced to hard labor, the application of certain time credits requires that the offender should be "immediately released," even though DPS&C would have no knowledge of the offender at that time. However, as required by Louisiana law, many steps must occur, and required documentation must be obtained, before DPS&C can release an offender.

The application of various credits lead to the anomaly that, when a pre-trial detainee spends months in a local facility awaiting trial or sentencing, by the time he is sentenced, he may appear on paper to be overdue for release because of the credits earned. However, in many instances, the offender is actually not "overdue" for release, and the DPS&C must ensure that he/she is not released early. For instance, if a detainee spends six months in a local facility, and then is sentenced to one year at hard labor, with good time credits and potential CTRP credits earned, on paper it may reflect that he was due for release prior to the time of sentencing and prior to the time that the DPS&C had any knowledge of his existence or custody of the detainee. Obviously, a pre-trial detainee cannot be released prior to the time he is sentenced. This hypothetical pre-trial detainee is not entitled to release prior to his sentence date, and presents the exact scenario that exemplifies why class certification is not appropriate here.

Not all inmates sentenced to hard labor are sent to the physical custody of DPS&C.[3] In fact, when an offender is sentenced to hard labor, DPS&C is not immediately notified of that fact.[4] After an inmate is sentenced to DPS&C time, local jails have a statutory obligation to send DPS&C the required paperwork on each offender. La. R.S.§ 15:566 tasks the local sheriff with providing proper paperwork to the DPS&C and notifying the DPS&C of transfers. It provides that the sheriff of the parish in which the prisoner has been convicted:

---

[3] Affidavit of Angela Griffin, attached as Exhibit 1, at para. 2.
[4] Exhibit 1, Affidavit of Angela Griffin, para. 2.

. . . [Sh]all deliver with the prisoner all documents and statements required by Article 892 ... of the Louisiana Code of Criminal Procedure.

\*\*\*

If said documents are not tendered with the prisoner, the Department of Corrections shall refuse delivery of said prisoner.[5]

Further, La. C.Cr.P. art. 892 lists documentation and information that must be transmitted by the sheriff to DPS&C.[6] This required paperwork, comprised of several pieces of documentation and information, is known as the "Pre-Class Packet." If the required paperwork listed in Article 892 is not provided DPS&C cannot calculate the release date for a pre-trial detainee sentenced to DPS&C time. Currently, there are 102 local jails across Louisiana. Obviously, given the numerous local jails and different procedures (or lack thereof) adopted by each jail or sheriff's office, individualized issues associated with the collection of necessary paperwork arise. Further, because of how the different offices operate, different delays and issues arise during this process.

Once DPS&C receives the Pre-Class Packet, DPS&C must verify that all required paperwork is included, must confirm the sentence is for hard labor, and confirm that the National Crime Information Center (NCIC) criminal history coincides with the disposition.[7] If any of the Pre-Class Packet information or documentation is missing or incomplete, DPS&C cannot perform

---

[5] La. R.S. 15:566. La. R.S.§ 15:706 also allows a sheriff to transfer prisoners to another parish when the jail is unsafe, unfit for detention, or otherwise presents a security risk. As an explicit condition of such transfers, the statute requires the transferring sheriff to notify either the court (for persons not under DPS&C sentence) or DPS&C (for persons under DPS&C sentence) of the transfer.

[6] The information that DOC receives from the local sheriff of the Parish of conviction is referred to as a "Pre-Class Packet," and must include: Basic Information and Interview for Local Jail Facilities Form; Credit for DPSC Commitment Form; Bill of Information; Uniform Commitment Order with Judges Signature; Suspect Rap Sheet with photo, State Identification Number (SID) and the Arrest Tracking Number (ATN) from the fingerprint for the conviction/disposition of the sentence from the Automated Fingerprinting Identification System; and DPSC Acknowledgements and Signature Statement signed by the inmate. Affidavit of Angela Griffin, para. 6.

[7] Exhibit 1, Affidavit of Angela Griffin, para. 8.

its time computation.[8] If any information is missing, DPS&C must track down the information, but is still at the mercy of other entities, such as a local jails or sheriff's office, to timely provide the information. Oftentimes, delays by these entities impact the processing of releases.[9]

Only once all of the information is received, the process of performing an offender's time computation can begin, which is detailed in the Release Clearing Checklist.[10] This process involves review of jail credits applicable for each sentence, sentence date, sentence start date, length of sentence for each charge, good time rate and parole eligibility for each charge, and whether an offender has time to serve on other sentences. DPS&C must also confirm whether the offender has warrants or charges without dispositions in Louisiana or out of state proceedings.[11] This requires obtaining the criminal history reports from State Police, FBI, or out of state criminal history.[12] In addition, an offender's State Police Rap Sheet must be cleared of all charges.  If the charges on the Rap Sheet do not show that they have been cleared or resolved and they remain open, then Pre-Class must call the Courts and District Attorneys to check every single arrest that does not have a disposition.[13]  While it is a burdensome process, it is imperative that all arrests and charges be cleared before the offender can be released.  Further, Pre-Class must also gather from the local Sheriff fingerprints from AFIS (Automated Fingerprint Identification System) to provide positive identification of the offender.

---

[8] Exhibit 1, Affidavit of Angela Griffin, para. 9.
[9] Exhibit 1, Affidavit of Angela Griffin, para. 9.
[10] Exhibit 1-A, Release Clearing Checklist.
[11] Exhibit 1, Affidavit of Angela Griffin, para. 11-12; Exhibit 1-A, Release Clearing Checklist.
[12] Exhibit 1, Affidavit of Angela Griffin, para. 13.
[13] Exhibit 1, Affidavit of Angela Griffin.

Only after all paperwork is received and verified can DPS&C release an inmate.[14] During this process, DPS&C relies on receiving paperwork and information from multiple entities, over which it has no authority or control, before an offender's time computation can even begin.

### B.    The DPS&C has continuously worked to address identified issues

Contrary to Plaintiff's conclusory arguments, DPS&C has worked diligently to address the issues outlined above. While DPS&C is not able to force third-parties to provide paperwork timely, its work to identify and address these issues is the antithesis of deliberate indifference. Some of these steps include:

- While Plaintiff incorrectly asserts that DPS&C "did nothing" following its internal review of time computation in 2016, known as the Six Sigma Project, a major outcome of the project was that DPS&C centralized its entire Pre-Class department. Instead of each state facility performing time computations, the entire department was revamped to include a centralized Pre-Class department.[15]

- In 2016, Leblanc requested a meeting with the Executive Director of the Clerks of Court Association, Debbie Hudnall, to address the delay in receiving paperwork and court documents. As stated by Plaintiff in his motion, Hudnall offered to send the court documents electronically to DPS&C simultaneous with the clerks sending the documents to the sheriff. However, after analyzing whether this would be feasible, it was determined that receiving piecemeal documentation from the clerk's office would only cause more confusion, as DPS&C needs the *entire* Pre-Class Packet from the sheriff in order to process time computation.[16] DPS&C did provide Hudnall with an analysis of average number of days DPS&C received Pre-Class information broken out by parish.

- In 2017, DPS&C cooperated with the legislator in reviewing time computation errors. DPS&C implemented a secondary review of every time computation, and conducts an additional random review of 25 time computations per month by each Pre-Class supervisor.[17]

- In 2019 DPS&C applied for a grant with the Department of Justice. DPS&C sought funds to assist with obtaining the documents required under the law to perform a time computation from the local jails after inmates were sentenced to DPS&C time.[18] In connection with this grant application, DPS&C prepared a spreadsheet of inmates in

---

[14] Exhibit 1, Affidavit of Angela Griffin, para. 14-15.
[15] Exhibit 1, Affidavit of Angela Griffin, para. 22.
[16] Affidavit of Angela Griffin, para 23.
[17] Affidavit of Angela Griffin, para. 24.
[18] Affidavit of Melanie Gueho, attached as Exhibit 2, at para. 4.

February 2019 who were released within seven days of their time computation. It was discovered later that this spreadsheet is not accurate and does not demonstrate inmates who were overdetained as Plaintiff alleges. While Plaintiff relies heavily on this pull document to support its case, the fact that DPS&C was (and is) working to address the issue is the antithesis of deliberate indifference.

- DPS&C is currently working with the Office of Technology Services (OTS), which is part of the Louisiana Division of Administration, to overhaul the information technology system of the DPS&C. The new system will replace all electronically-stored information of the Department of Corrections and initially will include a standalone time computation system which will eventually be integrated with the entire system referred to as Corrections Information Program and Records System ("CIPRS").[19]

### C.  Time computation process for the named Plaintiff, Joel Giroir

Plaintiff's complaint and the motion for class certification gives an improper and incomplete picture of the circumstances surrounding his time computation and release. As discussed above, each offender's time computation process will be different and unique. The following is a timeline of Giroir's specific time computation process.

- Giroir's probation was revoked and he was sentenced to one year hard labor on January 26, 2021.[20]
- DPS&C had no knowledge of this revocation or sentencing until February 12, 2021, 17 days after his sentencing date, when St. Tammany Parish emailed Giroir's Pre-Class Packet to the Pre-Class Department at Raymond Laborde Correctional Center at 11:05 am.[21]
- In accordance with the Pre-Class Intake, a Pre-Class employee, Joseph Bordelon, ran Giroir's criminal history on February 12, 2021. It was discovered that the Arrest Tracking Number (ATN) on Plaintiff's fingerprint rap sheet did not match the ATN on Plaintiff's criminal history. Bordelon called to notify St. Tammany Parish Jail of the discrepancy. Bordelon was transferred to the booking department, who advised that they would "re-book" Giroir on the charges and fax the corrected information once it was completed. Bordelon called St. Tammany Parish Jail two more times on February 12, 2021, but was not sent the updated information.[22]
- Due to an ice storm, all state offices in Avoyelles Parish were closed from February 15, 2021 through February 19, 2021. Once Bordelon was able to return to the office on

---

[19] Exhibit 5, Affidavit of Jonathon London.
[20] Exhibit 1, Affidavit of Angela Griffin para. 26. See also Giroir's Pre-Class Packet, attached to Angela Griffin's Affidavit as Exhibit 1-C.
[21] *Id.*
[22] *Id.*

February 22, 2021, he had received the requested updated information from St. Tammany Jail and was able to calculate Plaintiff's time that morning.[23]

- Bordelon sent the packet to DPS&C Headquarters at 8:22 am on February 22.[24]
- Jessica Smith at Headquarters received Giroir's packet at 8:22 am.  Smith then performed the following tasks necessary to process the release: (1) print and send submittal, clearance and residence plan to St. Tammany Parish Prison; (2) request criminal history to begin clearing release; (3) called Jefferson Parish Sheriff Office to determine whether Plaintiff had any active warrants or detainers; (4) called Orleans Municipal Court to check for active warrants or detainers; (5) obtain disposition of charges on criminal history sheet from St. Tammany; (6) updating information in CAJUN; (7) prepare release packet for signature; and (8) send final release packet to St. Tammany.[25]
- Giroir was released on February 22, 2021.[26]

The circumstances surrounding Giroir's sentencing and time computation are obviously unique to Giroir. Giroir has not shown any specific DPS&C policy that caused him to be released more than 48 hours after his sentencing. Likewise, he has not identified any policy that, if changed, would have resulted in his release any sooner.  Further, Giroir has not demonstrated that a change in any DPS&C policy would provide the relief request on behalf of the purported class. These unique issues specific to Giroir demonstrate why class certification is not appropriate here. To this point, a policy change that required Giroir's release within 48 hours of sentencing is impossible – DPS&C was unaware of Giroir until 17 days after sentencing.

### III.    Procedural Background

Plaintiff filed this suit on February 19, 2021, asserting class action allegations, seeking prospective injunctive and declaratory relief only, pursuant to Federal Rule of Civil Procedure 23(b)(2). Plaintiff alleges that he was entitled to "immediate release" when he was sentenced to one year in DPS&C custody, alleging that he was only required to serve 128 days of his one-year

---

[23] *Id*.
[24] *Id*.
[25] *Id*.
[26] *Id*.

sentence, and that he served 192 days in St. Tammany Parish jail prior to his sentence date. Three days after the suit was filed, Plaintiff was released.[27]

Plaintiff also makes broad sweeping and conclusory allegations that DPS&C has a policy and practice of "overdetaining" inmates who were eligible for release at the time of their sentencing. But Plaintiff identifies no specific policy that resulted in his untimely release or that, if changed, would have prevented the harm he alleges. Plaintiff admits that DPS&C must wait on the sheriffs to submit Pre-Classification packets to DPS&C before DPS&C can begin the time computation process, but concludes that Secretary Leblanc is deliberately indifferent in failing to adopt a general policy to "prevent overdetention." R.Doc.1, ¶ 89.

In April 2020, a similar purported class action complaint was filed in this court, entitled *Brian Humphrey v. James LeBlanc*, No. 20-cv-00233. In *Humphrey*, the named Plaintiff seeks to represent a class of "persons who have been sentenced to the custody of the DPS&C since April 16, 2019, and who were entitled to release at the time of their sentencing, but who were released by the DPS&C more than 48 hours past the time that they were sentenced."[28] The allegations in *Humphrey* are identical to the allegations in this suit - both complaints bring identical causes of action. The only difference in the two complaints is that the *Humphrey* action seeks monetary damages for claims arising one year before suit was filed seeking class certification pursuant to Rule 23(b)(1), while this suit seeks prospective injunctive and declaratory relief only.

On April 9, 2021, Defendants filed a Rule 12(b)(6) Motion to Dismiss Plaintiff's complaint. R.Doc. 17. In particular, Defendants argue that the broad injunctive relief requested (that Defendants "comply with Class Members' constitutional rights") was fatally overbroad to state a claim for injunctive relief. This is so because, as held by the Fifth Circuit, "[a] general request that Defendant be restrained from violating Plaintiffs' Fourteenth Amendment protections

---

[27] R.Doc. 17-2, Giroir's Certificate of Release.
[28] See R.Doc. 11, in Case No. 20-cv-00233.

is insufficient" to comply with Rule 23(b)(2). *Ward v. Hellerstedt,* 753 F. App'x 236, 249 (5th Cir. 2018). Importantly, Plaintiff has not, and cannot, identify a specific policy or procedure that, if changed, would prevent the harms alleged in this suit. The Rule 12 motion filed by Defendants is pending.

### IV.    Law and Argument

It is well settled that the district court must conduct a "rigorous analysis" of all of the requirements for certification under Rule 23. *Castano v. American Tobacco Co*., 84 F.3d 734, 740 (5th Cir. 1996)(citing *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147 (1982) ). Plaintiffs bear the burden of proving that those requirements are satisfied. *See* e.g. *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)(" Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule — that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.").

District courts have broad discretion in determining whether to certify a class, though it must "rigorously analyze" the prerequisites for class certification contained in Rule 23 before doing so. *Prantil v. Arkema Inc*., 986 F.3d 570, 574 (5th Cir. 2021) (quoting *Spence v. Glock, G.m.b.H*., 227 F.3d 308, 310 (5th Cir. 2000)). This analysis requires "the district court to go beyond the pleadings to determine whether the requirements of Rule 23 have been met: 'a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.'" *Id*. (quoting *Cole v. Gen. Motors Corp*., 484 F.3d 717, 724 (5th Cir. 2007)). A court cannot "merely 'review a complaint and ask whether, taking the facts as the party seeking the class presents them, the case seems suitable for class treatment.'" *Chavez v. Plan Benefit Servs., Inc.,* 957 F.3d 542, 46 (5th Cir. 2020).

The party seeking certification bears the burden of proof." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir.1996) (internal citations omitted). Federal Rule of Civil Procedure 23(a) requires a Plaintiff to prove all of the following: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

In addition to satisfying the four criteria set forth in Fed. R. Civ. P. 23(a), a Plaintiff seeking to certify a class must also satisfy the requirements of Fed. R. Civ. P. 23(b)(1), (2), or (3). *M.D. ex rel. Stukenberg*, 675 F.3d at 837. In this case, Plaintiff is seeking to have the proposed class action to be maintained under Rule 23(b)(2). R.Doc. 1, ¶ 66.

The United States Court of Appeals for the Fifth Circuit holds that the following three requirements must be satisfied before a class can be certified under Rule 23(b)(2): "(1) class members must have been harmed in essentially the same way; (2) injunctive relief must predominate over monetary damage claims; and (3) the injunctive relief sought must be specific." *Ward v. Hellerstedt,* 753 F. App'x 236, 249 (5th Cir. 2018) (internal citations omitted). "[S]atisfaction of these requirements is premised on common behavior by the defendant toward the class, as opposed to the presence of common issues." *Id*. Class members are "'harmed in essentially the same way' where they have each been subject to the same allegedly wrongful *policy*, despite variations in the degree of damages suffered by each." *Id*. With respect to the Rule 23(b)(2) requirement that the injunctive relief sought be specific, the Fifth Circuit has recognized that Plaintiffs must "give content to the injunctive relief they seek so that final injunctive relief may be crafted to describe in reasonable detail the acts required." *Yates*, 868 F.3d at 367. Plaintiff must be able to explain "how a court could define or enforce meaningful injunctive relief." *Maldonado*,

493 F.3d at 525. Therefore, to comply with Rule 23(b)(2), Plaintiffs will, at minimum, have to describe in some kind of detail from what actions or inactions Defendants should be restrained. *Ward v. Hellerstedt,* 753 F. App'x 236, 249 (5th Cir. 2018).  In particular, a general request that Defendants be retrained from violating Plaintiff's constitutional rights is insufficient. *Id.*

Here, Plaintiff has not and cannot identify a specific policy that has harmed the putative class members in the same way, or that, if changed, would provide class wide relief. Plaintiff only generally alleges that Defendants be enjoined from violating Plaintiff's constitutional rights. R.Doc. 1, ¶ 82. Because Plaintiff fails to meet the specificity requirements of Rule 23(b)(2) class, this matter can be disposed of without even analyzing the Rule 23(a) factors. As such, defendant will address Rule 23(b)(2) first.

### A.    Plaintiff fails to meet the requirements of Rule 23(b)(2)

Rule 23(b)(2) provides that class certification is appropriate where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed.R.Civ.P. 23(b)(2). By its terms, then, Rule 23(b)(2) imposes two independent but related requirements. In the first place, the Defendants' actions or inactions must be based on grounds generally applicable to all class members. The latter half of Rule 23(b)(2) requires that final injunctive relief be appropriate for the class as a whole. The rule therefore authorizes an inquiry into the relationship between the class, its injuries, and the relief sought, and courts have interpreted the rule to require that a class must be "amenable to uniform group remedies." *Shook v. Bd. of Cty. Commissioners of Cty. of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008). Put differently, Rule 23(b)(2) demands a certain cohesiveness among class members with respect to their injuries,

the absence of which can preclude certification. *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir.2007).

This cohesiveness has at least two aspects. First, the class must be sufficiently cohesive that any class-wide injunctive relief can satisfy the limitations of Federal Rule Civil Procedure 65(d)—namely, the requirement that it "state its terms specifically; and describe in reasonable detail ... the act or acts restrained or required." Fed.R.Civ.P. 65(d)(1); *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007). Second, "[a] class action may not be certified under Rule 23(b)(2) if relief specifically tailored to each class member would be necessary to correct the allegedly wrongful conduct of the defendant." *Shook v. Bd. of Cty. Commissioners of Cty. of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008). So, if redressing the class members' injuries requires time-consuming inquiry into individual circumstances or characteristics of class members or groups of class members, "the suit could become unmanageable and little value would be gained in proceeding as a class action." *Id.* at 604. Further, individual issues cannot be avoided simply by formulating an injunction at a stratospheric level of abstraction because "injunctions simply requiring the defendant to obey the law are too vague to satisfy Rule 65." *Id.*

In addition, in the context of "overdetention" class actions, many courts have held that a Plaintiff must challenge a specific policy, and not simply the length of delay to satisfy Rule 23(b)(2). See *Otero v. Dart*, 301 F.R.D. 276, 281 (N.D. Ill. 2013)(finding that Plaintiff failed to meet requirements of Rule 23(b) where "[p]laintiff's motion for class certification also focused largely on the unreasonable delay in the release of acquitted detainees, rather than challenges to any specific detention procedures applied to them irrespective of the time those procedures took.") citing *Harper v. Sheriff of Cook County*, 581 F.3d 511 (7th Cir.2009) and *Portis v. City of Chicago*, 613 F.3d 702 (7th Cir.2010).

### 1.  The proposed class definition is based on flawed legal premise

At the outset, Plaintiff's entire case is based on the flawed theory that DPS&C would legally be obligated to release an offender, whom it has no knowledge of, within 48 hours after sentencing, or further that injunctive relief requiring release of all detainees within 48 hours of sentencing is even permissible. In the situation before this Court, where an offender is in the custody of the sheriff until the date of sentencing, DPS&C has no knowledge of the existence, identity, or length of detention of offenders until the local sheriffs transfer the offender and/or provide the necessary paperwork. Therefore, where a sheriff, over whom DPS&C has no control, delays notifying DPS&C of the existence of an offender sentenced to hard labor for more than 48 hours, Plaintiff's theory would hold DPS&C liable for alleged overdetention, even before DPS&C could legally release an offender.

In the specific example of named Plaintiff Joel Giroir, he was sentenced on January 26, 2021. However, DPS&C had no knowledge that Giroir was sentenced to hard labor until his Pre-Class Packet was transmitted to DPS&C on February 12, 2021. Therefore, by the time DPS&C was aware of Giroir's sentence, Giroir was incarcerated more than 48 hours past his sentencing date. Plaintiff cites to no authority to hold DPS&C liable for delays caused by third-parties. Likewise, there is no DPS&C policy that could even prevent this exact series of events from occurring.

In addition, the entire basis of the class definition is premised on an incorrect legal standard regarding release within 48 hours of sentencing. Plaintiff relies on *McLaughlin* for the proposition of a "bright line" 48-hour limit for the purpose of due process. *McLaughlin* stands for no such proposition. In *Mclaughlin*, arrestees brought suit alleging the county violated the Fourth Amendment by failing to provide prompt judicial determination of probable cause to persons

arrested without a warrant. *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 56, 111 S. Ct. 1661, 1670, 114 L. Ed. 2d 49 (1991). The Court was tasked with articulating the boundaries of what is permissible under the <u>Fourth Amendment</u> in relation to the *Gertsien* court's holding that "warrantless arrests are permitted but persons arrested without a warrant must promptly be brought before a neutral magistrate for a judicial determination of probable cause." The court held that "we believe that a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*." *Id.* at 56.

The *McLaughlin* decision is not applicable here for many reasons, including: (1) *McLaughlin* concerned a pre-trial detainee's rights to a probable cause hearing following a warrantless arrest; (2) *McLaughlin* analyzed a pre-trial detainee's rights under the <u>Fourth Amendment</u>, not the Due Process violations alleged here; (3) the pre-trial detainees in *McLaughlin* remained in the jailer's custody from the point of arrest, which began the 48-hour time period; and (4) the jailer was not held liable for delays caused by third-parties.

The flawed class definition attempts to impose liability if an inmate is not released within 48 hours after sentencing, regardless if DPS&C was aware of the inmate's sentencing to hard labor. Plaintiff's reliance on *McLaughlin* for a bright-line 48-hour rule is misplaced; there is no bright line rule for due process where any alleged delay in release is caused by entities which DPS&C has no control. In fact, the Western District recently refused to hold DPS&C liable for delays caused by the sheriff's offices, only analyzing the time it took DPS&C to process a release from the time period after DPS&C received the Pre-Class Packet. *Joseph Babineaux, et. al v. Mark Garber, et al.*, Western District of Louisiana, 18-cv-00233, R.Doc. 64, attached as Exhibit 4.

Further, a question of liability cannot be used to define the class; this would result in a "fail-safe" class defined in such a way that each class member "either wins, or by virtue of losing,

is defined out of the class and is therefore not bound by the judgment." *Messner v. Northshore Univ. Health System*, 669 F.3d 802, 825 (7th Cir. 2012). As such, the flawed purported class definition constitutes an improper fail-safe definition.

The problems with Plaintiff's improper class definition further show that certification under Rule 23(b)(2) is improper, as Plaintiff cannot show all purported members were harmed by the same acts, or that any specific policy of DPS&C caused the harm alleged.

### 2. Plaintiff cannot show any specific policy that, if changed, would have prevented the harm alleged

Under Rule 23(b)(2) class actions, the injunctive relief request must be specific, and the request must be one that courts can define and/or enforce meaningful injunctive relief that would allow class-wide relief. Here, Plaintiff fails to meet these requirements.

In *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007), Plaintiffs, uninsured patients that sought treatment from Ochsner, sought to certify a Rule 23(b)(2) class. Plaintiffs sought an injunction requiring Ochsner, in part, to provide them with "mutually affordable health care" and to cease and desist charging them a higher amount than that charged to insured patients. *Id*. at 24. The Fifth Circuit noted that in order to meet the requirements for Rule 23(b)(2), a request for an injunction must be specific. The Court found that Plaintiffs had difficulty specifying exactly what they sought from an injunction, which highlighted that individual issues overwhelm class cohesiveness. These individualized issues included the amounts the patients were charged, the discounts varied depending on insurance carrier, and the class members varied because Ochsner offered discounts to uninsured patients. As such, Plaintiffs were "unable to explain how a court could define or enforce meaningful injunctive relief."[29]

---

[29] Compare, for example, *Tellis v. LeBlanc*, No. CV 18-541, 2021 WL 4267513, at *2 (W.D. La. Sept. 20, 2021), in which Plaintiffs identified and introduced many specific policies and

In this case, Plaintiff seeks the following injunctive relief: "requiring Defendants to take the steps necessary to ensure timely releases" and establish procedures to prevent all overdetention and to calculate sentences and release persons within a time not to exceed 48 hours, for all persons sentenced to the custody of the DPS&C who are eligible for immediate release upon sentencing." R.Doc. 25-1, p. 20. It does not specify the "steps" requested or required, what "procedures" could accomplish this relief, or how this could be implemented or enforced.

Because this lacks specificity, it would be impossible for a court to define injunctive relief as requested here. In fact, based solely on these allegations, it would be impossible for this Court to craft any injunctive relief that would comply with Rule 23(b)(2). As discussed at length above, DPS&C is not aware of those offenders who are eligible for immediate release until the sheriff provides DPS&C with the paperwork required under Article 892. DPS&C has no authority over each individual sheriff's office or local jail, and cannot promulgate a policy to require a third party to provide DPS&C with the necessary paperwork.

DPS&C was not aware that Giroir had been sentenced to hard labor at his January 26 hearing until the St. Tammany sheriff sent DPS&C Giroir's Pre-Class Packet 17 days later. As such, the injunctive relief requested here would not have even provided the named Plaintiff with the relief he seeks, as DPS&C could not release Giroir within 48 hours of his hearing date where DPS&C was not aware of Giroir's status as a potential "immediate release" until 17 days after his sentence was imposed.

In addition, as described above, DPS&C faces the problem that once the Pre-Class Packets are received from the sheriff, in many instances those packets are missing information. DPS&C is

---

procedures, including through the use of expert testimony, to establish specific injunctive relief requested under Rule 23(b)(2).

then required to obtain that information before time computation can begin. DPS&C again is at the mercy of 57 different sheriff's offices and 102 local jail facilities and courts across Louisiana.

As such, this Court cannot fashion injunctive relief to release an offender within 48 hours of sentencing where: (1) DPS&C has no knowledge of, and cannot release an offender, until the Pre-Class Packet is received; (2) DPS&C has no authority or control over sheriff's offices to provide the Pre-Class Packets within 48 hours of sentencing; and (3) DPS&C has no authority or control over sheriff's office to provide **all** necessary paperwork required under Article 982 within 48 hours.

In *Ontero v. Dart*, the Illinois Eastern District court analyzed "overdetention" cases in relation to class certification. 301 F.R.D. 276 (N.D. Ill. 2013). In that case, plaintiff asserted that the sheriff's unlawful detention policy and continued detention after his acquittal violated 42 USC §1983. The court noted that numerous courts refuse to certify overdetention class actions where the only complaint is the alleged unreasonable amount of delay, because reasonableness of delay necessarily implicates individualized issues. While Plaintiff argued that he alleged violations of specific detention procedures, the court held:

> Although Plaintiff alleges generally in the Complaint that Defendants subjected him and other class members to unlawful policies that "result[ed] in class members being detained for unreasonable amounts of time and in an unreasonable manner," most of Plaintiff's allegations focus on the allegedly unreasonable delay in his release, rather than the constitutionality of any specific detention procedures.
> …
> Plaintiff's motion for class certification also focused largely on the unreasonable delay in the release of acquitted detainees, rather than challenges to any specific detention procedures applied to them irrespective of the time those procedures took or the time they added to an acquitted detainee's detention…
>
> Plaintiff attempts to distance his claims from pure "overdetention" claims in his reply brief in order to distinguish this case from Harper and Portis by arguing that he "is not claiming that the mere length of his or any other class member's detention was unreasonable.... Rather, Plaintiff challenges specific aspects of Defendants' release procedures (or lack thereof) that applied equally to all class members and

which, collectively, create an unconstitutional policy or practice."…The allegations in the Complaint, Plaintiff's broad proposed class, and even his arguments in his opening brief, however, undermine Plaintiff's purported new position. Like in Harper, Plaintiff fails to explain how any of the specific detention procedures he challenges are unconstitutional "unless [they] take[ ] an unreasonable amount of time or [are] done in some unreasonable manner."

*Id*. at 282. The same fatal problems exist here. Plaintiff does not allege a specific policy, other than a general policy of overdetention. Further, Plaintiff does not identify that a change in any specific policy would provide the relief sought here. Instead, Plaintiff complains about the alleged unreasonable amount of delay, which necessarily contemplates individualized issues.[30]

Plaintiff seeks a vague injunction for DPS&C to "take steps" to ensure timely releases. There is no content and no specificity as to what steps DPS&C could possibly take to receive paperwork from third parties within 48 hours of sentencing. As such, Plaintiff fails to meet the requirements of Rule 23(b) and class certification should be denied.

### B. Plaintiff fails to meet requirements of Rule 23(a)

As explained by the Fifth Circuit, "Rule 23 governs whether a proposed class falls within the limited exception to 'the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Ibe v. Jones*, 836 F.3d 516 (5th Cir. 2016). "Four prerequisites must be met by all classes: numerosity, commonality, typicality, and adequacy of representation." *Ibe*, 2016 WL 4729446, at *7, quoting Fed. R. Civ. P. 23(a).

---

[30] Compare for example, *Yates v. Collier*, 868 F.3d 354, 368 (5th Cir. 2017). In Yates, Plaintiffs sought to certify a Rule 23(b)(2) class seeking the following injunctive relief: "[E]njoin Defendants to maintain a safe indoor apparent temperature (e.g., maintaining a heat index of 88 degrees or lower) inside each of the Pack Unit's housing areas (calculated using the NWS heat index table)." While the court noted that the request to "maintain a safe indoor apparent temperature" offered little content, the Plaintiffs identified specific relief reasonable detail but including "maintaining a heat index of 88 degrees or lower."

### 1. Plaintiff failed to demonstrate that numerosity is met

Under Rule 23(a)(1), certification is only appropriate where "the class is so numerous that joinder of all members is impracticable." "[A] Plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members." *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981). This court, however, has repeatedly noted that "the number of members in a proposed class is not determinative of whether joinder is impracticable." *In re TWL Corp.*, 712 F.3d 886, 894 (5th Cir. 2013) (quoting *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999)). Rather, "a number of facts other than the actual or estimated number of purported class members may be relevant to the 'numerosity' question; these include, for example, the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each Plaintiff's claim." *Zeidman*, 651 F.2d at 1038.

To establish numerosity, Plaintiff solely relies on the "February 2019 Pull Document" to argue that "more than 200 individuals were overdetained in a single month." R.Doc. 25-1, p. 11. However, the February 2019 Pull Document is not a list that identifies DPS&C prisoners who were "overdetained." The pull document compiled a list of individuals who were released in February 2019 within seven days of their time computation.[31] The February 2019 Pull Document was created to give some data points to the federal government for a grant application; it was not intended for any other purpose, nor was it intended to be recreated in litigation years later. The pull document does not give any information as to the specific circumstances surrounding each's inmate's time computation or release.[32] Any potential issues with an inmate's release are specific

---

[31] Exhibit 2, Affidavit of Melanie Gueho.
[32] *Id*. at para. 20.

to each particular inmate.[33] Thus, without more analysis and information, the original pull document does not reflect "overdetention" data as Plaintiff asserts.

After this suit was filed, to better understand the February 2019 Pull Document, Angela Griffin, a Program Manager within the Pre-Classification Department, started to review the document and cross reference the data with the Pre-Class record for each inmate on the list.[34] For many entries on the list, the inmates had substantial time to serve with DPS&C upon sentencing.[35] In other words, the inmates would not be entitled to "immediate release." Further, some entries did not match with the circumstances surrounding release, as some inmates were sentenced under two docket numbers.[36] In reviewing the document and associated paperwork, Ms. Griffin created a "Modified Pull Document" which she created with new headings and added notes that reflected her review.[37]

In comparing the February 2019 Pull Document to the Modified Pull Document, it is clear that the February 2019 Pull Document does not provide a list of "overdetained" inmates. For example, of the first 25 inmates on the Pull Document, 14 of those inmates owed time at sentencing. As such, those inmates would not be entitled to "immediate release." Plaintiff's "estimate" of individuals that would meet the class definition is flawed. In addition, Plaintiff has not demonstrated that the class size can be easily identified.[38] As such, numerosity is not satisfied.

---

[33] Exhibit 1, Affidavit of Angela Griffin, para. 20; Exhibit 2, Affidavit of Melanie Gueho, para. 11.
[34] Exhibit 1, Affidavit of Angela Griffin, para. 16.
[35] *Id*. at para. 18.
[36] *Id*. at para. 19.
[37] *Id*. at para. 17.
[38] Compare *Tellis v. LeBlanc*, No. CV 18-541, 2021 WL 4267513, at *2 (W.D. La. Sept. 20, 2021) in which Plaintiffs satisfied numerosity by offering the actual current population of the prison, not a number extrapolated by a two-year-old document that bears no resemblance to the class Plaintiff seeks to certify.

### 2.    Plaintiff cannot show common questions of law or fact

Rule 23(a)(2)'s commonality requirement demands more than the presentation of questions that are common to the class because "'any competently crafted class complaint literally raises common questions.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011). Further, the members of a proposed class do not establish that "their claims can productively be litigated at once," merely by alleging a violation of the same legal provision by the same defendant. *Id*. ("[T]he mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once.").

In this case, given the time computation process, the numerous courts, clerks and sheriffs involved for each offender, and the myriad of issues the DPS&C could encounter in any given release, the individualized issues preclude a finding of commonality. As discussed at length above, there could be numerous reasons why an inmate was not released within 48 hours of his sentencing, which could include delay in receiving paperwork from the sheriff, missing information required to perform time computation, or various issues encountered during the release process. Any alleged delay would necessarily turn on individual issues. See *Lopez v. Brown*, 217 Cal. App. 4th 1114, 1127, 159 Cal. Rptr. 3d 86, 94 (2013)(upholding the district court's finding that Plaintiff failed to provide evidence of a policy that caused overdetention which could be the basis for classwide adjudication on liability, finding that even if Plaintiff could establish Defendants' liability based on the unique and individualized facts that gave rise to his overdetention, that liability determination would not operate to adjudicate liability of Defendants to the putative class members).

Clearly, not every time computation process for each putative class member will look like Giroir's process. The specific 17-day delay associated with St. Tammany providing necessary

paperwork, the information missing from Giroir's Pre-Class Packet, which required St. Tammany to "re-book" Giroir, and an ice storm in Louisiana that closed state offices demonstrates that issues of fact and law will not be common among potential class members.

Plaintiff's attempt to impose liability on DPS&C for any release after 48 hours, despite the fact that DPS&C would have no knowledge or control over the release of an offender in some instances well past the 48 hour period, cannot circumvent his burden to show commonality. It cannot be disputed that each purported class member will have individual issues, and potentially different reasons for the alleged delay. As such, commonality is not satisfied.

### 3. Typicality

For the same reasons explained above, Plaintiff fails to meet the typicality requirement. While Plaintiff argues that "liability in this case is not dependent upon…individual circumstances," this argument is without merit. As shown above, the alleged delays are potentially caused by numerous issues. Plaintiff cannot rely on an alleged "pattern" of overdetention where DPS&C relies on 57 different sheriffs to provide necessary paperwork. In Giroir's case, alleged delay caused by an ice storm in Louisiana is atypical from any other purported class members. Accordingly, for the purpose of showing that Plaintiff failed to establish the element of typicality, Defendants herein adopt all their arguments set forth in the immediately preceding subsection regarding commonality.

### 4. Adequacy

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." The named Plaintiff, Giroir, cannot adequately represent the unnamed members of the class where he cannot identify injunctive relief that would provide the requested relief to the entire class. Further, no policy could prevent delay caused by an ice storm in Louisiana. As such, Giroir is not an adequate representation of the purported class.

### 5.  Ascertainability

The problem with Rule 23's requirement of ascertainability here stems from Plaintiff's improper class definition, and the lack of specific injunctive relief requested, discussed in section IV(A)(3), *supra*. Plaintiff's argument that the class can be determined by answering whether the individual was entitled to release at the time of their sentencing and whether the individual is being detained for than 48 hours past their sentencing is not supported. Other questions that would require answers include: (1) when did DPS&C receive the inmate's Pre-Class Packet for each purported class member?; (2) did DPS&C receive a complete packet with all necessary information?; (3) did the inmate have other pending charges that must be cleared prior to release?; (4) did the inmate have a detainer in another matter?; (5) were there other impediments to processing time computation?

Because it would be impossible to require DPS&C to process time computation within 48 hours where DPS&C is not aware of these offenders within 48 hours, ascertaining the purported class members is also impossible.

## V.  Conclusion

For all of these reasons, the Court should deny Plaintiff's Motion to Certify Class.

Respectfully submitted,

JEFF LANDRY
Attorney General

By:   /s/ Christopher K. Jones
Andrew Blanchfield, T.A. (#16812)
Email: ablanchfield@keoghcox.com
C. Reynolds LeBlanc (#33937)
Email: rleblanc@keoghcox.com
Christopher K. Jones (#28101)
Email: cjones@keoghcox.com
Chelsea A. Payne (#35952)
Email: cpayne@keoghcox.com
Special Assistant Attorneys General
701 Main Street (70802)
Post Office Box 1151
Baton Rouge, Louisiana 70821
Telephone: (225) 383-3796
Facsimile: (225) 343-9612

## CERTIFICATE OF SERVICE

I hereby certify that I have this date electronically filed the foregoing with the Clerk of Court by utilizing the CM/ECF system, and a copy of the above and foregoing was this day forwarded by the Court's ECF Delivery System to all counsel of record.

Baton Rouge, Louisiana, this 1st day of October, 2021

    /s/ Christopher K. Jones
    CHRISTOPHER K. JONES