# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
February 1, 2022
Lyle W. Cayce
Clerk

No. 21-30230

Rodney Grant,

*Plaintiff—Appellee*,

*versus*

James LeBlanc,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:17-CV-2797

Before Barksdale, Engelhardt, and Oldham, *Circuit Judges*.

Per Curiam:[*]

  Underlying this interlocutory appeal is Rodney Grant's pleading guilty in 2016 to an offense committed in 2000. He was sentenced by a Louisiana state court to time already served for an offense in 2008, for which he was on parole in 2016, after being incarcerated for the 2008 offense from 2008 to 2015. Rather than being promptly released after receiving the time-

---

[*] Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

**EXHIBIT 1**

served sentence, however, Grant was detained another 27 days. Regarding that overdetention, this interlocutory appeal by Louisiana Department of Public Safety & Corrections (DPSC) Secretary James LeBlanc from the denial of summary judgment concerns, despite several pending claims by Grant, only whether the Secretary is entitled to qualified immunity against Grant's federal and state due-process claims. Because Grant fails to show the Secretary, in his individual capacity, violated those claimed due-process rights by overdetention, he is entitled to such immunity. REVERSED; RENDERED; and REMANDED.

I.

After being arrested in 2000 for simple burglary, Grant was released because, as the parties agree, a bill of information was not timely filed. On the other hand, his arrest warrant for that offense remained outstanding after his release.

From 2008 to 2015, Grant was incarcerated for committing a burglary in 2008 (2008 crime). In 2015, he was released on parole for the remainder of his sentence for the 2008 crime.

While on parole in 2016, Grant's arrest warrant for the 2000 offense was flagged. Because that warrant had remained outstanding after his release 16 years earlier, he was arrested on 27 June and detained at Orleans Parish Prison (OPP).

Three days after being arrested, he pleaded guilty on 30 June to the 2000 simple-burglary charge (2000 crime) and was sentenced to one-year's imprisonment, with credit for the time served from 2008 to 2015 for the 2008 crime. In the light of this time-served sentence, the judge presiding (sentencing judge) spoke with an attorney for the Orleans Parish Sheriff's Office (OPSO) and requested expedited processing for Grant.

On 7 July, seven days after Grant's sentencing, DPSC received Grant's pre-class packet, described below, from OPSO, pending Grant's transfer from OPP to a DPSC facility on 12 July. In that regard, Louisiana law requires sheriffs having custody of an individual to: prepare certain documents concerning that individual; and transmit the documentation to DPSC when that individual is transferred to DPSC custody. LA. CODE CRIM. PROC. ANN. art. 892.

Until that documentation is transmitted to DPSC, it has no notification of an individual's being in custody. DPSC refers to this documentation as a "pre-class packet". Along that line, the above-cited code provision requires sheriffs and court clerks to transmit the individual's indictment or bill of information to DPSC. *Id.*

Pertinent to this interlocutory appeal, DPSC uses pre-class packets to, *inter alia*, calculate an inmate's release date. Relevant to Grant's time-served sentence for the 2000 crime, and, when it was imposed, his being on parole for the 2008 crime, "Louisiana clearly requires automatic parole revocation when a parolee is convicted of a felony in Louisiana". *Pickens v. Butler*, 814 F.2d 237, 240 (5th Cir. 1987) (citing LA. STAT. ANN. § 15:574.10) (emphasis omitted). As a result, the parolee is returned to DPSC custody and must serve the remainder of his sentence. LA. STAT. ANN. § 15:574.10.

For this reason, DPSC relies on pre-class packets to determine whether an inmate has violated previously-ordered parole. Accordingly, and as also relevant here, the Secretary contends: An inmate's charging document "is crucial for time-calculation and release-clearing purposes, because when the criminal conduct [occurred]—not when the offender was convicted—can affect parole".

Grant's pre-class packet, received by DPSC on 7 July before Grant's transfer on 12 July from OPP to DPSC custody, did not include his bill of

information. Although DPSC noted Grant was sentenced to time served for the 2000 crime (simple burglary), it was concerned that Grant could have violated parole for his 2008 crime by virtue of pleading guilty in June 2016 to the 2000 crime. If Grant had violated his parole, he would have remained in DPSC custody—not released—to complete the remaining term of his sentence for his 2008 crime. Therefore, DPSC placed him on a "parole hold" until it could verify his parole-status upon receiving the missing bill of information.

On 15 July, three days after Grant's transfer to a DPSC facility and 15 days after receiving the time-served sentence for his 2000 crime, Grant remained incarcerated. Grant contends an acquaintance, concerned about Grant, contacted the sentencing judge, who in turn called a sheriff and warden to inquire about Grant's release.

In addition, the sentencing judge held a hearing on 18 July, vacated Grant's sentence for his 2000 crime, and again resentenced him to time served for that simple-burglary offense.

DPSC still failed, however, to release him. The sentencing judge subsequently contacted two DPSC employees to inquire about Grant's release. DPSC officials explained: Grant was on a parole hold; and it had not received Grant's bill of information from the court clerk.

DPSC asked the sentencing judge on 25 July to provide a photo of Grant's bill of information; the judge did so using her cell phone. After DPSC received a copy of Grant's bill of information from the sentencing judge, another arrived the next day from the Orleans Parish Clerk of Court. On 27 July, 27 days after imposition of Grant's 30 June original time-served sentence for his 2000 crime, he was released from custody after DPSC confirmed he had not violated his parole for his 2008 crime.

No. 21-30230

Grant filed this action in April 2017 against, *inter alia*, Secretary LeBlanc. Grant claims, *inter alia*, the Secretary violated: the Fourteenth Amendment (due-process claim under 42 U.S.C. § 1983); and Article I, Section 2 of the Louisiana Constitution (due process). (Grant filed other claims against the Secretary: false imprisonment; negligence; failure to intervene; *Monell* supervisory liability; *respondeat superior*; and indemnification. These claims are not at issue in this interlocutory appeal, having either been dismissed or not presented in this appeal, which concerns only the Secretary's having been denied qualified immunity for the federal and state due-process claims.)

Grant filed an amended complaint in June 2017. Approximately two weeks later, the Secretary moved to, *inter alia*, dismiss the federal due-process claim, contending qualified immunity applied. In March 2018, the district court concluded Grant failed to show the Secretary acted objectively unreasonably in the light of clearly-established law; but, rather than awarding qualified immunity, granted leave for Grant to submit a Federal Rule of Civil Procedure 7(a)(7) reply.

Instead, Grant filed a second amended complaint that April, claiming, *inter alia*, the Secretary, in his individual capacity, violated Grant's federal and state due-process rights by, as a supervisory official, failing to adopt policies, and train subordinates, to prevent overdetention. Two weeks later, the Secretary moved to dismiss, *inter alia*, the federal due-process claims, again based on qualified immunity. That August, the court denied the motion, ruling Grant pleaded sufficient facts to overcome the Secretary's qualified-immunity defense.

Following the August 2018 denial of the Secretary's motion to dismiss, the parties engaged in extensive discovery (excluding a six-month stay ordered in 2019), with trial set for April 2020. The parties exchanged

written discovery, took depositions, and filed related motions not relevant here.

In February 2020, Grant and the Secretary filed cross-motions for summary judgment. Grant requested such relief on his false-imprisonment and Fourteenth Amendment due-process claims; the Secretary, on the remaining claims against him. As relevant here, in March 2021, the court denied: Grant's motion; and the Secretary's motion on the federal and state due-process claims, concluding he was not entitled to qualified immunity. As a result, several claims remain against the Secretary, including, *inter alia*, Grant's federal and state due-process claims, and a false-imprisonment claim.

## II.

For this interlocutory appeal, the Secretary maintains qualified immunity shields him from liability, in his individual capacity, against the claims that he violated Grant's federal and state due-process rights by failing to promulgate policy, and train subordinates, to prevent overdetention. (As reflected above, other claims, not at issue in this appeal, remain against the Secretary.)

The Secretary contends the court erred in denying him qualified immunity because: he did not violate Grant's due-process rights; and, in the alternative, the Secretary's conduct was not objectively unreasonable in the light of clearly-established law. Grant counters, *inter alia*, that our court lacks jurisdiction to consider these challenges.

### A.

The threshold issue is whether our court has jurisdiction under 28 U.S.C. § 1291 (review of final decisions). In challenging jurisdiction, Grant contends this interlocutory appeal: presents only factual disputes,

No. 21-30230

including, *inter alia*, whether the Secretary was aware of a past pattern of overdetention; and, therefore, does not constitute an appealable final decision.

It goes without saying that interlocutory appeals "are the exception, not the rule". *Johnson v. Jones*, 515 U.S. 304, 309 (1995). An interlocutory decision is appealable, however, if it "finally determine[s] claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated". *Mitchell v. Forsyth*, 472 U.S. 511, 524–25 (1985) (citation omitted). In that respect, it is more than well-established that the denial of qualified immunity is an immediately appealable collateral order, *id.* at 530, but, only if the challenge "concerns the purely legal question whether the [movant is] entitled to qualified immunity on the facts", *Armstrong v. Ashley*, 918 F.3d 419, 421–22 (5th Cir. 2019) (citation omitted).

Accordingly, it is also more than well-established that this "significantly limited" jurisdiction does not include review of mere factual disputes. *Kinney v. Weaver*, 367 F.3d 337, 346–47 (5th Cir. 2004) (en banc). On the other hand, our court may "review the *materiality* of any factual disputes, but not their *genuineness*". *Blake v. Lambert*, 921 F.3d 215, 219 (5th Cir. 2019) (emphasis in original). In that respect, if defendant's appeal "hinges on . . . factual disputes being resolved in his favor", it challenges genuineness. *Winfrey v. Pikett*, 872 F.3d 640, 644 (5th Cir. 2017). A fact is "material" if it "might affect the outcome of the suit under governing law". *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A material-fact dispute "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party". *Anderson*, 477 U.S. at 248.

No. 21-30230

For the following reasons, the Secretary's challenges do not rely on our resolving factual disputes in his favor. *See id.* Instead, his interlocutory appeal concerns questions of law, over which our court has jurisdiction. *Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013) (whether, "plaintiff has alleged a violation of a [clearly-established] constitutional or statutory right"); *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 392 (5th Cir. 2000) (whether, in the light of that clearly-established right, defendant's conduct was objectively unreasonable); *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 379 (5th Cir. 2005) (whether supervisor's conduct was objectively unreasonable because he acted deliberately indifferent). Although the district court concluded, "there are genuine issues of material fact", this alone, of course, does not deprive our court of jurisdiction for our below-discussed *de novo* review. *E.g.*, *Behrens v. Pelletier*, 516 U.S. 299, 312–13 (1996); *Cunningham v. Castloo*, 983 F.3d 185, 190 (5th Cir. 2020).

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Bishop v. Arcuri*, 674 F.3d 456, 460 (5th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)). And, as reflected above, a summary-judgment decision, including denial of qualified immunity, is reviewed *de novo*. *E.g.*, *Lytle v. Bexar Cnty.*, 560 F.3d 404, 409 (5th Cir. 2009).

For such *de novo* review, we apply the same standard as did the district court. *E.g.*, *Bishop*, 674 F.3d at 460. Accordingly, our court "[is] required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion". *Lytle*, 560 F.3d at 409 (quotation omitted). Based on our *de novo* review of a summary-judgment decision denying qualified immunity, if defendant is instead entitled through this lens to such immunity, "any disputed fact issues are not material, the district court's denial of summary judgment was improper, and we must

8

reverse; otherwise, the disputed factual issues are material and we lack jurisdiction over the appeal". *Id.*

Grant's contention that our court lacks jurisdiction fails. As noted above, and discussed further in part II.B., this interlocutory appeal presents only legal questions over which our court has jurisdiction. In other words, there are no genuine disputes of material fact. And, as also detailed below, including, as required, viewing the facts and drawing all reasonable inferences in Grant's favor, the Secretary is entitled to qualified immunity. *See Cunningham*, 983 F.3d at 190 (concluding jurisdiction existed over interlocutory appeal challenging summary-judgment denial of qualified immunity). Because our court has jurisdiction over this interlocutory appeal, we turn to why the Secretary is entitled to qualified immunity.

B.

As discussed *supra*, the Secretary's interlocutory appeal pertains to both federal and Louisiana-state due-process claims. The same legal standards governing qualified immunity apply to both claims. *Burge v. Par. of St. Tammany*, 187 F.3d 452, 482 (5th Cir. 1999).

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). "When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law". *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quotation omitted). Therefore, when defendant invokes the defense, the burden rests on plaintiff to rebut it. *E.g.*, *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam).

As reflected above, the existence of qualified immunity *vel non* requires considering two questions: whether defendant "violated a statutory

or constitutional right", *al-Kidd*, 563 U.S. at 735; *and*, whether his "actions were objectively unreasonable in [the] light of clearly established law at the time of the violation", *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011). As noted, Grant must satisfy each prong. In that regard, we have discretion to address either prong first. *Mayfield v. Currie*, 976 F.3d 482, 486 (5th Cir. 2020) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Accordingly, we consider initially the first prong: whether the Secretary violated Grant's federal and state due-process rights by overdetention.

Grant, seeking to hold the Secretary individually liable as a supervisory official, contends: The Secretary and other DPSC employees were aware of a pattern of overdetention within DPSC; employees followed the Secretary's unconstitutional instructions to delay releasing inmates until receiving their charging documents (in this instance, Grant's bill of information) from external entities; and, therefore, the Secretary acted deliberately indifferent by failing to promulgate policy, or train his employees in a manner sufficient, to prevent overdetention.

The default rule is that supervisory officials are not vicariously liable for constitutional violations caused by their subordinates. *E.g.*, *Cozzo v. Tangipahoa Par. Council-President Gov't*, 279 F.3d 273, 286 (5th Cir. 2002); *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (noting in proceedings brought under § 1983, "[T]he term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct".). Accordingly, liability attaches "only if" defendant-supervisor: "affirmatively participates in the acts that cause the constitutional violation"; or "implements unconstitutional policies [or fails to train subordinates] that causally result" in the violation. *Porter*, 659 F.3d at 446 (citation omitted).

Grant concedes the Secretary was not involved personally in his overdetention. Therefore, for the Secretary to be liable in his individual capacity, Grant must demonstrate the Secretary failed to promulgate policy, or train his subordinates, to prevent overdetention.

In that regard, for both failure to promulgate policy and failure to train, a showing of deliberate indifference is required, else "*de facto respondeat superior* liability" would result. *Id.* at 447. "[D]eliberate indifference is a stringent standard of fault". *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997)). It does not amount to mere "inept, erroneous, ineffective, or negligent" conduct, but instead "more than negligence or even gross negligence". *Estate of Davis*, 406 F.3d at 381.

Deliberate indifference requires plaintiff to show defendant-supervisor: "disregarded a known or obvious consequence of his action[s]". *Id.* (citing *Bryan Cnty.*, 520 U.S. at 410). Accordingly, failure to promulgate policy "must amount to an intentional choice, not merely an unintentionally negligent oversight", and "can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights". *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992). Similarly, failure to train is deliberately indifferent when defendant has "actual or constructive notice that a particular omission in [the] training program causes employees to violate citizens' constitutional rights and . . . nevertheless chooses to retain that program". *Porter*, 659 F.3d at 447 (citation and alterations omitted). For both theories of liability, plaintiff ordinarily must show "[a] pattern of similar constitutional violations", because "without notice" of prior constitutional violations, a supervisor "can hardly be said" to have acted deliberately indifferent. *Id.* (citation omitted); *Jason v. Tanner*, 938 F.3d 191, 198 (5th Cir. 2019) (explaining "theory of deliberate indifference . . . allow[ing] liability despite no pattern

11

or practice of prior violations" impermissible (quoting *Connick*, 563 U.S. at 73 (Scalia, J., concurring))).

For the reasons that follow, Grant fails to rebut the Secretary's asserted entitlement to qualified immunity because, having conceded the Secretary was not involved personally in Grant's overdetention, Grant does not show the Secretary acted deliberately indifferent by failing to promulgate policy, or train his subordinates, to prevent overdetention. *See Estate of Davis*, 406 F.3d at 382. As reflected above, the crux of Grant's challenge in this regard ultimately rests on the local sheriff's and clerk's offices' failure to deliver his bill of information to DPSC in a timely manner. Moreover, in his summary-judgment motion, Grant notes generally that Louisiana's state administration contributes to overdetention at DPSC: "It is worth noting that nothing about this pattern is outside the *State's* capability". (Emphasis added.) This erroneously conflates whether the Secretary, *in his role as DPSC Secretary*, can be held *personally* liable for Grant's overdetention caused by other entities.

1.

The Secretary, however, has no authority over entities—including local sheriff's and clerk's offices—other than DPSC. Grant also concedes this point, but insists the Secretary still "influences" them. This is not enough to establish supervisory liability under theories of failure to promulgate policy and failure to train. Grant also contends DPSC could have released him after the sentencing judge notified two DPSC employees about Grant's overdetention. But, as previously noted, the Secretary had no personal involvement in the events causing Grant's overdetention.

No. 21-30230

2.

Grant fails to show the Secretary's personal involvement and authority over other entities. He also fails to satisfy deliberate indifference's "stringent standard". *See Connick*, 563 U.S. at 61 (citation omitted).

a.

As for failure to promulgate policy, Grant has not demonstrated the Secretary made the "intentional choice" to implement a policy delaying the timeframe in which DPSC receives an inmate's bill of information. *Rhyne*, 973 F.2d at 392. Instead, as reflected above, Louisiana law places the onus on sheriff's and clerk's offices to timely transmit bills of information to DPSC. LA. CODE CRIM. PROC. ANN. art. 892. And, as for the claimed failure to train, Grant has failed to show the Secretary had "actual or constructive notice that a particular omission in [*his*] training program cause[d] . . . employees to violate citizens' constitutional rights". *Porter*, 659 F.3d at 447 (emphasis added) (citation omitted); *see also Jason*, 938 F.3d at 198 (explaining failure to train requires showing supervisor-defendant "was on notice that, absent additional specified training, it was 'highly predictable'" *supervisor's* subordinates would continue to cause constitutional violations).

b.

Moreover, Grant has not presented the requisite pattern of due-process violations similar to the one he asserts: DPSC's failing to timely release an individual, specifically as a result of *the Secretary's failure* to promulgate policy, or train subordinates, to prevent overdetention due to delayed delivery of the charging document. *See Jason*, 938 F.3d at 198 (noting "*Connick* require[s] that only very similar violations could jointly form a pattern"). Again, as reflected above, the delay in receiving Grant's bill of information was caused by external entities—not by the Secretary.

13

Along that line, Grant points to items in the summary-judgment record relied upon by the district court in concluding the Secretary was deliberately indifferent because he had notice of instances of DPSC's overdetention. But, as reflected above, because our review is *de novo*, we necessarily review the summary-judgment record "*again* or *afresh*". *United States v. Kieffer*, 991 F.3d 630, 638 (5th Cir. 2021) (Oldham, J., concurring) (emphasis in original).

Regarding the three items cited by Grant, the district court mainly relied upon a 2012 Six Sigma study of DPSC, a 2017 report by the Louisiana Legislative auditor, and a grant application DPSC submitted to the federal government in 2019, all referencing overdetention within DPSC. The first, however, examined DPSC's internal-release procedures, not policies of external offices. The latter two, as the Secretary notes correctly, are insufficient to establish deliberate indifference on the part of the Secretary. Both occurred after Grant's overdetention, and they fail to show, prior to Grant's overdetention, that the Secretary had knowledge of due-process violations of the type claimed by Grant. Moreover, the Secretary took steps after all three occurred to lower rates of overdetention at DPSC. This undercuts Grant's contention that the Secretary acted deliberately indifferent by failing to promulgate policy, or train his subordinates, to prevent overdetention due to non-DPSC entities' failing to include the charging document in the pre-class packet. *See Estate of Davis*, 406 F.3d at 382.

In sum, the first qualified-immunity prong is not satisfied. Therefore, we need not consider the second (whether the Secretary acted objectively unreasonable in the light of clearly-established law). Accordingly, the Secretary is entitled to qualified immunity against Grant's federal and state due-process claims.

III.

For the foregoing reasons, the denial of qualified immunity for the Secretary for Grant's federal and state due-process claims is REVERSED; judgment is RENDERED for the Secretary against those claims; and this matter is REMANDED to district court for further proceedings consistent with this opinion.