## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| JOEL GIROIR, on behalf of himself and all similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>JAMES LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections; and THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS,<br><br>Defendants. | CIVIL ACTION NO. 21-cv-108<br><br>CLASS ACTION<br><br>**JURY TRIAL DEMANDED** |

## AMENDED CLASS ACTION COMPLAINT

### INTRODUCTION

1.      For years now, the Louisiana Department of Public Safety & Corrections ("the DOC") has been unlawfully and knowingly overdetaining thousands of Louisiana residents in its custody every year. Defendant James LeBlanc, Secretary of the DOC, has known about this misconduct since at least 2012. Ex. 1, Dep. of Secretary LeBlanc at 45, 48-49. Secretary LeBlanc has admitted that the DOC is "legally bound" to release people on time, and he has admitted that the DOC's chronic, unlawful overdetention is a "big problem." *Id.* at 41. Yet the DOC has done little to fix this big problem, continuing to overdetain people as a matter of routine practice.

2.      Many of these people are sentenced by a court to "time served" or an equivalent sentence that legally entitles them to immediate release from the moment they are sentenced. But they are not immediately released. Instead, as a standard practice, the DOC delays computation of release dates and, in the meantime, simply continues to detain people who should be free. Many are forced to sit for weeks or even months with no idea of when the DOC will get around to processing their paperwork and releasing them. The DOC, in other words, falsely imprisons thousands of

people every year, upending lives, imposing punishment that no court has ordered, and creating uncertainty and misery for families across the state.

3.     Still, Secretary LeBlanc has not implemented any policy to ensure that the DOC stops overdetaining—and falsely imprisoning—Louisianans. The DOC overdetains so many people that the DOC itself estimated that housing alone costs the state an extra $2.8M per year, Ex. 2, DOC Grant Application at 4, but Secretary LeBlanc has not attempted to reallocate that spending toward new measures to prevent the DOC from holding people past their legal release dates.

4.     Named Plaintiff Joel Giroir is a victim of the DOC's misconduct. He seeks to represent a Class of all persons who were sentenced to the custody of the Louisiana DOC on or since February 17, 2020, or who will be sentenced to the custody of the DOC in the future, and who were, or will be, entitled to release at the time of their sentencing, but who nevertheless remain in custody, now or in the future, for more than 48 hours past their sentencing dates. On behalf of the numerous people subject to this unlawful practice, Mr. Giroir seeks injunctive and declaratory relief against this false and unlawful overdetention.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a). It has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims arise from the same events and are part of the same case and controversy as the federal claims.

6.     Venue is proper in this district under 28 U.S.C. § 1391.

## PARTIES

7.     Plaintiff Joel Giroir was eligible for immediate release upon his resentencing on January 26, 2021, but the DOC has not yet released him from custody.[1] He is currently being held—illegally—at St. Tammany Parish Jail. Although he is in the St. Tammany Parish Jail, he is in DOC custody.

8.     James LeBlanc is the Secretary of the DOC and its final policymaker. He has served in that role since 2008. He is appointed by the Louisiana governor and is the chief executive officer for the DOC. He formulates rules and regulations for the DOC, and he determines policy regarding management, personnel, and total operations for the agency. He oversees the DOC's central office and its field unit staff, who are charged with carrying out the work of the agency and protecting the rights of all persons held in DOC custody. At all relevant times, Secretary LeBlanc has acted under color of law. He can be served at 504 Mayflower Street, Baton Rouge, LA 70802.

9.     The Louisiana Department of Public Safety & Corrections ("DOC") oversees the custody and care of adults in its custody and includes adults under probation and parole supervision, pursuant to La. R.S. § 36:4. The domicile of the DOC and its divisions is the parish of East Baton Rouge, city of Baton Rouge, Louisiana, pursuant to R.S. 15:821.1.

## FACTUAL ALLEGATIONS

### I.     Plaintiff Joel Giroir

10.     Joel Giroir is a 36-year-old man who is currently being imprisoned by the DOC in St. Tammany Parish Jail. He is being overdetained and is entitled to immediate release. Ex. 3, Giroir Decl. at ¶¶ 1-2.

---

[1] Mr. Giroir was released from custody on February 22, 2021. He was still in custody when his complaint was originally filed on February 19, 2021 (ECF No. 1) and when his original motion for class certification was filed, also on February 19, 2021 (ECF No. 3). Thus, references to Mr. Giroir's "current" overdetention have been left as they were alleged on that initial filing date, but Plaintiff does not allege that he remains overdetained as of the filing of this Amended Complaint.

11.     Mr. Giroir has served enough jail time to be eligible for immediate release. He was held on an attachment with no bond in case number 589-169 and held on a $5000 bond in case number 589-855 in St. Tammany Parish Jail from January 30, 2018, to March 13, 2018. He was held with no bond on case numbers 589-855 and 589-169 from June 12, 2018 until July 19, 2018. On July 19, 2018, he was sentenced to 90 days in DOC custody in lieu of revocation. He served 110 days in Concordia Parish Jail. He turned himself into St. Tammany Parish Jail on January 22, 2021, and was incarcerated there until his revocation hearing date on January 26, 2021. *Id.* at ¶ 4.

12.     On January 26, 2021, Mr. Giroir had a probation revocation and resentencing hearing. He was sentenced to one year in DOC custody. *Id.* at ¶ 5.

13.     Under Louisiana's "good time" law, Mr. Giroir is entitled to a diminution of sentence. La. Rev. Stat. § 15:571.3(B)(1)(a). Because of his good behavior and because he was not convicted of a crime of violence, he is only required to serve 35 percent of his one-year sentence, or 128 days. Ex. 3, Giroir Decl. at ¶ 6.

14.     As of the date of his revocation and sentencing on January 26, 2021, Mr. Giroir had served at least 192 days in jail on his one-year sentence. Thus, on the date of his sentencing, he was eligible for immediate release. *Id.* at ¶ 7.

15.     Mr. Giroir was not immediately released on January 26, 2021, even though he had already served at least 64 days beyond his sentence. He still has not been released. He is being overdetained in DOC custody. *Id.* at ¶ 8.

## II.     The DOC Has a Pattern and Practice of Overdetaining People in Its Custody

16.     Mr. Giroir's case is not an aberration—on the contrary, his false imprisonment through overdetention is the standard practice of the DOC—a standard practice that Defendants have known about for at least eight years, yet have failed to change.

17.    Defendants have been aware of the problem of overdetention in Louisiana since at least 2012.

18.    The DOC has no process in place for ensuring that persons entitled to immediate release upon sentencing are actually released upon sentencing, or any time promptly thereafter.

19.    Instead, the DOC detains such people for weeks and even months with no idea whether it has a legal right to imprison them at all. For the DOC, such determinations are made in an unhurried process in which the agency (1) waits days or weeks for others to provide it with the person's sentencing order, and then (2) waits weeks to actually examine that sentencing order and determine whether the DOC has the legal authority to continue to detain the person. During all that time, the person who should be free—whom a judge has already deemed eligible for immediate release—languishes behind bars. Thousands of people in Louisiana suffer this fate every year.

20.    To make matters worse, the leadership of the DOC, including Secretary LeBlanc, have been acutely aware of this problem since at least 2012. And after making half-hearted efforts to mitigate the problem, they have essentially abandoned those efforts and have specifically endorsed overdetention as a normal practice.

**A.    The DOC Detains Thousands of People Past Their Legal Release Dates Every Year**

21.    The DOC recognizes that a person who (1) has spent time in custody pretrial, (2) is given a sentence with credit for time served, and (3) has a sentence that is less than or equal to their period of pretrial custody is entitled to release on the day of their sentencing. *See* Ex. 4, Dep. of DOC 30(b)(6) Representative Angela Griffin (May 31, 2019) at 30-31. For example, a person who spent two months in jail awaiting sentencing, and is then sentenced to thirty days with credit for time served, is entitled to release on the day of his sentencing.

22.    The DOC is responsible for a person's overdetention from the day of sentencing, even if the person is not physically housed in a DOC facility.

23.     The DOC has conceded that a person's "admit date" to DOC custody is the date of that person's sentencing. Ex. 5, Dep. of DOC 30(b)(6) Representative Melanie Gueho at 53. Indeed, Secretary LeBlanc has explained that he is "responsible for the inmates sentenced to the custody of the DOC," whether they are in "a state-run facility, a parish-run facility, or private-facility." Ex. 1, Dep. of Secretary LeBlanc at 13.

24.     Any person who is detained past his or her legal release date is overdetained.

25.     The DOC admits that it is "legally bound to release inmates on their release date." *Id.* at 15.  Secretary LeBlanc has stated that he first learned "that thousands of people in the custody of the Department of Corrections for whatever reason were being held past their release date" in 2012. *Id.* at 48. But every investigation into the matter since that time has confirmed that the problem continues; indeed, it has even come to the attention of judges and legislators.

26.     In 2012, a team of DOC staff performed a review of its time calculation processes, which revealed a widespread pattern of people being held significantly past their legal release dates.

27.     Specifically, the investigation found that when the DOC calculated the release dates of inmates, 83% were eligible for "immediate release . . . due to an earlier release date." Ex. 6, DOC Lean Six Sigma 2012 PreClassification at 4.

28.     The DOC learned through this investigation that it was overdetaining over 2,000 people each year, with an average of 71.69 "overdue days" per person who was overdetained. Ex. 7, Dep. of DOC 30(b)(6) Representative Derek Ellis at 20.

29.     The DOC has admitted that this is "a lot of overdetention." Ex. 8, Dep. of DOC 30(b)(6) Representative Angela Whittaker at 33.

30.     The 2012 review found that some of the delay was caused by the time it took for the DOC to obtain documents from the clerks' and sheriffs' offices, and the remainder was caused by

the DOC itself taking an average of approximately 79 days to calculate sentences after it had the sentencing documents in hand. *Id.*[2]

31.    Under Louisiana law, confining any person without legal authority amounts to false imprisonment.

32.    Under settled decisions by the United States Supreme Court, correctional facilities are allowed some time to ensure that an imprisoned person's release is administratively proper, but in all events, it is presumptively unreasonable to imprison a person for more than 48 hours after they are entitled to release. *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991).

33.    The DOC's imprisonment of people for *months* after they are entitled to release violates the laws of Louisiana and the United States.

34.    No alarm was raised, however, following the 2012 study. After making their 2012 findings, the DOC did not eliminate or even meaningfully mitigate the problem of overdetention. Secretary LeBlanc recently testified that he understood that "people [are still] being held [in DOC custody] an average of about two months past their release date." Ex. 1, Dep. of Secretary LeBlanc at 45.

35.    Indeed, five years after the 2012 investigation, in 2017, another internal investigation reported that the DOC had "an average of 200 inmates per month held an average of 49 days past the end of their sentence." Ex. 7, Dep. of DOC 30(b)(6) Representative Derek Ellis at 38.[3]

36.    So many people were being overdetained under this practice that it cost the state "$2.8M per year in housing costs alone." Ex. 2, DOC Grant Application at 4. According to the DOC, this is "taxpayer money" that the "DOC should not have to spend" on people whose sentences are complete. Ex. 7, Dep. of DOC 30(b)(6) Representative Derek Ellis at 35.

---

[2] "Q. So this approximately 79-day number represents the DOC's, to the best of its knowledge in 2012, about how long it was taking for documents to wait at the DOC to be calculated? A. Correct.".

37.    Defendants took no meaningful action in response to the 2017 investigation either.

38.    As recently as 2019, the DOC compiled a set of data and found that it had held 231 individuals past their legal release dates in a single month (February of 2019) for an average of 44 extra days. *See* Ex. 9, Feb. 2019 Pull Doc.

39.    The DOC gathered this information in order to estimate the magnitude of its overdetention problem as part of a grant application to the U.S. Department of Justice. The figures suggest that over 2,000 people per year are still being overdetained, seven years after the DOC first identified the problem.

40.    The causes of this problem have been obvious since at least the 2012 investigation.

41.    The 2012 inquiry found that some of the delay was caused by the time it took for the DOC to receive documents from the clerks' and sheriffs' offices, and then, even after receiving the sentencing papers, the DOC was taking an average of approximately 79 additional days to complete the process of calculating sentences. Ex. 8, Dep. of DOC 30(b)(6) Representative Angela Whittaker at 33.

42.    In fact, the DOC waits nearly 11 days on average to even *begin* calculating a person's time once the paperwork is obtained from the sheriff or court clerk.[4]

43.    As the DOC's overdetention practices have continued, judges and state legislators have repeatedly reminded Secretary LeBlanc of the problem.

44.    On January 20, 2015, Judge Mary Doggett of the 9th Judicial District Court sent an email that was forwarded to Secretary LeBlanc complaining that an individual had been held past his

---

[3] "Q. So it's a true statement that the DOC found that in 2017 it had an average of 200 inmates per month held an average of 49 days past the end of their sentence, correct? A. Yes.".

[4] This number was obtained by calculating the average of the column "RECEIV TO COMP" in Ex. 9, Feb. 2019 Pull Doc. The "RECEIV TO COMP" column provides, for each individual listed, the number of days that passed between the DOC receiving the person's paperwork and the DOC beginning the process of calculating the person's time.

release date by nearly two months "in spite of several phone calls from Judge Randow for his release." Ex. 10, Secretary LeBlanc Emails 3-4.[5]

45.     On January 28, 2016, a state legislator's office emailed Secretary LeBlanc regarding an individual who had obtained "an order of immediate release" more than two weeks prior, and was "still being detained and has been given no explanation of the delay." *Id.* at 10.[6]

46.     On February 21, 2019, Secretary LeBlanc received an email from Judge Jules D. Edwards of the 15th Judicial District Court to which Judge Edwards had attached three articles about overdetention in Louisiana and information about a specific overdetained person. Judge Edwards added that "defense attorneys in Lafayette are also complaining about the failure to timely release inmates from LPCC." Secretary LeBlanc's response indicated that he had read at least one of the articles. *Id.* at 1-2.[7]

### B.    Secretary LeBlanc Has Been Deliberately Indifferent to the DOC's Overdetention of Thousands of Louisianans

47.     Multiple investigations since 2012, and repeated attempts to intervene by other branches of Louisiana government, have done little to change the DOC's pattern of overdetention. The DOC has been content to tinker around the edges of the problem, while doing little to actually reduce or eliminate the mass false incarceration it is committing.

48.     Upon learning of the scale of its overdetention problem in 2012, the DOC did not set a goal of eliminating the problem. Rather, it set a goal to "[r]educe the percentage of Immediate Releases by 80% (from 2252 to 450/yr)" and to "[r]educe the average number of days per case for

---

[5] Email from Mary Lauve Doggett, District Judge, 9th JDC, to Cole Gralapp, District Administrator, Probation and Parole (Jan. 20, 2015, 4:48 PM) (forwarded to James LeBlanc Jan. 23, 2015, 1:54 PM).
[6] Email from the office of Chris Hazel, State Representative, House District No. 27, to James LeBlanc, Secretary, DOC (Jan. 28, 2016, 9:44 AM).
[7] Email from Jules D. Edwards III, District Judge, 15th JDC, to Rhett Covington, Assistant Secretary, DOC (forwarded to James LeBlanc Feb. 24, 2019, 6:14 PM).

immediate releases from 71.69 days (non CTRP) to 31 days." Ex. 6, DOC Lean Six Sigma 2012 PreClassification at 5.[8]

49.     After learning in 2017 that the DOC was still detaining people an average of about two months past their legal release dates even with action taken after the 2012 review, Secretary LeBlanc did not fire anyone. He did not demote anyone. He did not dock anyone's pay. He did not even reprimand anyone. Ex. 1., Dep. of Secretary LeBlanc at 48-49. He did not take any supervisory action to prevent his agency from continuing to detain people past their legal release dates.

50.     Since that time, Secretary LeBlanc has not consulted with the heads of other states' departments of corrections about how they ensure that people are not detained past their legal release dates, aside from looking at some of the software that other states use. *Id.* at 103-04.

51.     Secretary LeBlanc has suggested that overdetention might be somewhat lessened in Louisiana if the DOC were to go and pick up the paperwork necessary to process release dates rather than waiting for sheriffs and clerks to deliver it, *id.* at 80, 100-01, but neither Secretary LeBlanc nor the DOC has ever taken steps to implement that strategy.

52.     Secretary LeBlanc has failed to adopt a policy proposed by a legislative auditor that would impose a deadline on sheriffs to submit pre-classification packets to the DOC, despite his own admission that "there's no reason why [the DOC] couldn't" adopt such a policy and that he is "not sure why we don't, to be honest," and "we could certainly, at least, make an attempt."[9]

---

[8] The DOC estimated that if it could achieve these goals of reducing the percentage of overdetained people by 80% and reducing the average number of days of overdetention per person to 31 days, it could save the state $3.7 million per year. *Id.* at 19.

[9] *Crittindon v. Gusman*, No. 3:17-cv-00512-SDD-EWD at 26 (M.D. La., Apr. 13, 2020) (order denying motions for summary judgment) ("[B]oth Secretary LeBlanc and Defendant Stagg testified in their depositions that they were familiar with a proposal by the legislative auditor that such a deadline be implemented, and both men expressed approval for the idea. In fact, when Secretary LeBlanc was asked at his deposition if it has 'ever been considered to include a timeframe for the submission of these materials to DOC,' he responded: 'Not that I'm aware of, but **there's no reason why we couldn't. I mean, I'm not sure why we don't, to be honest with you.**' Secretary LeBlanc added: 'I'm not sure that we could enforce it to begin with, but we could certainly, at least, make an attempt.'") (emphasis in original).

53.    Secretary LeBlanc has not adopted any policy for the DOC requiring the immediate calculation of sentences; instead, he has continued to permit sentences to be calculated in an *ad hoc* manner after the DOC receives the relevant paperwork.

54.    Eliminating the overdetention problem has remained a low priority. It has not even been included as a goal in the DOC's strategic plans in any year from 2012 to the present. By contrast, the DOC has set goals for itself in its strategic plans such as "Maintain the adult offender institution population at a minimum of 99% of design capacity through 2019."

55.    Further, the DOC has declined help when offered. In 2019, the executive director of the Louisiana Clerks of Court Association, Debbie Hudnall, had a series of meetings with the DOC and Secretary LeBlanc. Ms. Hudnall suggested that, to speed things up, the Clerks of Court could begin emailing sentencing documents to the DOC. The DOC declined, claiming without explanation that they "don't have the capability of receiving that." Testimony of Debbie Hudnall, Louisiana House of Representatives, Judiciary Committee, Jan. 15, 2020, at 1:03:35.[10]

56.    Further, after his meeting with Ms. Hudnall, Secretary LeBlanc state that he would "develop an action plan with you and the Sheriffs' Offices in these areas to improve upon this turnaround time" and "look at the feasibility of receiving the UCO and Bill of Information documents electronically."

57.    But Secretary LeBlanc has never developed that action plan.

58.    And he never conducted the feasibility study.

59.    Aside from the specific investigations in 2012, 2017, and 2019, the DOC does not even keep a record or count of individuals who have been overdetained. *See* Ex. 4, Dep. of DOC 30(b)(6) Representative Angela Griffin (May 31, 2019) at 29.

60.    Indeed, the DOC has endorsed overdetention as a matter of policy.

---

[10] http://house.louisiana.gov/H_Video/VideoArchivePlayer.aspx?v=house/2019/dec/1212_19_JU.

61.    At least as late as May 2019, the DOC website's "Frequently Asked Questions" page stated, "If a person has recently been sentenced to DOC custody, it can take up to 12 weeks to calculate a date as the Department has to receive official paperwork from the sentencing court in order to calculate the offender's release date." The DOC has since removed the reference to taking "up to 12 weeks to calculate a date," a timeframe even Secretary LeBlanc conceded was "ridiculous" and "absurd." Ex. 1, Dep. of Secretary LeBlanc at 88-90.

62.    The DOC also included an audio statement in its voicemail recording saying that it "takes at least 90 days after sentencing" for the department to calculate a person's time. This statement was finally removed from the voicemail recording in or around February or March of 2019. *See* Ex. 7, Dep. of DOC 30(b)(6) Representative Derek Ellis at 12-13.

63.    These voicemail and website statements reveal both the scope of the DOC's misconduct and Defendants' indifference to it; their purpose was to discourage family members from "inundat[ing]" the DOC with questions about when their loved ones—who had been told by a judge that they were free to rejoin their families—would actually be released. *See* Ex. 1, Dep. of Secretary LeBlanc at 89; *see also* Ex. 7, Dep. of DOC 30(b)(6) Representative Derek Ellis at 18.

64.    Mr. Giroir is one of thousands of people who have been wrongfully imprisoned as a result of Secretary LeBlanc's demonstrated indifference to the DOC's unlawful conduct.

## CLASS ACTION ALLEGATIONS

65.    Named Plaintiff Joel Giroir brings this action, on behalf of himself and all others similarly situated, to assert the claims alleged in this Complaint on a common basis.

66.    This action is brought and may properly be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure.

## I.    The Plaintiff Class

67.    Named Plaintiff proposes a class defined as all persons who were sentenced to the custody of the Louisiana DOC on or since February 17, 2020, or who will be sentenced to the custody of the DOC in the future, and who were, or will be, entitled to release at the time of their sentencing, but who nevertheless remain in custody, now or in the future, for more than 48 hours past their sentencing dates. The Class seeks declaratory and injunctive relief against this overdetention and false imprisonment.

## II.    Rule 23(a)

68.    The proposed class satisfies the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a).

### A.    Numerosity — Fed. R. Civ. P. 23(a)(1)

69.    The Class is so numerous that joinder of all members is impracticable. The most recent overdetention data from the DOC (from February of 2019) shows that over 200 individuals were overdetained in a single month, suggesting that the DOC overdetains more than 2,000 individuals over the course of a year. This 2019 count was consistent with data from 2017, which showed that the DOC had "an average of 200 inmates per month held . . . past the end of their sentence." Ex. 7, Dep. of DOC 30(b)(6) Representative Derek Ellis at 38.[11] Upon information and belief, the DOC has not implemented any meaningful changes that might have significantly mitigated the rate of overdetention that was captured in the February 2019 snapshot. Plaintiff therefore estimates a class size of approximately 200 current members, with over 2,000 estimated individuals who will become class members during the course of the next year.

---

[11] "Q. So it's a true statement that the DOC found that in 2017 it had an average of 200 inmates per month held an average of 49 days past the end of their sentence, correct? A. Yes."

B.    Commonality — Fed. R. Civ. P. 23(a)(2)

70.    All members of the proposed Class are subject to the same systemic unconstitutional policies, acts, and omissions on the part of Defendants described in this Complaint, and all are suffering or will suffer violations of their constitutional rights and their rights under state law as a result of the DOC's pattern and practice of overdetaining people in its custody.

71.    There are questions of law and fact common to the members of the class.

72.    Questions of law that are common to all members of the class include, but are not limited to:

- Whether the DOC has the legal authority to hold class members past their sentencing dates under the United States Constitution;
- Whether Class Members have a liberty interest in their immediate release upon sentencing under the United States Constitution;
- Whether Defendants' failure to adopt a policy or policies to mitigate overdetention constitutes deliberate indifference;
- Whether the DOC has the legal authority to hold class members past their sentencing dates under the Louisiana Constitution;
- Whether Class Members have a liberty interest in their immediate release upon sentencing under the Louisiana Constitution; and
- Whether the DOC's detention of Class Members past their legal release dates constitutes false imprisonment under state law.

73.    Questions of fact that are common to all members of the class include, but are not limited to:

- Whether the DOC has a pattern of overdetaining people in its custody;
- Whether Defendants are aware of the DOC's pattern of overdetaining people;
- Whether the DOC is responsible for people sentenced to DOC custody from the day they are sentenced; and
- Whether Defendants failed to adopt a policy or policies to mitigate overdetention.

74.    Defendants are expected to raise common defenses to these claims, including denying that their actions violate the law.

### C.    Typicality — Fed. R. Civ. P. 23(a)(3)

75.    Named Plaintiff's claims are typical of those of the Class, as his claims arise from the same policies, practices, or courses of conduct as those of the Class, and his claims are based on the same theories of law as the Class's claims. Named Plaintiff Joel Giroir was eligible for immediate release upon his sentencing, and the DOC has held him in custody past his sentencing date. *See* Ex. 3, Giroir Decl. Mr. Giroir is therefore typical of the putative Class, and he suffers the same injury of overdetention described in this Complaint.

### D.    Adequacy — Fed. R. Civ. P. 23(a)(4)

76.    Named Plaintiff is an adequate representative of the Class because his interests in the vindication of the legal claims that he raises are entirely aligned with the interests of the other Class Members, who each have the same basic constitutional claims. Named Plaintiff is a member of the Class, and his interests coincide with, and are not antagonistic to, those of the other Class Members.

77.    There are no known conflicts of interest among Class Members, all of whom have a similar interest in vindicating their constitutional rights.

78.    Plaintiffs are represented by attorneys from the Promise of Justice Initiative, Loevy and Loevy, and Most & Associates, who have experience in litigating complex civil rights matters, including class actions, related to prisoners' rights in federal court and extensive knowledge of both the details of the DOC and the relevant constitutional and statutory law. Most & Associates has litigated a number of individual overdetention cases in Louisiana, and all class counsel are currently litigating a class action case involving overdetention in Louisiana, *Humphrey v. LeBlanc*, 20-cv-233 (M.D. La).

79.    Class counsel have a detailed understanding of local law and practices as they relate to federal constitutional requirements.

15

**III.    Rule 23(b)(2)**

80.    Class action status is appropriate because Defendants have acted or will act in the same unconstitutional manner with respect to all Class Members. Defendants unlawfully and knowingly detain thousands of Louisianans past their legal release dates every year.

81.    The Class therefore seeks declaratory and injunctive relief to enjoin Defendants from continuing to overdetain and falsely imprison people in their custody. Because the putative Class challenges Defendants' conduct as unconstitutional through declaratory and injunctive relief, which would apply the same relief to every Class Member, Rule 23(b)(2) certification is appropriate and necessary.

82.    Injunctive relief compelling Defendants to comply with Class Members' constitutional rights will similarly protect each Class Member from being subjected to Defendants' unlawful policies and practices. A declaration and injunction stating that Defendants cannot continue to detain people past their legal release dates would provide relief to every Class Member. Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

## CLAIMS FOR RELIEF

### COUNT I
### 42 U.S.C. § 1983

83.    Plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth in this Count.

84.    Plaintiff Joel Giroir brings this claim on his own behalf and on behalf of the putative Class against Defendants.

85.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution is violated where a person remains incarcerated after the legal authority to hold that person has expired. *See Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980). No privilege enables a jailor to detain a person beyond the period of that person's lawful sentence. *See Whirl v. Kern*, 407

F.2d 781, 791 (5th Cir. 1968); *see also Powell v. Barrett*, 376 F. Supp. 2d 1340, 1351 (N.D. Ga. 2005) (detainee has constitutional right to be free from continued detention after it was or should have been known that he was entitled to release).

86.     The DOC's legal authority to detain Plaintiff Joel Giroir expired on the day of his sentencing, January 26, 2021. Yet pursuant to an unlawful standard practice that has existed for years, the DOC continues to detain Plaintiff.

87.     The DOC is falsely imprisoning Plaintiff pursuant to a practice that has existed for years in which it waits weeks and even months to determine whether it has lawful authority to imprison persons who in fact were entitled to release on the day of their sentences. That practice is injuring the hundreds of members of the putative class, as described in this Complaint.

88.     Secretary LeBlanc has been aware of this practice since at least 2012, but he has not attempted to stop it; instead, Defendants have attempted to normalize their own misconduct.

89.     Secretary LeBlanc's failure to adopt a policy or policies to prevent overdetention is "deliberately indifferent" because "it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights." *Rhyne v. Henderson Cnty.,* 973 F.2d 386, 392 (5th Cir. 1992).

90.     In failing to adopt any policy to prevent predictable overdetention, Secretary LeBlanc acted with deliberate indifference. This is evidenced by the fact that every investigation into the matter since 2012 has shown that overdetention is a persistent and widespread problem in Louisiana, yet Secretary LeBlanc did not create any policy to attempt to remedy the problem.

91.     Through his deliberate indifference, Secretary LeBlanc is depriving Mr. Giroir, and all Members of the putative Class he seeks to represent, of the fundamental right to liberty and violating their due process rights under the Fourteenth Amendment, causing the injuries described in this Complaint.

## COUNT II
### Due Process under Article I, Section 2 of the Louisiana Constitution

92.     Plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth in this Count.

93.     Plaintiff Joel Giroir brings this claim on his own behalf and on behalf of the putative Class against Defendants.

94.     Article One, Section Two of the Louisiana Constitution of 1974 guarantees that "[n]o person shall be deprived of life, liberty, or property, except by due process of law."

95.     By reason of the same conduct that violates Plaintiff's federal constitutional rights, Defendants violate Plaintiff's state constitutional rights to liberty and due process, as well as the state constitutional rights of the putative class he seeks to represent, causing the injuries described in this Complaint.

## COUNT III
### False Imprisonment under State Law

96.     Plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth in this Count.

97.     Plaintiff Joel Giroir brings this claim on his own behalf and on behalf of the putative Class against Defendants.

98.     Defendants are committing the tort of false imprisonment against Plaintiff because the DOC is "restrain[ing] [Plaintiff] against his will without a warrant or other statutory authority," *Kyle v. City of New Orleans*, 353 So.2d 969, 971 (La. 1977); *see also Miller v. Desoto Regional Health Sys.*, 128 So.3d 649, 655-56 (La. App. 3d Cir. 2013), beyond Plaintiff's legal release date. By definition, the Class Members Plaintiff seeks to represent are also falsely imprisoned by Defendants because they are, or will be, unlawfully detained beyond their legal release dates, causing the injuries described in this Complaint.

## COUNT IV
## State Law Negligence

99.     Plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth in this Count.

100.    Plaintiff Joel Giroir brings this claim on his own behalf and on behalf of the putative Class against Defendants.

101.    Defendants owe duties to avoid overdetention to persons in DOC custody, including Plaintiff and the members of the putative Class. *Porter v. Epps*, 659 F. 3d 440, 445 (5th Cir. 2011) (a jailor has "not only the duty to protect a prisoner, but also the duty to effect his timely release.").

102.    These duties are being breached by Defendants' acts and omissions, including the failure to timely release Plaintiff and the putative Class Members.

103.    The risks and harms that Defendants cause are within the scope of protection afforded by the duties Defendants owe to Plaintiff and to the putative Class Members.

104.    As a result of Defendants' acts and omissions, Plaintiff and the putative Class Members are suffering actual, foreseeable harm, as described in this Complaint.

## COUNT V
## State Law Intentional Infliction of Emotional Distress

105.    Plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth in this Count.

106.    Defendants have acted intentionally or recklessly regarding the false imprisonment and overdetention of Mr. Giroir and the Members of the putative Class.

107.    Defendants' conduct is extreme and outrageous, and it is rooted in an abuse of power and authority over the freedom of Mr. Giroir and the Members of the putative Class.

108.    Defendants' misconduct is causing severe emotional distress, induced by weeks and even months of caging in crowded, dangerous jails and prisons of persons who are legally entitled to be free.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Joel Giroir requests that this Court enter judgment in his favor, and in favor of the putative class he seeks to represent, against Defendants and order the following relief:

(a) An order and judgment declaring that Defendants' practice of routinely allowing individuals to be incarcerated past their legal release dates violates Plaintiff's rights under the United States Constitution as well as the state law rights of the class Plaintiff seeks to represent;

(b) An order and judgment enjoining Defendants from continuing to allow individuals to be incarcerated past their legal release dates and ordering Defendants to establish procedures to prevent all such overdetention;

(c) An order and judgment requiring Defendants to calculate sentences and release as soon as reasonably feasible, and in no event longer than 48 hours after the person is sentenced, for all persons sentenced to the custody of the DOC who are eligible for immediate release upon sentencing;

(d) An order and judgment ordering Defendants to release Plaintiff and all members of the class Plaintiff seeks to represent;

(e) An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and all other applicable laws; and

(f) Any other relief this Court deems proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted this 27th day of April, 2022.

/s/ Mercedes Montagnes

Mercedes Montagnes, La. Bar No. 33287
Nishi Kumar, La. Bar No. 37415
Rebecca Ramaswamy, La. Bar No. 39524
Elena Malik, La. Bar No. 39662

The Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117
Telephone: (504) 529-5955
Facsimile: (504) 595-8006
Email: mmontagnes@defendla.org

Sarah Grady (*pro hac vice*)
Stephen H. Weil (*pro hac vice*)
Kelly Jo Popkin (*pro hac vice*)
Loevy & Loevy
311 N. Aberdeen
Chicago, IL 60607
Telephone: (312) 243-5900
Facsimile: (312) 243-5902
Email: sarah@loevy.com

William Most, La. Bar No. 36914
Caroline Gabriel, La. Bar No. 38224
Most & Associates
201 St. Charles Avenue, Suite 114, #101
New Orleans, LA 70170
Telephone: (504) 509-5023
Email: williammost@gmail.com

*Attorneys for Plaintiff*