UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| HUMPHREY *et al.*,<br><br>              Plaintiffs,<br><br>v.<br><br>LEBLANC,<br><br>              Defendant. | Civil Action No. 3:20-cv-0233-JWD-SDJ |
| GIROIR, *et al.*,<br><br>              Plaintiffs,<br><br>v.<br><br>LEBLANC, *et al.*,<br><br>              Defendants. | Civil Action No. 3:21-cv-108-JWD-SDJ |

### **PLAINTIFFS' POST-HEARING BRIEF**

The DOC's systemic over-detention problem is well-documented. The Court of Appeals has denounced the DOC and Secretary James LeBlanc – three times – for deliberately ignoring systemic administrative failures they knew were leaving prisoners in jail who had already served their sentences and should have been free.[1] The Louisiana Legislative Auditor has found—twice—that DOC's inefficient data management, poorly defined procedures, and lack of training and oversight have contributed to a consistent pattern of over-detention.[2] And after a multi-year investigation into the DOC's "Preclass" practices, the U.S. Department of Justice concluded that:

---

[1] *See Crittindon v. LeBlanc*, 37 F.4th 177, 187-88 (5th Cir. 2022), *cert. denied*, No. 22-1171, 2023 WL 6377920 (U.S. Oct. 2, 2023) ("A reasonable factfinder could conclude that [LeBlanc's] awareness of this pattern of delays and their conscious decision not to address it rises to the level of deliberate indifference."); *Parker v. LeBlanc*, 73 F.4th 400, 408 (5th. Cir. 2023); *Hicks v. LeBlanc*, 81 F.4th 497, 505 (5th. Cir. 2023).
[2] *Giroir*, ECF 25-5 (2019 Audit), ECF 31-7 (2017 Audit).

1

> [DOC] incarcerates thousands of individuals each year beyond their legal release dates in violation of the Fourteenth Amendment . . . . These violations are pursuant to a pattern or practice of infringements on the constitutional rights of incarcerated persons. . . . <u>These violations are severe, systemic, and are both caused and perpetuated by serious ongoing deficiencies in [DOC's] policies and practices.</u> [DOC] has persisted with these unconstitutional practices despite at least a decade of notice and clear recommendations for fixing the problem.[3]

So systemic are these failures that during oral argument in an individual over-detention case, Fifth Circuit Judge Edith Jones wondered aloud:

"Well, let me ask: why didn't someone file a class action?"[4]

The overwhelming evidence confirms that the long-standing and widespread over-detention of DOC prisoners is the result of Defendants' failures to adopt appropriate policies in virtually every step of the sentence calculation process, resulting in what this Court aptly characterized as a "byzantine" system that inevitably generates delays. Tr. 210:1-4. Every member of the proposed classes has been subject to this unlawful process and the illegal over-detention that results from it. Class certification is appropriate in both *Humphrey* and *Giroir*.

## CLASS CERTIFICATION HEARING EVIDENCE

***System for transmission of sentencing information to DOC***. The DOC calculates release dates for people in DOC custody and is responsible for their timely release. Tr. 15:6-13. To do this, DOC uses "pre-class packets," which consist of sentencing information from the court and jail credit information from the sheriff's office that had custody of the person prior to sentencing. Tr. 15:24-16:5. The clerk sends sentencing information to the sheriff. Tr. 17:8-19; 137:18-20.[5] The

---

[3] DOJ Report at 3 (*Humphrey*, ECF 158-1; *Giroir*, ECF 80-1) (emphasis added); *see also Buchicchio v. LeBlanc*, 2023 U.S. Dist. LEXIS 26595, at *2 n.1, *11 (M.D. La. Feb. 15, 2023) (taking judicial notice of the DOJ Report and characterizing it as "damning and unequivocal").
[4] Transcript of Oral Argument at 23:02-23:07, *McNeal v. LeBlanc*, Case No. 22-30180 (5th Cir. Sept. 6, 2023).
[5] Historically this information was recorded in "sentencing minutes." Tr. 138:7-19. A few years ago the Louisiana Supreme Court created a Uniform Commitment Order, or UCO, to record the information, Tr. 138:7-19, but if a judge does not fill out a UCO, the sentencing minutes still suffice. Tr. 138:25-139:2.

sheriff adds jail credit and identifying information and transmits the resulting packet to the DOC, Tr. 17:15-19:1, which arrives in the form of hard-copy paper documents. Tr. 137:3-5.

The DOC has not instituted any rules governing when clerks send sentencing information to the sheriff, or when sheriffs must complete the pre-class packet and send it to the DOC. Tr. 19:12-21:2. Nor has the DOC imposed a requirement on sheriffs to send *complete* pre-class packets; indeed many sheriffs send in the information "piecemeal," Tr. 100:22-101:5; 20:18-21:5, and over half the packets are deficient in some way. Tr. 139:11-15.

*DOC's system for processing sentencing information*. DOC inventories pre-class packets after they arrive. When staff determine information or documents are missing, they resort to *ad hoc* phone calls and emails to court clerks and sheriffs to retrieve the necessary information. Tr. 139:16-140:20. However, there is no system to prioritize fixing deficiencies in the packets of persons entitled to immediate release. Tr. 153:16-154:8. The DOC waits until it obtains a complete pre-class packet before it calculates an inmate's release date. Tr. 142:15-143:15. Only *then* does DOC "prioritize" the files of people entitled to immediate release. Tr. 142:15-24; 152:15-20.

*Widespread delay in sentencing calculation*. Secretary LeBlanc has known since at least 2012 that numerous DOC inmates were being held past their legal release dates. Tr. 36:8-38:7; 39:19-40:3 (discussing Lean Six Sigma report); 44:25-45:1. But the DOC did not fix the problem even though, in a 2019 grant application seeking federal funds, it admitted that the paperwork process caused over-detention. In that application, DOC explained that the 2012 Six Sigma project had found that "overall [sentence calculation] cycle time was 38 days, of which 31 days was post-conviction time in which [DOC] did not have the paperwork" required for calculating sentences. PX3 at 3. And while DOC addressed other delays identified in the Six Sigma project, "the project did not address th[is] cumbersome front-end paperwork process. As a result, there remains a delay

in identifying and processing cases, which leads to . . . an increase in offenders who are due for immediate release" upon calculation. *Id.* "[D]ue to these deficiencies," the DOC continued, "[i]n 2017 [DOC] had an average of 200 cases per month considered an 'immediate release' . . . ." PX3 at 4.

The DOC's own records also show this "cumbersome" paperwork problem has persisted. The DOC's pull document for February 2019 indicates that 231 inmates were held past their release dates that month, for an average of 44.68 days each. Tr. 74:3-75:3. Other pull documents indicate similarly widespread over-detention, including about 1,360 inmates who were over-detained an average of 38.6 days from January to June of 2018. Tr. 75:4-16, 84:17-86:5, PX13, ECF 177-3.

***Failure to create deadlines***. For several decades, the DOC has paid local sheriffs to hold some DOC inmates in parish jails. Tr. 56:3-13; 58:23-59:1. To protect the "fundamental constitutional rights" of these jail-held DOC inmates, the DOC developed the "Basic Jail Guidelines" ("BJG"). Tr. 57:14-23. According to Secretary LeBlanc, "[i]f the sheriffs are going to hold DOC inmates in their local prisons, they have to adhere to [the BJG]," Tr. 58:17-21, and indeed, the DOC has moved its prisoners out of parish jails that fail to comply with the BJG. Tr. 59:5-15.

The BJG sets the terms for how sheriffs handle pre-class paperwork. However, as of 2019, the DOC had not considered including in the BJG a timeframe for sheriffs to submit pre-class documents, even though the DOC could have done so. Tr. 59:20-60:3, 60:12-14. Then, as the DOJ Report observes:

> In July 2022, LDOC drafted revised [BJG] that include a deadline of three working days for Sheriffs to deliver certain documents to Preclass. We were informed by LDOC that the deadline only applies to certain supplemental documents that may be required after time computation is complete, but does not apply to the preclass packet itself. The revised guidelines have not been implemented and there is currently no expected implementation date. Even if the deadline were implemented,

4

there is no system in place to track whether Sheriffs are complying with the deadline, and no consequences for non-compliance. Nevertheless, the revision demonstrates LDOC's ability to impose deadlines, if it chooses.[6]

Despite having drafted a BJG with a deadline in July 2022, Secretary LeBlanc waited until October 2023 – just a week or a week and a half before the class certification hearing – to sign it. Tr. 60:2-22 ("Q. When did you sign it? A. Probably a week and a half ago.") And the timeframe applies to the submission of some—but not all—pre-class paperwork. Tr. 60:3-61:1; 126:22-127:1.[7]

***Failure to implement electronic transmission of sentencing information***. The DOC acknowledges that an electronic system for transmitting the documents and information contained in the pre-class packet, is "central to resolving [DOC's] over-detention issues." Tr. 177:15-21; 187:10-12. Between 2012 and 2019, however, the DOC failed to implement any sort of electronic sentencing information transfer system for pre-class documents and information. *See generally* Tr. 160:10-166:19. In 2019, the DOC applied for a grant from the federal government to set up an electronic system for receiving pre-class paperwork. Tr. 98:8-18; PX3. But after the DOC failed to obtain the grant, it did not attempt to implement the system on its own: as of January 2022, Secretary LeBlanc testified he had no written plans to set up such a system. Tr. 47:4-48:9.

In January 2023, the DOJ concluded its multi-year investigation into the DOC's pre-class procedures. Among other things, the DOJ recommended that the DOC implement an electronic submission portal so clerks and sheriffs could submit sentencing documents to the DOC electronically. Tr. 183:15-24. After the DOJ issued its report, the DOC decided to expedite developing an electronic submission portal. Tr. 184:2-9; *see also* 187:25-188:3. It then took the DOC only 3.5 months, from March to July 2023, to develop the standalone electronic submission portal. Tr. 185:6-15.

---

[6] DOJ Report at 11, n.38;
[7] *See also* PX 18 (Spears dep.) at 161:22-164:15.

5

The DOC's new submission system allows clerks and sheriffs to transfer pre-class documents electronically. Tr. 169:6-13. It also contains an automated triage function to prioritize processing of immediate releases: besides uploading documents, clerks and sheriffs enter sentencing "metadata"—the sentence date, sentence length, and jail credit amount—which the new system uses to "put[] people at the top of the list that we may need to look at first to do time computation for, because they may be close to their release date." Tr. 170:3-16; 172:5-19. The system is already being piloted, Tr. 185:9-11, and the DOC expects it to be implemented in all parishes within the year. Tr. 189:14-22.[8]

The DOC could have created such a system in 2012, or even 2008. Tr. 186:9-17. It could have done so even without the implementation of CIPRS. Indeed, the DOC is currently operating the portal even though it still relies on the legacy CAJUN system for its time computation data. Tr. 186:9-19; 188:4-9.

*Use of DOC data to identify class members*. The DOC used its own data to identify 1,700 inmates eligible for immediate release between April 2019 and May 2020. Tr. 61:25-62:2; 68:6-12. To compile this data, Melanie Gueho created a spreadsheet that includes a "must serve" number indicating the days remaining on a person's sentence. Tr. 64:17-20; 65:19-66:4; *see also* ECF 177-16. A person with a negative "must-serve" number is eligible for immediate release. Tr. 67:2-5.

Pre-class employees can verify the data in the pull documents using DOC's own records. *See, e.g.*, Tr. 97:12-18 (outliers can be determined "using DOC records and the systems of Preclass personnel"); 106:8-107:2 (highlighting outliers on a pull document); 111:23-112:15 (Pre-class can "check and see if it was accurate"); 114:14-24 (discussing an example of an outlier identified using DOC's records); DX 2 (Jan. 2020 pull document identifying some outliers); Tr. 111:11-13

---

[8] A parish with limited technology will not affect implementation, because the DOC will simply procure the necessary computer hardware and internet access for the parish offices in question. Tr. 172:20-173:21.

6

(admitting that DOC has the correct data). This review requires minimal work. It only took Angela Griffin about five minutes per person to verify the data for the 231 inmates identified in the February 2019 pull document. Tr. 124:8-15 ("roughly 20 hours" to evaluate 231 inmates, or 5.2 minutes each); Tr. 74:3-75:3; ECF 177-3.

Setting aside these outliers, with three pieces of data—raw GTPS date, release date, and sentencing date—the DOC can identify most inmates whose sentence was complete at the time of their sentencing, but who were released more than 48 hours later. Tr. 91:16-24.

## DISCUSSION

Plaintiffs have already briefed the application of Federal Rule of Civil Procedure 23 to this case. Accordingly, Plaintiffs focus here on matters raised during the October 19, 2023 class certification hearing.

***Proposed amended class definitions.*** Plaintiffs propose to amend both class definitions to include the cause of over-detention: Defendants' failure to implement and maintain an adequate process for timely releasing inmates, with modifications in underline.[9] In *Giroir,* Plaintiffs seek to certify the following Rule 23(b)(2) class:

> All persons who have been, or will be, sentenced to the custody of the Louisiana DOC, and who were, or will be, entitled to release at the time of their sentencing, but who nevertheless remain in custody, now or in the future, due to Defendants' failure to implement and maintain an adequate process for timely releasing inmates, for more than 48 hours[10] past their sentencing dates.

In *Humphrey*, Plaintiffs seek to certify the following Rule 23(b)(3) class:

> All persons who have been remanded to the custody of the DOC since April 16, 2019, and who were entitled to release at the time of their remand (either pursuant to sentencing or parole revocation), but who were released by the DOC more than

---

[9] *Cf. Healey v. Louisville Metro Gov't*, Case No. 3:17-cv-71, 2021 WL 149859, at *19, 2021 U.S. Dist. LEXIS 8345, at *53 (W.D. Ky. Jan. 15, 2021).

[10] *See Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 276 (D.D.C. 2011) ("[C]ourts appear to agree that the maximum permissible administrative delay in the overdetention context likely falls well short of the 48-hour horizon set out in *McLaughlin*. . . ."), *citing Cty. of Riverside v. McLaughlin*, 500 U.S. 44 (1991).

7

48 hours past the <u>date</u> that they were remanded to the DOC's custody <u>due to Defendant's failure to implement and maintain an adequate process for timely releasing inmates</u>.

***Both classes will be driven by common issues.***  The October 19, 2023 hearing made plain that Plaintiffs can point to a common cause for the DOC's widespread over-detention problem: the Defendants' longstanding indifference to a slow-moving paperwork process that causes widespread over-detention. Indeed, the core issues raised during the hearing will generate answers common to every class member's claims, including:

(1) Whether the DOC's data modernization project, including the development of a stand-alone electronic submission portal and the eventual implementation of CIPRS and/or Mi-CASE, will resolve the DOC's over-detention problem;

(2) Whether the DOC could have implemented data modernization tools sooner; and

(3) Whether, and to what extent, the DOC could have sped up the transmission of pre-class documents from the clerks and/or sheriffs.

Answers to these questions are "'apt to drive the resolution'" of every class member's over-detention claims against the Defendants.[11] Whether the DOC has a cumbersome paperwork process, and whether the Defendants' have been indifferent to the resulting delays, are "substantive issues that . . . will predominate" in determining whether or not each class member will be able to prove that he or she was unlawfully over-detained.[12] That satisfies the core criteria for certification under Rules 23(b)(2) and (b)(3), as the DOC's cumbersome paperwork process is the same for every DOC inmate, across both proposed classes. *See* Tr. 24:8-10; 26:11-13 (confirming process is uniform).[13]

---

[11] *Yates v. Collier*, 868 F.3d 354, 361 (5th Cir. 2017) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).
[12] *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 326 (5th Cir. 2008) (quotation omitted; articulating Rule 23(b)(3) predominance requirement).
[13] Plaintiffs do not seek to class treatment of their claims for intentional infliction of emotion distress (IIED). The putative class representatives will prosecute their IIED claims individually.

Without class treatment, class members would have to introduce this same systemic evidence, over and over, to prove Defendants' liability for each member's own over-detention. Rule 23 was enacted precisely avoid such a wasteful outcome.

***Clerical review of DOC's records does not affect class certification***. Defendants conceded that DOC can identify class members based on a manual review of its own records. Tr. 123:13-124:15. Defendants argued that this clerical work undermines the predominance of common issues in this case. Tr. 108:23-109:5. Not so. It is well established that "[c]ommon issues predominate where individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria—thus rendering unnecessary an evidentiary hearing on each claim."[14] Here, DOC witnesses have even confirmed that the clerical review is minimal: it took Ms. Griffin only about 5.2 minutes per inmate to determine if they "would meet the class definition." Tr. 124:8-15. ("roughly 20 hours" to evaluate 231 inmates, or 5.2 minutes each).

***Any individualized damages do not affect predominance***. Defendants argued that certification of the *Humphrey* class was improper because the damages flowing from over-detention would vary among class members. Tr. 206:17-20. This misunderstands Rule 23. "[T]he black letter rule is that individual damage calculations generally do not defeat a finding that common issues predominate, and courts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determination."[15] Indeed, "[t]he Fifth Circuit has found no abuse of discretion in certification under Rule 23(b)(3) where there required individualized calculation of damages because '[virtually]

---

[14] *Slade v. Progressive Sec. Ins. Co.*, No. 6:11-cv-2164, 2014 WL 6484588, at *9 (W.D. La. Oct. 31, 2014), *rev'd and remanded on other grounds*, 856 F.3d 408 (5th Cir. 2017) (citing *Roper v. Consurve, Inc.*, 578 F.2d 1106, 1112 (5th Cir. 1978)). *Accord* 2 Newberg and Rubenstein on Class Actions § 4:50 (6th ed.) (citing *Roper*).

[15] 2 Newberg and Rubenstein on Class Actions § 4:54 (6th ed.).

9

every issue prior to damages [was] a common issue.'"[16] That is the case here. The eventual calculation of damages here, even if it ultimately were to take place in bifurcated proceedings, does not defeat certification.[17]

## CONCLUSION

For the foregoing reasons, and as detailed in Plaintiffs' primary class certification briefing, Plaintiffs respectfully request that this Court grant their Motions for Class Certification.

Dated: November 30, 2023

 */s/ Lydia Wright*
Lydia Wright, La. Bar No. 37926
Samantha Bosalavage, La. Bar No. 39808
The Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117
Tel: (504) 529-5955
Fax: (504) 595-8006
lwright@defendla.org

*/s/ William Most*_____
William Most, La. Bar No. 36914
Caroline Gabriel, La. Bar No. 38224
Most & Associates
201 St. Charles Ave., Ste. 114 #101
New Orleans, LA 70170
Tel: (504) 509-5023
williammost@gmail.com

Respectfully submitted,

*/s/ Stephen Weil*
Mike Kanovitz
Stephen Weil
Maria Makar
Loevy & Loevy
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
Tel: (312) 243-5900
Fax: (312) 243-5902
weil@loevy.com

---

[16] *Serna v. Transp. Workers Union of Am., AFL-CIO*, No. 3:13-CV-2469, 2014 WL 7721824, at *10 (N.D. Tex. Dec. 3, 2014) (quoting *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 298 (5th Cir. 2001) ("virtually" bracketing to accurately quote *Bertulli*); *see also In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir. 2014) ("[C]lass members' damage calculations [that] give rise primarily to individual questions that are not capable of classwide resolution" are "not fatal to class certification.").

[17] *See Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 628 (5th Cir. 1999) (collecting examples of certified classes in which damages were ultimately bifurcated).

10