## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**BRIAN HUMPHREY**, *et al.*, **on behalf of themselves and all others similarly situated,**

**CIVIL ACTION**

**VERSUS**

**NO. 20-233-JWD-SDJ**

**JAMES LEBLANC**

*AND*

**JOEL GIROIR, on behalf of himself and all similarly situated individuals,**

**CIVIL ACTION**

**VERSUS**

**NO. 21-108-JWD-SDJ**

**JAMES LEBLANC, in his official capacity as Secretary of the Louisiana Department of Public Safety & Corrections, ET AL.**

## <u>RULING AND ORDER</u>

TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................................. 3

II.  RELEVANT FACTUAL BACKGROUND ........................................................................... 5

   A.   Immediate Release and DOC's Duty Concerning Same ...................................... 5

   B.   DOC's Process for Releasing Inmates ................................................................. 6

      1.   The Release Process Generally ...................................................................... 6

      2.   Release Process of Giroir, Humphrey, and White ...................................... 10

   C.   Defendant's Alleged Policies ............................................................................. 16

      1.   The Fifth Circuit's Cases ............................................................................. 16

      2.   Plaintiffs' Evidence of the Problem and Policies ....................................... 28

      3.   Defendant's Evidence of Efforts to Fix the Problem .................................. 39

III. RULE 23 STANDARD .................................................................................................. 42

IV.  CLASS DEFINITION ISSUES ....................................................................................... 44

   A.   Ascertainability .................................................................................................. 44

      1.   Parties' Arguments ...................................................................................... 44

2.   Applicable Law ............................................................................ 48

3.   Analysis ........................................................................................ 48

B.   48-Hour Requirement & *Healey* ..................................................... 52

1.   Parties' Arguments ..................................................................... 52

2.   Law and Analysis ....................................................................... 58

C.   Numerosity ......................................................................................... 68

1.   Parties' Arguments ..................................................................... 68

2.   Applicable Law ........................................................................... 69

3.   Analysis ........................................................................................ 70

D.   Adequacy ............................................................................................ 74

1.   Parties' Arguments ..................................................................... 74

2.   Law and Analysis ....................................................................... 76

E.   Commonality and Typicality ............................................................ 77

1.   Parties' Arguments ..................................................................... 77

2.   Applicable Law ........................................................................... 83

3.   Analysis ........................................................................................ 85

V.   *HUMPHREY*: PREDOMINANCE UNDER RULE 23(B)(3) ............................ 88

A.   Parties' Arguments ................................................................................ 88

B.   Applicable Law ...................................................................................... 96

C.   Analysis ................................................................................................. 103

VI.   *GIROIR*: RULE 23(B)(2): PREDOMINANCE AND SPECIFICITY ............... 106

A.   Parties' Arguments ................................................................................ 106

B.   Applicable Law ...................................................................................... 110

C.   Analysis ................................................................................................. 113

VII.   CONCLUSION ............................................................................................ 115

## I.  INTRODUCTION

This matter comes before the Court on two *Motions for Class Certification* filed by the named plaintiffs in two actions: *Humphrey v. LeBlanc*, No. 20-233-JWD-SDJ ("*Humphrey*"), and *Giroir v. LeBlanc*, No. 21-108-JWD-SDJ ("*Giroir*"). (*Humphrey*, Doc. 104; *Giroir*, Doc. 25.) Both motions are opposed by defendant James LeBlanc ("LeBlanc" or "Defendant"), former Secretary of the Louisiana Department of Public Safety and Corrections ("DOC" or "DPSC"). (*Humphrey*, Doc. 118; *Giroir*, Doc. 27.)[1] Replies were filed as well. (*Humphrey*, Doc. 123; *Giroir*, Doc. 30.)

On March 14, 2023, the Court requested briefing on, *inter alia*, whether a class certification hearing would be beneficial; whether *Humphrey* and *Giroir* should be consolidated for purposes of the class certification issue; and, if so, what such a hearing would look like. (*Humphrey*, Doc. 173; *Giroir*, Doc. 87.) Both parties responded. (*Humphrey*, Docs. 176, 177, 172; *Giroir*, Docs. 90, 91, 96 (sometimes referred to as "pre-hearing briefing").) Additionally, both parties have provided supplemental authority to the Court and have, at times, responded to same. (*Humphrey*, Docs. 158, 164, 166, 196, 197, 200, 204; *Giroir*, Docs. 43, 44, 50, 52, 80, 81, 102, 106.)

The Court conducted a class certification hearing on October 19, 2023. (*Humphrey*, Doc. 209; *Giroir*, Doc. 112.) Witnesses testified, and the Court heard oral argument. (*Id.*) A transcript of the hearing ("Tr.") was filed on November 16, 2023, (*Humphrey*, Doc. 212; *Giroir*, Doc. 115), and the parties submitted post-hearing briefs, (*Humphrey*, Docs. 213, 214; *Giroir*, Docs. 116, 117), and replies, (*Humphrey*, Doc. 215, 216; *Giroir*, Docs. 118, 119). The parties also filed more supplemental authority. (*Humphrey*, Docs. 233, 237; *Giroir*, Docs. 135, 140.)

---

[1] LeBlanc is the only defendant in *Humphrey*. The defendants in *Giroir* are LeBlanc and DPSC. For simplicity's sake, the Court has tried to refer to LeBlanc as the only Defendant, though the Court has preserved in quotes those instances of the parties referring to "Defendants."

As a preliminary note, all record citations hereafter are to *Humphrey* unless otherwise noted; *Humphrey* is the lower numbered case, and *Giroir* has been consolidated with it for purposes of the hearing. Further, the named plaintiffs in *Giroir* and *Humphrey* are sometimes referred to collectively as "Plaintiffs."

Both cases involve the DOC's alleged policies of "overdetaining" individuals who have served their term of imprisonment but have not been released. More specifically, in *Humphrey*, the named plaintiffs—Brian Humphrey, Joel Giroir, and Bryant White ("*Humphrey* Plaintiffs")—seek to certify a class defined as:

> All persons who have been remanded to the custody of the DOC since April 16, 2019, and who were entitled to release at the time of their remand (either pursuant to sentencing or parole revocation), but who were released by the DOC more than 48 hours past the date that they were remanded to the DOC's custody due to Defendant's failure to implement and maintain an adequate process for timely releasing inmates.

(Doc. 213 at 7–8.)[2] "The [*Humphrey*] Class seeks to recover damages for the injuries caused to each class member by this overdetention and false imprisonment." (*H-SAC* ¶ 65, Doc. 43.)

In *Giroir*, the named plaintiff Joel Giroir ("*Giroir* Plaintiff") seeks to certify the following class:

> All persons who have been, or will be, sentenced to the custody of the Louisiana DOC, and who were, or will be, entitled to release at the time of their sentencing, but who nevertheless remain in custody,

---

[2] The *Humphrey* class was originally defined as:

> all persons who have been remanded to the custody of the DOC since April 16, 2019, and who were entitled to release at the time of their remand (either pursuant to sentencing or parole or probation revocation), but who were released by the DOC more than 48 hours past the time that they were remanded to the DOC's custody.

(*Humphrey Second Amended Class Action Complaint* ("*H-SAC*") ¶ 65, Doc. 43.) But, Plaintiffs seek to amend that definition so that the class will be consistent with *Healey v. Louisville Metro Government*, No. 3:17-cv-71, 2021 WL 149859, at *19 (W.D. Ky. Jan. 15, 2021). (Doc. 213 at 7–8 & n.9.) Because the Court finds *Healey* persuasive, and for reasons which will be clear below, the Court will grant this request.

> now or in the future, due to Defendants' failure to implement and maintain an adequate process for timely releasing inmates, for more than 48 hours past their sentencing dates.

(Doc. 213 at 7.)[3] "The [*Giroir*] Class seeks declaratory and injunctive relief against this overdetention and false imprisonment." (*G-AC* ¶ 67, Doc. 46.)

The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, the *Humphrey* motion will be granted in part and denied in part, and the *Giroir* motion will be granted. In sum, both classes will be certified as Plaintiffs seek, with the limited exception that the issue of mental anguish and emotional distress damages will be severed from the *Humphrey* class.

## II.    RELEVANT FACTUAL BACKGROUND

### A.  Immediate Release and DOC's Duty Concerning Same

A person is entitled to immediate release if he or she (1) spent time in custody pretrial; (2) is given a sentence with credit for time served; and (3) has a sentence that is less than or equal to their period of pretrial custody. (Pl. Ex. 5, Rule 30(b)(6) Dep. (Griffin) 30, Doc. 109-5 at 8.) Someone is "eligible to be released" if "they've been granted parole by the Parole Board; they have reached their good time release date based on time calculations; they have no detainers or warrants or extradition issues from other places; and they're not serving on any other sentence." (Pl. Ex. 18, Rule 30(b)(6) Dep. (Ellis) 19–20, Doc. 109–18 at 20–21.) As LeBlanc testified, some

---

[3] *Giroir* Plaintiff originally sought certification for the following class:

> all persons who were sentenced to the custody of the Louisiana DOC on or since February 17, 2020, or who will be sentenced to the custody of the DOC in the future, and who were, or will be, entitled to release at the time of their sentencing, but who nevertheless remain in custody, now or in the future, for more than 48 hours past their sentencing dates.

(*Giroir Amended Class Action Complaint* ("*G-AC*") ¶ 67, Doc. 46.) As with *Humphrey* Plaintiffs, *Giroir* Plaintiff sought an amendment in light of *Healey*, which the Court will grant. (Doc. 213 at 7.)

inmates are eligible for immediate release on the date of their sentence or conviction because of the application of good time, although their full term of their sentence will not yet be complete. (Pl. Ex. 17, LeBlanc Dep. 19–20, Doc. 109-17.) The DOC is legally bound to release inmates on their release date. (*Id.* at 15–16.)

Additionally, DOC is responsible for the inmates who are in the custody of the DOC, regardless of whether they are in a state-run facility, a parish-run facility, or a private facility. (*Id.* at 14; *see also* Pl. Ex. 3, Rule 30(b)(6) Dep. (Gueho) 53, Doc. 109-3 at 54) (stating that the admission date is the date the person is sentenced to DOC custody, not when he is physically brought to a state facility)); *see also* La. R.S. § 15:824(a) ("Notwithstanding any provision of law to the contrary, any individual subject to confinement in a state adult penal or correctional institution shall be committed to the [DPSC] and not to any particular institution within the jurisdiction of the department."). It is DOC's legal duty to make sure timely release of inmates happen. (Pl. Ex. 17, LeBlanc Dep. 14–16, Doc. 109-17; *see also* Tr. 15 (stating that DOC calculates the release dates for those in DOC custody and is responsible for their timely release).)

### B. DOC's Process for Releasing Inmates

Angela Griffin is a Program Manager for DOC. She oversees the DOC's Pre-Classification Department, which handles time computation of inmates sentenced to DOC custody and the release of inmates. (Def. Ex. 1, Griffin Aff. ¶ 1, Doc. 118-1.) Griffin provided an overview of the release of inmates from DOC custody generally and the history of the Plaintiffs specifically.

### *1. The Release Process Generally*

Griffin testified that not every offender sentenced to a DOC sentence is transferred to the physical custody of DOC. (*Id.* ¶ 2.) For instance, inmates awaiting their sentencing date at the local jail will generally stay at the local jail after they are sentenced to DOC time. (*Id.*) Griffin stated

that DOC "must rely on the local jails to send the necessary paperwork to advise [DOC] that the offender is sentenced to [DOC] time. That local jail must send the paperwork on all offenders sentenced to [DOC], even the offenders that transfer into [DOC] state facilities." (*Id.*)

"Pre-Classification is the process by which [DOC] identifies offenders who have been sentenced to [DOC] custody and determines the logistics of their sentences." (*Id.* ¶ 3.) This process "includes time computation, awards of credits, qualifications for parole, and other matters affecting the length of an offender's time in [DOC] custody." (*Id.*) This process also "includes the release of offenders sentenced to [DOC] custody and housed in the local facility." (*Id.*)

> The Pre-Classification process includes, but is not limited to: verification of the offender's identity, review and collection of conviction and sentencing information, time computation of release dates and parole eligibility dates in compliance with applicable sentencing laws, clearance of each offenders' records prior to their release, and the creation of offenders' release certificates for transmission to their holding facilities or Probation and Parole District Office.

(*Id.* ¶ 4.)

Griffin attested that "Louisiana Code of Criminal Procedure Article 892 lists the documentation and information that must be transmitted by the Parish Sheriff to [DOC] for the purpose of completing time computation." (*Id.* ¶ 5.) Such information is referred to as the "Pre-Class Packet" and must include:

- Basic Information and Interview for Local Jail Facilities Form,

- Credit for DPSC Commitment Form,

- Bill of Information,

- Uniform Commitment Order [("UCO")] with Judges Signature,

- Suspect Rap Sheet with photo, State Identification Number (SID) and the Arrest Tracking Number (ATN) from the fingerprint for the conviction/disposition of the sentence from the Automated Fingerprinting Identification System, and

- [DOC] Acknowledgements and Signature Statement signed by the inmate.

(*Id.* ¶ 6.) As explained at the hearing, the clerk sends sentencing information to the sheriff, who then verifies that they have the right inmate in custody, provides the disposition on the state police criminal history as to that arresting charge, and then sends the packet to DOC in the form of hard-copy paper documents. (Tr. 17, 136–37.)

When DOC receives a Pre-Class Packet, the DOC stamps or signs the first page of the packet with the date it was received. (Def. Ex. 1, Griffin Aff. ¶ 7, Doc. 118-1.) Next, the documents in the packet are "scanned into Oracle, an electronic filing system, and saved by the offender's [DOC] Number if he has one. If not, he is assigned a [DOC] Number by [DOC]." (*Id.*)

> Once [DOC] receives the Pre-Class Packet from the parish jail, [DOC] personnel within the Pre-Class Department verifies all paperwork included is for the same person, confirms the sentence on the [UCO] is a hard labor sentence to be served in the custody of [DOC], and prints criminal history from NCIC and verifies that the offender's tracking number, from the NCIC fingerprinting paperwork and criminal history, coincides with the disposition for the conviction on the [UCO].

(*Id.* ¶ 8; *see also* Clearing Checklist, Def. Ex. 1-A, Doc. 118-2.)

"[I]n most instances, [DOC] cannot process the offender's time computation" if the Pre-Class Packet is missing required documents or if the required documents are not completely filled-out and executed as required by La. Code Crim. Proc. art. 892. (Def. Ex. 1, Griffin Aff. ¶ 9, Doc. 118-1.) Griffin cited by way of example that some courts do not send or prepare UCOs, even though the Supreme Court requires them. (*Id.* ¶ 10; *see also* Tr. 119.) At the hearing, Griffin also

testified that DOC regularly encounters other delays in time computation, including (1) "not getting the jail credit to know when the offender was in custody, [(2)] not getting fingerprints on an offender to know who he is[,]" and (3) processing parole violators and offenders with open charges and no dispositions. (Tr. 103, 119–20.) Griffin said that the first two were the "main ones[,]" (Tr. 119), but the Court finds her testimony on these points slightly unclear.

In any event, "[t]he Pre-Class Department must update the Criminal and Justice Unified Network (CAJUN) using an offender's previously-assigned [DOC] number or new [DOC] number, with the information obtained or learned from the Pre-Class Packet." (Def. Ex. 1, Griffin Aff. ¶ 11, Doc. 118-1.)

> After the necessary information is located in or entered into CAJUN, [DOC] personnel completes the offender's time computation, which requires reviewing: any and all jail credit that is applicable for each sentence (found on the Credit for [DOC] Commitment Form received from the jail and listed on CAJUN); the crime convicted (found on the Uniform Commitment Order), the date the crime was committed (found on the Bill of Information), the sentence date (the date the offender was given an imposed sentence to [DOC] (found on the [UCO])]; the sentence start date (if deferred sentence, the date the [UCO] gives to report to jail and the date the offender was remanded as listed on the Credit for [DOC] Commitment Form from the jail); the sentence length for each charge (the amount of time listed on the [UCO] to serve in the custody of [DOC] on a new commitment); offender class for the charge related to number of felony convictions (calculated by using the information on the CAJUN system and the Criminal History Reports[)]; and Good time rate and parole eligibility for each charge (determined by the commitment date and the type of crime).

(*Id.* ¶ 12.)

DOC personnel also look at whether the "offender has any time to serve on other sentences based on the information obtained from their criminal history and dispositions." (*Id.* ¶ 13.) These personnel get the offender's criminal history reports (i.e., State Police, FBI, and out of state criminal history) to see whether the offender has "any warrants, charges without dispositions, and

any Louisiana or out of state proceedings in which the offender may need to serve time." (*Id.* ¶ 14.)

> For every arrest or charge without a recorded disposition, [DOC] personnel must contact the arresting agency, clerk of court, or prosecuting agency, to determine the disposition of each charge. This task must be completed before a release certificate can be issued, as it may impact the calculation of an inmate's release date.

(*Id.* ¶ 14.)

If DOC personnel determine that an offender is entitled to release, they send the proper release certificate and form letter by email or fax to the supervising Probation and Parole district, or to the local facility holding the offender. (*Id.* ¶ 15.) That personnel confirms the release paperwork was received. (*Id.*) But, if any information is missing or incomplete, DOC cannot legally release the offender until that information is obtained or verified. (*Id.* ¶ 16.)

### 2. Release Process of Giroir, Humphrey, and White

Griffin attested that she reviewed the Pre-Class Packet and time computation information regarding each of the Humphrey and Giroir Plaintiffs. (Def. Ex. 1, Griffin Aff. ¶¶ 23, 25, 27, Doc. 118-1.) Plaintiffs also submit their own evidence in support of these facts. Below is a summary of both.

#### a. Giroir

On January 26, 2021, Giroir's probation was revoked, and he was sentenced to one-year hard labor. (*Id.* ¶ 24a.) Giroir declares how, at the time of his sentence, he was entitled to immediate release. (Pl. Ex. 20, Giroir Decl. ¶¶ 3–8, Doc. 104-21.)[4] Giroir stated that he was held for 64 days over his sentence. (*Id.* ¶ 8.)

---

[4] The details of Giroir's alleged overdetention are set out in his February 18, 2021, declaration:

> 3. I am entitled to immediate release. I have already been held past my legal release date. I am being overdetained by the DOC. I should not still be in jail.

According to Griffin, DOC had no knowledge of this sentence until February 12, 2021, after St. Tammany Parish emailed Giroir's Pre-Class Packet to the Pre-Class Department at Raymond Laborde Correctional Center at 11:05 a.m. (Def. Ex. 1, Griffin Aff. ¶ 24b, Doc. 118-1.)

On February 12, 2021, Joseph Bordelon (a Pre-Class employee) ran Giroir's criminal history in accordance with Pre-Class Intake. (*Id.*¶ 24c.) Griffin said that "[i]t was discovered that the Arrest Tracking Number (ATN) on plaintiff's fingerprint rap sheet did not match the ATN numbers on [his] criminal history." (*Id.*) Bordelon called the St. Tammany Parish Jail and informed them of the discrepancy. (*Id.*) "Bordelon was transferred to the booking department, who advised that they would 're-book' Giroir on the charges and fax the corrected information once it was

---

4. I have served enough jail time to be eligible for immediate release. I was held on an attachment with no bond in case number 589-169 and held on a $5000 bond in case number 589-855 in St. Tammany Parish Jail from January 30, 2018, to March 13, 2018. I was held with no bond on case numbers 589-855 and 589-169 from June 12, 2018 until July 19, 2018. On July 19, 2018, I was sentenced to 90 days in DOC custody in lieu of revocation. I served 110 days in Concordia Parish Jail. I turned myself into St. Tammany Parish Jail on January 22, 2021, and was incarcerated there until my revocation date on January 26, 2021.

5. On January 26, 2021, I had a probation revocation and resentencing hearing. I was sentenced to one year in DOC custody.

6. Under Louisiana's "good time" law, I am entitled to a diminution of sentence. Because of my good behavior and because I was not convicted of crimes of violence, I am only required to serve 35 percent of my one-year sentence, or 128 days.

7. As of the date of my revocation and sentencing on January 26, 2021, I had served at least 192 days in jail on my one-year sentence. So on the date of my sentencing, I was eligible for immediate release.

8. I was not immediately released on January 26, 2021, even though I had already served at least 64 days over my sentence. I still have not been released. I am being overdetained in DOC custody.

(Pl. Ex. 20, Giroir Decl. ¶¶ 3–8, Doc. 104-21.)

completed." (*Id.*) Griffin said that Bordelon called the jail two more times that day, but the jail did

not send the updated information. (*Id.*)

An ice storm caused all state offices in Avoyelles Parish to be closed from February 15 to

19, 2021. (*Id.* ¶ 24d.) Bordelon returned to the office on February 22, 2021, and he received the

requested updated information from the jail and was able to calculate Giroir's time that morning.

(*Id.*) At 8:22 a.m. that day, Bordelon sent the packet to Headquarters. (*Id.* ¶ 24e.)

Jessica Smith received the packet at that time. (*Id.* ¶ 24f.)

> Smith then performed the following tasks necessary to process the
> release: (1) print and send submittal, clearance and residence plan to
> St. Tammany Parish Prison; (2) request criminal history to begin
> clearing release; (3) called Jefferson Parish Sheriff Office to
> determine whether plaintiff had an active warrants or detainers; (4)
> called Orleans Municipal Court to check for active warrants or
> detainers; (5) obtain disposition of charges on criminal history sheet
> from S[t]. Tammany; (6) updating information in CAJUN; (7)
> prepare release packet for signature; and (8) send final release
> packet to St. Tammany.

(*Id.*) Giroir was released on February 22, 2021, the same day. This was 27 days after his sentence,

and 10 days after the DOC first purportedly received the Pre-Class Packet.

### b.  Humphrey

On April 16, 2019, Humphrey was sentenced in the 26th JDC. (*Id.* ¶ 26a.) The minutes to

this proceeding say he was sentenced to serve three years hard labor in the DOC "suspend all but

time served[.]" (Pl. Ex. 22, Minutes, Doc. 104-23 at 3.) As Plaintiffs argue, "In other words, Mr.

Humphrey's sentencing judge gave him credit for the time he had served in jail, and otherwise

suspended his sentence. Thus, as of the date of his sentencing, Mr. Humphrey had served his entire

sentence. He should have been released immediately." (Doc. 104-1 at 13.) Nevertheless, Griffin

attested that the UCO stated that the sentence was three years, DOC time was "0" years, and there

was no indication that the sentence was at hard labor. (Def. Ex. 1, Griffin Aff. ¶ 26a, Doc. 118-1; *see also* Pl. Ex. 22, UCO, Doc. 104-23 at 14.)

On April 26, 2019, at the end of the day, the Bossier Parish Sheriff sent the Pre-Class Packet to DOC. (Def. Ex. 1, Griffin Aff. ¶ 26b, Doc. 118-1; *see also* Pl. Ex. 22, Doc. 104-23 at 10.) According to Griffin, the packet was initially received by the Pre-Class Department at David Wade Correctional Center, which had the responsibility of processing sentence computations and releases for offenders in certain parishes. (Def. Ex. 1, Griffin Aff. ¶ 26b, Doc. 118-1.) Griffin said that Humphrey's packet was "included with a group of Pre-Class Packets from the Bossier Parish Sheriff's Office." (*Id.*) The document listed Humphrey's term as "3 yrs HL DOC all but time served suspended." (Pl. Ex. 22, Doc. 104-23 at 12.)

Still, "[b]ecause it was received at the end of the day on Friday, [Humphrey's] Pre-Class Packet was not sorted and assigned until the following Monday (April 29, 2019), when it was assigned to Carlisa Lewis to begin processing." (Def. Ex. 1, Griffin Aff. ¶ 26b, Doc. 118-1.) According to Griffin, "[o]n that day Lewis accessed CAJUN, which showed that [Humphrey] was already reporting to Probation and Parole ("P&P"). Lewis returned [Humphrey's] Pre-Class Packet to Cecilia Lawrence for further handling[.]" (*Id.*)

That same day (April 29), Lawrence started the process of confirming Humphrey's information in CAJUN and verifying his whereabouts. (*Id.* ¶ 26c.) She also conducted a criminal history check on Humphrey. (*Id.*) The information in CAJUN indicated that Humphrey was reporting to P&P, and this contradicted the Pre-Class Packet. (*Id.*) So, "Lawrence contacted the Webster, Caddo and Bossier Parish jails by telephone to confirm whether [Humphrey] was housed there." (*Id.*) Each jail told her that Plaintiff was not there. (*Id.*)

Lawrence then emailed P&P to verify the information in CAJUN. (*Id.*) "P&P responded that it had no information but assumed Plaintiff had been released because his case had been assigned as a 'no show,' indicating he did not appear for his initial meeting with P&P after release." (*Id.*) Lawrence sent the Pre-Class Packet back to Lewis because Humphrey could not be found at that time. (*Id.*)

Between May 3 and May 6, 2019, Lewis entered further information into CAJUN related to Humphrey to process his time computation and release. (*Id.* ¶ 26d.) On May 9, 2019, DOC headquarters updated the CAJUN information to show that Plaintiff was housed at the Bayou Dorcheat Correction Center. (*Id.*) Lawrence then told Lewis of Humphrey's whereabouts, and Lewis sent the Pre-Class Packet to Jeffrey Norred at David Wade Correctional Center for further processing. (*Id.*)

Between May 9, 2019, and May 13, 2019, "Norred was provided with [Humphrey's] file by Lewis so that he could run an initial time computation." (*Id.* ¶ 26e.) However, Griffin did not state what exactly that meant (i.e., whether the file was mailed) or why this took so long.

On May 13, 2019, Norred gave Sally Gryder a release packet which included all information required according to the DOC Release Clearing Checklist and "the appliable Instructions." (*Id.*) "Gryder checked the time computation, signed the Release Clearing Checklist[,] and returned it to Norred to process the release." (*Id.*) The computation showed a "MUST SERV" value of -114. (Pl. Ex. 22, Doc. 104-23 at 16.)

On the same day, around 8:30 a.m., Norred began the releasing process. (Def. Ex. 1, Griffin Aff. ¶ 26e, Doc. 118-1.)

> The Webster Parish Sheriff sent the residence plan and clearance sheet back to Norred on May 13, 2019 at 11:01 AM. Norred then printed out the release certificate information and presented it to David Wade Correctional Center Assistant Warden Angie Huff. The

14

> signed release certificate was then faxed by Norred to the Bayou
> Dorcheat Correctional Center, where Plaintiff was located. Norred
> then called Carolyn Douglas, Assistant Warden at Bayou Dorcheat
> Correctional Center, to confirm the certificate was received.

(*Id.*) Humphrey was released later that day, on May 13, 2019, though Griffin does not specify the time—again, 27 days after the sentence, and 17 days after DOC first received his Pre-Class Packet.

### *c.*  White

On January 10, 2018, White was released on parole on his charges. (*Id.* ¶ 28a.) On March 12, 2019, White was arrested on new felony charges. (*Id.* ¶ 28b.) On April 25, 2019, White chose to defer his preliminary hearing and to postpone the finale parole hearing before the Parole Board until the pending felony charges were disposed of. (*Id.* ¶ 28c.)

On March 1, 2021, White pled guilty to one charge and one lesser charge. (*Id.* ¶ 28d.) White attested that he was sentenced on this date to "6 months and 23 months to run concurrently and to be served at the Orleans Parish Justice Center, which [he] had already served." (Pl. Ex. 21, White Decl. ¶ 4, Doc. 109-21.) White stated that, based on the state's "good time law" and the amount of time he had spent in jail with a parole hold, at the time of his sentence, his "parole should have been revoked and [he] was eligible for immediate release." (*Id.* ¶ 5.)

On March 12, 2021, White's parole officer completed the necessary report recommendation revocation of White's parole, after getting the necessary court minutes and UCO pertaining to White's guilty plea. (Def. Ex. 1, Griffin Aff. ¶ 28e, Doc. 118-1.) The report was sent to DOC Headquarters and then to the Parole Board on March 19, 2021. (*Id.* ¶ 28f.) On April 15, 2021, the Parole Board issued a letter revoking White's parole. (*Id.* ¶ 28h.)

> On April 19, 2021 the DOC Pre-Class Department received White's
> parole revocation packet. Melissa Morrison sent the parole
> revocation letter to the Orleans Parish Sheriff's office requesting the
> Pre-Class packet for White. The Pre-Class packet was received the
> same day, and Morrison calculated White's time and scanned and

indexed all documents into Oracle. Morrison then email the time
computation to Headquarters.

On April 20, 2021, Amy Caruso received White's information. She
sent off the residence plan and release clearance to Orleans Parish
Sheriff's office, and discovered that White had a detainer from St.
Bernard Parish. On April 20, 2021, White was released from DOC
custody to St. Bernard Parish on the detainer.

(*Id.* ¶¶ 28h–i.)

White maintained that he was overdetained because he was not immediately released on

March 1, 2021; rather, he was held until April 23, 2021. (Pl. Ex. 21, White Decl. ¶ 6, Doc. 109-

21.) That means White was held 53 days after he was entitled to release, and 35 days after his

paperwork was sent to DOC headquarters.

### C. Defendant's Alleged Policies

#### 1. The Fifth Circuit's Cases[5]

Before applying this general law to the facts at hand, the Court finds it important to describe

the evolution of the Fifth Circuit caselaw governing the overdetention crisis in Louisiana. Counsel

for both sides are intimately familiar with these cases. Nevertheless, these decisions will provide

context for this Court's ruling as well as support for it.

##### a. The "Long Long Ago"

*Hicks v. LeBlanc*, 832 F. App'x 836 (5th Cir. 2020) ("*Hicks I*") captures its beginnings.

There, the appellate court concluded that Chief Judge Dick erred in denying LeBlanc qualified

immunity for overdetention. *Id.* at 838. The appellate court stated:

Whether LeBlanc acted with deliberate indifference is a close call.
Hicks alleged that LeBlanc knew of the DPSC's long history of
over-detaining inmates; that DPSC employees used different
methods to calculate release dates; and that the DPSC had not

---

[5] This summary of "The Overdetention Saga" was provided by this Court in *McNeal v. Louisiana Department of
Public Safety & Corrections*, No. 18-736, 2025 WL 350244, at *10–18 (M.D. La. Jan. 30, 2025) (deGravelles, J.). It
has been reproduced here in full for the sake of completeness.

disciplined employees who miscalculated sentences. However, the alleged facts—which included processing delays, data errors, inconsistent calculation methodologies, and unspecified deficiencies—speak to the incompetence of DPSC employees and the lack of adequate training and supervision. Based on these allegations, LeBlanc could be held liable for incompetent over-detention, such as the failure to process a prisoner's release or immediately compute an inmate's sentence after being sentenced to time served. *See Traweek v. Gusman*, 414 F. Supp. 3d 847 (E.D. La. 2019); *Grant v. Gusman*, No. 17-2797, 2018 WL 3869494 (E.D. La. Aug. 14, 2018). But it cannot be said that LeBlanc had notice that his employees were purposely disregarding sentencing orders out of retaliatory intent. The complaint was devoid of allegations supporting the reasonable inference that a pattern of intentional over-detention existed in the DPSC; that is, the alleged facts suggest a pattern of over-detention caused by quality control deficiencies and the lack of training and supervision, not a pattern of over-detention stemming from the blatant refusal to credit offenders with time served contrary to sentencing orders. In the absence of such a pattern, LeBlanc could not have acted with deliberate indifference to Lawson's intentional sentencing miscalculation and over-detention of Hicks. Accordingly, the district court erred in denying LeBlanc's defense of qualified immunity.

*Id.* at 842.

### b.   Crittindon v. LeBlanc

Then, a change came with *Crittindon v. LeBlanc*. There:

Plaintiffs argue that Defendants were deliberately indifferent to their right to timely release by failing to adopt policies that would ensure local jails' timely transmission of pre-classification paperwork to DPSC; that all three officials knew that local jails were failing to timely send paperwork but did nothing, well aware that their policies (or lack thereof) led to overdetentions.

*Crittindon v. LeBlanc*, 37 F.4th 177, 186 (5th Cir. 2022). Chief Judge Dick denied both parties' motions for summary judgment, and the DPSC defendants appealed the denial of qualified immunity. *Id.* at 185.

The Fifth Circuit affirmed as to LeBlanc's motion, finding that, when construing the evidence in a light most favorable to the plaintiffs, "a reasonable jury could find that Defendants

[(including LeBlanc)] knew of a 'pattern of similar constitutional violations,' such that their inaction amounted to a disregard of an obvious risk." *Id.* at 187.

The Fifth Circuit relied on the DPSC's Lean Six Sigma study, which "revealed that 2,252 DPSC prisoners were annually held past their release date. On average, these prisoners were detained 72 days past the expiration of their court-imposed sentence." *Id.* The Court continued,

> The study attributed this overdetention to delays in determining prisoners' release dates, finding that on average, it took 110 days to determine a prisoner's release date after his conviction. This included approximately 31 days for documents to be transmitted from the Clerk of Court to the local jail to DPSC's Pre-Classification Department.

*Id.* The appellate court noted that LeBlanc was "familiar with the Lean Six Sigma study" and "was a 'champion' of the project and apprised of its findings." *Id.* The appellate court continued:

> Defendants concede that, because of the study, they each knew that on average, it took a month for DPSC to receive the paperwork necessary to begin calculating a prisoner's release date after his conviction. Defendants also knew that some prisoners would be entitled to immediate release upon conviction. Therefore, in cases like Plaintiffs', where prisoners were entitled to immediate or near-immediate release upon conviction, it was obvious that a failure to address those processing delays would lead to unconstitutional overdetentions. Despite this awareness, years after the Lean Six Sigma project, Defendants have not pointed to a single effort that any of them took to identify immediate releases more quickly during that month-long delay. And this is despite the fact that LeBlanc and Stagg were responsible for the Basic Jail Guidelines, while Stagg and Griffin were responsible for running DPSC's Pre-Classification Department. They were each in a position to adopt policies that would address this delay.

*Id.*

There, Defendants urged that they should be "insulated from liability" because Lean Six Sigma study was irrelevant to showing any deliberate indifference there because it "was aimed at investigating DPSC's internal—not external—delays in processing prisoner paperwork." *Id.* The

Fifth Circuit responded: "But this misses the point; Defendants cannot avoid the evidence that the study exposed unlawful detentions of prisoners. A reasonable factfinder could conclude that Defendants' awareness of this pattern of delays and their conscious decision not to address it rises to the level of deliberate indifference." *Id.* at 187–88.

The Fifth Circuit also found that defendants were not entitled to qualified immunity. The appellate court explained:

> This Court has recognized the "clearly established right to timely release from prison." Of course, "timely release" is not the same as instantaneous release: it is reasonable for jailers to have some administrative delay in processing an inmate's discharge. [*See Whirl v. Kern*, 407 F.2d 781, 792 (5th Cir. 1968) (concluding that a jailer does not commit "an instant tort at the moment" the prisoner is entitled to release; instead, a jailer's "duty to his prisoner is not breached until the expiration of a reasonable time for the proper ascertainment of the authority upon which his prisoner is detained.").] While courts have declined to define the amount of delay that is reasonable, [(citation omitted)], it is without question that holding without legal notice a prisoner for a month beyond the expiration of his sentence constitutes a denial of due process. [*Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980) ("Detention of a prisoner thirty days beyond the expiration of his sentence in the absence of a facially valid court order or warrant constitutes a deprivation of due process.").] Indeed, Defendants knew not just of delay, but that there was, on average, a month-long delay in receiving paperwork from the local jails. Therefore, they had "fair warning" that their failure to address this delay would deny prisoners like Plaintiffs their immediate or near-immediate release upon conviction. We conclude that because a reasonable jury may find that Defendants' inaction was objectively unreasonable in light of this clearly established law, they have failed to show they are entitled to qualified immunity on these claims.

*Id.* at 188 (some citations omitted). The Court later continued:

> [T]here is a clearly established right to a timely release from prison, which "establishes that a jailer has a duty to ensure that inmates are timely released from prison." Due to the mothers' phone calls, Defendants knew that Crittindon and Burse were at risk of overdetention. Nonetheless, despite their knowledge that the two had been illegally held for three months, for 17 days they failed to address this risk. They had "fair warning" that their failure to

> address this delay would result in the illegal detention of Crittindon
> and Burse. Because a factfinder may find that Defendants' inaction
> in response to the risk of overdetention was objectively
> unreasonable in light of this clearly established law, Defendants
> have failed to show they are entitled to qualified immunity on these
> claims.

*Id.* at 189–90.

Lastly, the *Crittindon* majority rejected the dissent's view that the claims were barred by

*Heck*. *Id.* at 190. In doing so, they highlighted how the Defendants "did nothing for 17 days" and

how, after finally "'pick[ing] up the phone[,]' Plaintiffs were released within 24 hours." *Id.* Equally

important, the Fifth Circuit stated, "This Court recognizes that overdetention by thirty days is a

per se deprivation of due process." *Id.* at 191 (citing *Douthit*, 619 F.2d at 532).

### c.    Parker v. LeBlanc

Subsequent cases only reenforced *Crittindon*. In July of 2023, in *Parker v. LeBlanc*, the

Fifth Circuit affirmed undersigned's ruling that Plaintiffs adequately pled that LeBlanc was subject

to supervisor liability and that he was not entitled to qualified immunity. 73 F.4th 400, 408 (5th

Cir. 2023). There, Plaintiff relied upon three pieces of evidence to support a pattern of similar

constitutional violations:

> (1) an October 2017 legislative audit report on the Louisiana DPSC
> entitled "CFE Management of Offender Data: Processes for
> Ensuring Accuracy Department of Corrections"; (2) a 2018 editorial
> by Senator John Kennedy and Attorney General Landry entitled,
> "Criminal Justice Reform Actually Hurting Public Safety,"
> published in the newspaper "The Advocate"; and (3) testimony by
> DPSC employees admitting to rampant over-detention in a similar
> suit in Louisiana state court, *Chowns v. LeBlanc*, La. 37th JDC 26-
> 932. Parker also alleges on information and belief that Defendant
> LeBlanc was aware of the three items we just enumerated.

*Id.* at 405. "LeBlanc insist[ed] that there [wa]s a meaningful distinction between Parker's over-

detention due to his alleged misclassification as a sex offender, as opposed to over-detention due

to miscalculations of his sentence or his status being generally lost in the system." *Id.* But the Fifth

Circuit "agree[d] with the district court's assessment":

> The district court "decline[d] to draw the line as finely as LeBlanc advances and limit the types of problems involved solely to those instances where individuals have been misclassified as sexual offenders." The court noted that the real problem alleged in the Legislative Audit report was the Department "not knowing when [inmates'] proper release date was" and that "inmate sentences have been 'done wrong'" as stated in testimony from *Chowns v. LeBlanc*.

*Id.*

The Fifth Circuit also relied on *Crittindon*: "The allegations in the complaint are that there

is a 'pattern of over-detention' that renders Parker's own case 'neither unique nor even unusual.'"

*Id.* at 406. "Parker has alleged that he was detained for 337 days past his release date and has cited

three pieces of evidence to support his allegations that LeBlanc was aware of the deficiencies of

implemented policies that routinely led to errors like the one that violated his constitutional rights."

*Id.* The Fifth Circuit went on to find that, under *Crittindon*, Plaintiff's right was clearly established,

and "defining the clearly established right as 'timely release from prison'" was not "overbroad."

*Id.* at 408. Based on the allegations of the complaint, and under *Crittindon*, LeBlanc had "'fair

warning' that [his] failure to address this delay would deny prisoners like [Parker] their immediate

or near-immediate release upon conviction." *Id.* (quoting *Crittindon*, 37 F.4th at 188).

### d.  Hicks II

In September 2023, the Fifth Circuit yet again found that a prisoner stated a viable claim

against LeBlanc for overdetention in *Hicks v. LeBlanc*, 81 F.4th 497, 510 (5th Cir. 2023)

(hereinafter *Hicks II*). The Court began its opinion: "We are seeing with some frequency claims of

'overdetention,' now a euphemism for prisoners illegally incarcerated beyond the terms of their

sentence. Unfortunately, many of these cases have come to this Court in recent years. This is yet another from Louisiana." *Id.* at 500. The Court provided the same foundational law as above:

> The Fourteenth Amendment guarantees that no state may "deprive any person of life, liberty, or property, without due process of law." [U.S. Const. amend. XIV, § 1.] Clear as day, the government cannot hold an inmate without the legal authority to do so, for that would "deprive" a person of his "liberty . . . without due process of law." [*Id.*] Applying this foundational concept to carceral sentences and releases, it is clearly established that inmates have the right to timely release from prison consistent with the terms of their sentences, a holding we have long-held and repeatedly reaffirmed. [*See Parker*, 73 F.4th at 408 ("We agree that there is sufficient clearly established law regarding the constitutional right to a timely release from prison."); *Crittindon*, 37 F.4th at 188 (noting that the Fifth Circuit "has recognized the 'clearly established right to timely release from prison'"); *see also Porter*, 659 F.3d at 445 ("Our precedent establishes that a jailer has a duty to ensure that inmates are timely released from prison."); [*Douthit*, 619 F.2d at 532] ("Detention of a prisoner thirty days beyond the expiration of his sentence in the absence of a facially valid court order or warrant constitutes a deprivation of due process.").] Relevant here, the right to timely release was clearly established well before 2017.

*Id.* at 504. The Court ultimately concluded:

> "There isn't always an explanation for everything." [Ernest Hemingway, A FAREWELL TO ARMS 81 (1929).]. Indeed, as our Court remains plagued by claims arising from inexplicable and illegal overdetention in Louisiana prisons, explanations scarcely arise, let alone satisfy scrutiny upon our review. [*See Crittindon*, 37 F.4th at 183.] The problem is endemic in Louisiana, where the process for calculating release dates is so flawed (to put it kindly) that roughly one in four inmates released will have been locked up past their release dates—for a collective total of 3,000-plus years. [Mariah Timms*, Louisiana Prisons Hold Inmates Past Their Release Dates, Justice Department Finds*, WALL ST. J. (Jan. 25, 2023); Kanishka Singh, *U.S. finds Louisiana deliberately kept inmates past release date*, REUTERS (Jan. 25, 2023); Lea Skene & Jacqueline DeRoberts, *State corrections overdetention woes, known since 2012, cost state millions, lawyer alleges*, THE ADVOCATE (Feb. 6, 2020).]

*Id.* at 510.

e.  McNeal v. LeBlanc

LeBlanc also appealed this Court's denial of a motion to dismiss premised on qualified

immunity in *McNeal v. LeBlanc*, 90 F.4th 425 (5th Cir. 2024). The Fifth Circuit summarized the

relevant allegations against LeBlanc as follows:

> McNeal alleges that, in 2012, DPSC performed an internal review
> called the "Lean Six Sigma," examining how long it took to
> calculate prisoner release dates. The review was "champion[ed]" by
> LeBlanc, who had been DPSC Secretary since 2008. Lean Six
> Sigma "found a widespread pattern of people being held past their
> legal release date," with 83% of DPSC prisoners being
> overdetained. The review determined that, on average, inmates were
> held 71.69 days past their release dates. After learning of the issue,
> LeBlanc set the goal to detain "450 persons per year, for an average
> of 31 days per person." LeBlanc's changes reduced the number of
> overdetained persons from "2,252 per year to 1,612, and the average
> number of overdue days was reduced from 71.7 to 60.52 days."
> Despite these efforts, LeBlanc conceded that "the 'functional
> processes' around the transmission of documents" at the DPSC
> "remain as antiquated as they were in 1996."
>
> Even after the Lean Six Sigma review, overdetention issues
> persisted. For example, four DPSC employees testified in a 2015
> state case, *Chowns v. LeBlanc*, La. 37th JDC 26-932, that DPSC
> employees were well aware of prisoner overdetention. In 2017, a
> report by the Louisiana Legislative Auditor documented DPSC's
> problems calculating and processing prisoners' release dates. DPSC
> itself conducted an internal review, which "confirmed that the
> pattern of overdetention it learned about in 2012" from Lean Six
> Sigma "was ongoing." In a grant application to the U.S. Department
> of Justice, DPSC disclosed that in 2017 it "had an average of 200
> cases per month considered an 'immediate release' due to
> [processing] deficiencies," and the prisoners in these cases "were
> held an 'average of 49 days past the end of their sentences.'" In
> 2018, then-Louisiana Attorney General Jeff Landry wrote an op-ed
> with U.S. Senator John Kennedy, stating there was "a layer of
> incompetence so deep that the Corrections Department doesn't
> know where a prisoner is on any given day of the week or when he
> should actually be released from prison."
>
> McNeal further alleges that LeBlanc knew overdetention issues still
> plagued the DPSC as of November 2017. Specifically, after Lean
> Six Sigma, LeBlanc learned that thousands of people in the custody

of DPSC "were being held past their release date." LeBlanc also admitted that, even after the changes he instituted, the DPSC "still had 'people being held an average of about two months past their release date.'" Yet, LeBlanc never fired, demoted, penalized, or reprimanded anyone for holding inmates past their release dates. Between 2012 and 2017, multiple officials reached out to LeBlanc about overdetained prisoners. LeBlanc was also personally involved in "the back-and forth with the auditor," which eventually led to the 2017 Louisiana Legislative Audit.

*Id.* at 429–430.

The Fifth Circuit affirmed this Court's denial of qualified immunity. *Id.* at 433. The Court began by quickly finding that, "[f]ollowing [the circuit's] recent caselaw, [the appellate court was] bound to agree with McNeal" that Plaintiff's claims were not barred by *Heck*. *Id.* at 430–31.

LeBlanc also argued that "McNeal fail[ed] to allege a pattern of similar overdetentions at DPSC." *Id.* at 431. But the Fifth Circuit rejected this argument as well:

> We have already addressed this argument based on almost identical allegations made in *Parker* . . . . We held there, as we are bound to hold here, that the overdetained prisoner alleged a pattern of similar violations at the DPSC sufficient to deny LeBlanc qualified immunity at the motion to dismiss stage. *See* [73 F.4th] at 406.

*Id.*

The Fifth Circuit then turned to the Fourteenth Amendment standard, again reiterating:

> Our precedent establishes, accordingly, "that a jailer has a duty to ensure that inmates are timely released from prison." *Porter*, 659 F.3d at 445. Relevant to LeBlanc's liability, we recently "held that 'it is without question that holding without legal notice a prisoner for a month beyond the expiration of his sentence constitutes a denial of due process.'" *Parker*, 73 F.4th at 404 (quoting *Crittindon*, 37 F.4th at 188); *see also* [*Douthit*, 619 F.2d at 532] ("Detention of a prisoner thirty days beyond the expiration of his sentence in the absence of a facially valid court order or warrant constitutes a deprivation of due process.").

*Id.* at 431. The *Parker* court "held that LeBlanc's knowledge of three facts put him on notice of 'a pattern of similar constitutional violations by untrained employees'":

> (1) an October 2017 legislative audit report on the Louisiana DPSC entitled "CFE Management of Offender Data: Processes for Ensuring Accuracy Department of Corrections"; (2) a 2018 editorial by Senator John Kennedy and Attorney General Landry entitled, "Criminal Justice Reform Actually Hurting Public Safety," published in the newspaper "The Advocate"; and (3) testimony by DPSC employees admitting to rampant over-detention in a similar suit in Louisiana state court, *Chowns v. LeBlanc*, La. 37th JDC 26-932.

*Id.* at 432 (quoting *Parker*, 73 F.4th at 405). "Relying on *Crittindon*, [*Parker*] held these allegations demonstrated LeBlanc's notice of a pattern of similar overdetentions to survive prong one of qualified immunity at the motion to dismiss stage." *Id.* (citing *Parker*, 73 F.4th at 405). *McNeal* then concluded:

> We are faced with two of the same relevant factual allegations made in *Parker*, and more. Like the plaintiff there, McNeal alleges that LeBlanc knew about the October 2017 legislative audit and testimony by DPSC employees in *Chowns v. LeBlanc*, La. 37th JDC 26-932, admitting to rampant overdetention. McNeal also alleges LeBlanc had intimate knowledge about the results from the Lean Six Sigma report before McNeal's overdetention occurred. Finally, McNeal alleges that before 2017, multiple public officials reached out to LeBlanc regarding overdetained prisoners. The *Parker* panel found fewer allegations sufficient to establish LeBlanc's knowledge of a pattern of overdetention. We are thus bound under the rule of orderliness to find McNeal's more numerous allegations sufficient to show deliberate indifference and to survive prong one of qualified immunity. *See ibid.*; *see also United States v. Traxler*, 764 F.3d 486, 489 (5th Cir. 2014).

*Id.*

The Fifth Circuit also found that, under *Parker*, the second prong of qualified immunity was satisfied:

> McNeal's alleged overdetention occurred in the fall of 2017, the same period the overdetention occurred in *Parker*. As in *Parker*, LeBlanc at that point had "fair warning that his failure to address" rampant overdetention in the DPSC "would deny prisoners like [McNeal] their immediate or near-immediate release upon

25

> conviction." [73 F.4th at 408] (cleaned up) (quoting *Crittindon*, 37
> F.4th at 188).

*Id.* at 433. Thus, this Court's decision was affirmed. *Id.* Though two judges concurred and called

for en banc reconsideration of *Crittendon*, *id.* at 435 (Jones, J., concurring), 439 (Duncan, J.,

concurring), the Fifth Circuit denied such rehearing, 93 F.4th 840 (5th Cir. 2024), and the Supreme

Court denied certiorari, 2024 WL 4427170.

### *f.*   Buccicchio v. LeBlanc

After *McNeal*, the Fifth Circuit has continued to reject LeBlanc's appeals and has cited to

increasing allegations supporting liability against LeBlanc. In October of 2024, in *Buchicchio*, the

Fifth Circuit once again affirmed the denial of a motion to dismiss based on qualified immunity.

2024 WL 4603272, at *1. The Fifth Circuit explained:

> In support of his allegations, Buchicchio cited to (1) an October
> 2017 legislative audit report on the DPSC that found that the DPSC
> "process for calculating offender release dates is inconsistent, which
> can result in errors"; (2) the DPSC's own investigation showing that
> in 2017, there was "an average of 200 cases per month considered
> an 'immediate release' due to the[ ] deficiencies" in the process for
> calculating release dates; (3) an August 2018 Excel spreadsheet
> created by DPSC staffers indicating that on average, prisoners were
> overdetained 38.6 days; (4) LeBlanc's 2019 deposition testimony
> admitting that the fact that it could take up to twelve weeks to
> calculate an offender's release date was "ridiculous" and
> "something we need to address"; (5) testimony by numerous DPSC
> employees in a similar suit in state court (*Chowns v. LeBlanc*, 37th
> Judicial District Court ("JDC") of Louisiana, No. 26-932)
> describing consistent overdetention; (6) a 2018 editorial opinion
> written by United States Senator John Kennedy and Attorney
> General Jeff Landry, describing the "incompetence" of DPSC; (7) a
> February 2019 letter to LeBlanc from Judge Edwards of Louisiana's
> 15th JDC informing him about a specific case of overdetention and
> adding that "defense attorneys in Lafayette are also complaining
> about the failure to timely release inmates"; and (8) 2022 deposition
> testimony by LeBlanc admitting that "there's not a system in place
> to get [prisoners eligible for immediate release upon sentencing]
> quickly released."

In this Court's recent decision in *Parker v. LeBlanc*, the plaintiff cited to three of the above documents, [73 F.4th at 405,] specifically the 2017 legislative audit report, the 2018 editorial, and the testimony by DPSC employees in *Chowns v. LeBlanc.* This Court held that those three documents "supported [Plaintiff's] allegations that LeBlanc was aware of the deficiencies of implemented policies that routinely led to error like the one that violated his constitutional rights." [*Id.* at 406.] In this case, Buchicchio has cited to even more evidence supporting the requisite "pattern" of constitutional violations by untrained employees to establish deliberate indifference for purposes of supervisory liability. Accepting all of his "well-pleaded facts as true" and viewing them "in the light most favorable to [him]," Buchicchio's complaint meets the facial plausibility standard under Rule 12(b)(6) for stating a clam [sic] of supervisory liability against LeBlanc. [*Id.* (citation omitted).]

*Id.* at *3. The appellate court also rejected LeBlanc's efforts to distinguish the case:

As he has done in prior overdetention cases, LeBlanc argues that Buchicchio has not pleaded facts establishing a pattern of "very similar" constitutional violations and that his allegations are "too general" to support deliberate indifference in this case. We have rejected these arguments, holding that "[t]he standard for deliberate indifference requires only a 'pattern of *similar* constitutional violations by untrained employees' rather than an exact duplication." [*Parker*, 73 F.4th at 406 (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)); *see McNeal*, 90 F.4th at 432.]

*Id.* at *4. The Fifth Circuit further found no abuse of discretion in the district court taking judicial notice of the DOJ report "followed a two-year investigation into DPSC's time-computation and release practices and detailed 'multiple policy failures resulting in overdetention at DPSC,' including failure to adopt appropriate polices and time-computation processes, as well as failure to train" and which "described the unconstitutional overdetentions as 'severe, systemic, and are both caused and perpetuated by serious ongoing deficiencies in [DPSC]'s policies and practices.'" *Id*. Based on all of this, the circuit court held that "Buchicchio's allegations are sufficient to survive LeBlanc's assertion of qualified immunity at the motion to dismiss stage." *Id.*

### 2. Plaintiffs' Evidence of the Problem and Policies

Plaintiffs claim that the evidence shows that LeBlanc and the DOC: (1) "learned that thousands of DOC inmates are held past their release date each year"; (2) failed to "set a goal of fixing the problem"; (3) "did not take the steps necessary to fix the problem"; (4) "refused help when offered"; and (5) "never . . . developed [an] 'action plan' the Secretary promised." (Doc. 104-1 at 9.) This section summarizes their evidence on these claims.

#### a.   The 2012 Six Sigma Investigation

Plaintiffs first point to the 2012 Six Sigma investigation, from which LeBlanc found that there were problems with the quality of the work that the time calculation people were doing. (Pl. Ex. 9, LeBlanc Dep. 45, Doc. 109-9.) He learned that thousands of people in the custody of the DOC were being held past their release date. (*Id.* at 48.) The Lean Six Sigma review showed that 83.44% of inmates were eligible for "immediate release . . . due to an earlier release date" (Pl. Ex. 10 at 4, Doc. 109-10 at 5.) The DOC's Six Sigma investigation found an average of 2,252 cases of immediate release per year with an average of 71.7 overdue days per case—that is, inmates being held past their legal release date. (Pl. Ex. 8, Rule 30(b)(6) Dep. (Ellis) 20, Doc. 109-8 at 10.) DOC found that, to the best of its knowledge in 2012, 79 days was roughly how long it took for documents to wait at the DOC to be calculated. (Pl. Ex. 11, Rule 30(b)(6) Dep. (Whittaker) 33, Doc. 109-11 at 7.) DOC conceded this was "a lot of overdetention as a baseline[.]" (*Id.*)

No one was fired, demoted, reprimanded, or lost pay. (Pl. Ex. 9, LeBlanc Dep. 48–49, Doc. 109-9 at 12–13.) This systematic problem (which Leblanc learned about as early as 2012) has been improved but not solved, and LeBlanc conceded that it is a problem for one inmate to be held past

their release date. (Pl. Ex. 17, LeBlanc Dep. 22, Doc. 109-17.)[6] In 2017, the DOC found that an average of 200 inmates per month were held an average of 49 days past the end of their sentence. (Pl. Ex. 8, Rule 30(b)(6) Dep. (Ellis) 38, Doc. 109-8 at 12.)

> *b.*   The Legislative Auditor Report

In 2017, the Louisiana Legislative Auditor also released a report concerning the DOC. (*Giroir*, Pl. Ex. 4, Doc. 25-5.) The report concluded, "Based on the results of our procedures, the Department did not have an adequate review process in place [for calculating inmate release dates]." (*Id.* at 6–7.) LeBlanc testified that he was "part of the back-and-forth with the auditor providing information[.]" (*Giroir*, Pl. Ex. 3, LeBlanc Dep. 61, Doc. 25-4 at 9.)

> *c.*   "Institutionalization" of the Problem

In 2019, LeBlanc admitted that they still had people being held an average of about two months past their release date. (Pl. Ex. 9, LeBlanc Dep 45, Doc. 109-9 at 11.) That year, DOC estimated that the overdetention problem cost the state "$2.8M per year in housing costs alone." (Pl. Ex. 12, Doc. 109-12 at 5.)

Plaintiffs say the problem was not fixed but institutionalized; for instance, as of 2019, the DOC stated on its website, in a frequently asked questions section, "If a person has recently been sentenced to DOC custody, it can take up to 12 weeks to calculate a date as the Department has to receive official paperwork from the sentencing court in order to calculate the offender's release date." (Pl. Ex. 9, LeBlanc Dep. 88–89, Doc. 109-9 at 15–16.) LeBlanc said, "we get . . . just inundate[d] . . . with requests for when they're going to get out . . .," but he acknowledged that "12 weeks is ridiculous" and "just absurd." (*Id.* at 89–90.) The DOC had also put a statement on its

---

[6] At various times in the hearing, LeBlanc tried to qualify or revise his deposition testimony. (*See, e.g.*, Tr. 36–38.) The Court need not address each individual instance but rather will simply say that, by and large, the Court found such equivocations to be lacking in credibility.

voicemail system that it "'takes at least 90 days after sentencing' for the department to calculate how much time a person must serve of their sentence[.]" (Pl. Ex. 8, Rule 30(b)(6) Dep. (Ellis) 12–13, Doc. 109-8 at 7–8.) This information was to give families the "parameters of how long it may take[.]" (*Id.* at 18.)

> ### d. The Clerks of Court Association Dealings and Electronic Submissions

Starting in Fall 2016, LeBlanc had about five meetings with Debbie Hudnall, Executive Director of the Louisiana Clerks of Court Association. (Pl. Ex. 1, Hudnall Dep. 17, Doc. 109-1 at 18.) At the first meeting, LeBlanc said that the process of getting documents to the DOC was slow, so people were being overdetained. (*Id.* at 22.) Hudnall suggested that the Clerks of Court email the UCO and Bill of Information directly to the DOC, with "[t]he idea being that if the DOC was saying the problem was things getting to us [were] too slow, the Clerks of Court can make sure that happened very quickly by emailing it[.]" (*Id.* at 25.) LeBlanc rejected the offer, saying they would not accept the documents electronically because "it would make it more difficult because they would be getting documents from the clerk electronically and then getting them from the sheriff, and then they would have to try to match them up, which would cause more work." (*Id.* at 27–28.)

In response, Leblanc talked about developing an "action plan" to "look at the feasibility of receiving the UCO and Bill of Information documents electronically from the Clerks," but LeBlanc did not know of any action plan that was developed. (Pl. Ex. 17, LeBlanc Dep. 45–46, 52–54, Doc. 109-17.) In July 2019, the DOC's strategic plan contained nothing about the timely release of inmates, and it continued to have nothing about it in 2022. (*Id.* at 94–100.) It said nothing about this being a goal or priority. (*Id.*; *see id.* at 113–14.)

The DOC did apply for a grant with the DOJ in 2019 to create a web portal that would make such submissions possible. (*Id.* at 44–48.) In that application, DOC stated that the 2012 Six Sigma project had found that "overall [sentence calculation] cycle time was 38 days, of which 31 days was post-conviction time in which [DOC] did not have the paperwork" required for calculating sentences. (Pl. Hr'g Ex. 3 at 3.) Further, though DOC addressed other delays identified in the Six Sigma project, "the project did not address th[is] cumbersome front-end paperwork process. As a result, there remains a delay in identifying and processing cases, which leads to . . . an increase in offenders who are due for immediate release" upon calculation. (*Id.*) "[D]ue to these deficiencies," in 2017, DOC continued to have "an average of 200 cases per month considered an 'immediate release' . . . ." (*Id.* at 4.)

But, as of 2022, there was no written plan to develop the web portal, and LeBlanc said they lacked the funding to pay for it. (Pl. Ex. 17, LeBlanc Dep. 80–82, Doc. 109-17.) LeBlanc conceded that, though ten years had passed since Six Sigma, and though there were discussions about electronic transmission of documents to the DOC, there was no written plan to put one in place. (*Id.* at 83.) Further, in 2019, the DOC admitted that it could mitigate the problem of inmates being held past the release date by going out and getting the paperwork itself rather than waiting to receive it, (*id.* at 89–90), but the most recent strategic plan still did not identify this as a priority, (*id.* at 95–98).

LeBlanc was asked if there was any sort of estimate of when a system would be in place statewide, and he responded that he did not "want to commit to anything, because then if [he] [doesn't] meet the deadline, [he'd] be responsible for that." (*Id.* at 93–94.)

*e.*  Enforcing The Basic Jail Guidelines

For several decades, the DOC has compensated local sheriffs for holding some DOC inmates in parish jails. (Tr. 56–58.) But, to protect these inmates' "fundamental constitutional rights," the DOC developed the Basic Jail Guidelines ("BJG"). (Tr. 57.) As LeBlanc testified, "[i]f the sheriffs are going to hold DOC inmates in their local prisons, they have to adhere to [the BJG]." (Tr. 58.) And LeBlanc has transported its prisoners out of parish jails that have failed to comply with the BJG. (Tr. 59.)

LeBlanc also testified that one thing DOC could do is to put a timeline in the BJG and to deduct sheriffs' pay if they do not adhere to it. (Pl. Ex. 17, LeBlanc Dep. 58, Doc. 109-17; *see id.* at 59–60; Tr. 59–60.) But LeBlanc never did so because it would "become[ ] a nightmare to try to enforce that" and "[DOC] already [has] enough to do." (Pl. Ex. 17, LeBlanc Dep. 58–59, Doc. 109-17.) LeBlanc said this "wouldn't cure [ ] the issue" or "mitigate" it. (*Id.* at 59–60.)

The DOJ Report noted that, in July 2022, DOC drafted a revised BJG which included a deadline of three working days for Sheriffs to deliver documents to Pre-Class. (Doc. 158-1 at 13 n.38.) But, (1) as the DOJ Report noted, this deadline only applied to "certain supplemental documents that may be required after time computation is complete, but [did] not apply to the [Pre-Class] [P]acket itself," (*id.*); (2) Defendant waited until October 2023—or a week or a week and a half before the class certification hearing—to sign the revised BJG, (Tr. 60); and (3) the timeline still applies to the submission of only some but not all of the Pre-Class Packet, as DOC does not "have any control of the clerk of courts or the judges." (Tr. 60–61, 126–127.)

*f.*  Expert Reports

Plaintiffs also submit the expert report of Dr. Dora Schriro, who served as the director of the Missouri Department of Corrections, the Arizona Department of Corrections, and the New

York City Department of Corrections, as well as the Director of the ICE office of Detention Policy and Planning at the Department of Homeland Security. (Pl. Ex. 7, Schriro Report, Doc. 109-7 at 2–3.) Schriro opined that "the DOC's ongoing over-detention of its inmates arises from several problems of which Sec. LeBlanc is aware but refuses to address." (*Id.* ¶ 23.) "DOC does not have a system in place to accurately identify and timely release all the people in its custody who are eligible for immediate release upon sentencing." (*Id.* ¶ 24.) According to Schriro, the problem was identified in 2012 in the "Sigma Six" LEAN activity, but LeBlanc took only one step to reduce the time of overdetention: "He agreed to set as a goal a reduction in the over-detention of people in DOC's custody from an average of 110 to 47 days, and then he fell short of that milestone." (*Id.* ¶ 25.) This shortfall was not discovered until a 2017 audit by the State Comptroller. (*Id.*) Schriro faults LeBlanc for incorrectly identifying the detention problem as only occurring "when the Department has all of their paperwork and has had the opportunity – which he set at two weeks, more or less – to calculate the newly sentenced individual's release date." (*Id.* ¶ 26.) But, Schriro stated:

> In all the systems I have served and in all the systems of which I am aware, the goal is to release eligible individuals within hours and to avoid holding anyone overnight whenever possible. In my experience, any release that went beyond two days was considered excessive and warranted notification up the chain of command to me, and then from me to the Office of the Mayor or Governor.

(*Id.*) Schriro identified the following deficiencies:

> a. Sec. LeBlanc failed to adequately define and address DOC's responsibility to release all the people in its custody on time. . . .
>
> b. Sec. LeBlanc has never tried to secure commitment papers directly from clerks of court the same day as sentencing by email. . . .
>
> c. Sec. LeBlanc could have picked up the commitment papers from the jails but failed to do so. . . .

33

>d. Sec. LeBlanc's strategic plan for DOC does not address over-detention. . . .

>e. Sec. LeBlanc exaggerates any differences that the Louisiana DOC and other states DOC may have. . . .

(*Id.* ¶ 27.) Schriro concluded:

>In my opinion, Sec. LeBlanc is indifferent to the serious problem of unlawful over-detention. He has said on numerous occasions that he has other things to do, that he has not gotten around to fixing this yet, and that there are four people in his chain of command – the chain of command that he put and keeps in place – between him and this problem, to be as familiar as one would expect an Agency head would be with an issue of this magnitude and duration.

(*Id.* ¶ 68.) Schriro stated that Louisiana's problem is not unique but a result of LeBlanc's choice not to prioritize solving the problem. (*Id.* ¶¶ 49–58.)

Similarly, Plaintiffs' expert Rita Rossi "was employed by the Illinois Department of Corrections ('IDOC') in various roles relating to the computation of sentences and the release of prisoners. . . . [f]or more than 25 years." (Pl. Ex. 13, Rossi Report, Doc. 109-13 at 2.) She explained, "There are multiple ways to accomplish the prompt sentencing calculations that are expected of a department of corrections sentencing calculation function. . . . Whatever the method, the department of corrections must orient its operations to enable the calculation of each sentence within a matter of hours." (*Id.* at 3–4.) She concluded:

>My examination of the information that was provided to me indicated that the sentence calculation function of the LDPS&C is set up differently, and is not designed to determine quickly whether the LDPS&C actually has authority to imprison a person. First, the LDPS&C appears to have little interest in gathering sentencing information quickly. Second, once the information is gathered, the system of sentencing calculation developed by the LDPS&C is not designed to complete quick sentencing calculation, but instead continues to imprison people in order to leave time to gather additional information that is not necessary to determine a person's

> sentence, but rather is gathered for other purposes – such as determining whether some other entity has the authority to arrest or detain the person. Incorporating such delays into the system of sentencing calculation inevitably and predictably causes persons entitled to immediate release to instead by imprisoned without authority for lengthy periods while the information-gathering process is completed.

(*Id.* at 7.)

### g. DOJ Report

Plaintiffs also rely on the January 25, 2023, report from the U.S. Department of Justice,

Civil Rights Division, entitled "Investigation of the Louisiana [DOC]" (the "DOJ Report"). The

DOJ Report begins:

> The [DOJ's] investigation determined that LDOC incarcerates thousands of individuals each year beyond their legal release dates in violation of the Fourteenth Amendment of the United States Constitution. These violations are pursuant to a pattern or practice of infringements on the constitutional rights of incarcerated persons. . . . These violations are severe, systemic, and are both caused and perpetuated by serious ongoing deficiencies in LDOC's policies and practices. LDOC has persisted with these unconstitutional practices despite at least a decade of notice and clear recommendations for fixing the problem.

(DOJ Report, Doc. 158-1 at 3.) The DOJ summarized the following practices that violate the

constitution:

> • **LDOC denies individuals' due process rights to timely release from incarceration.** LDOC violates the constitutional rights of people in its custody by detaining them for weeks and often months past their release dates. According to the most recent available data, of the 4,135 people released from LDOC's custody between January and April 2022, 1,108 (or 26.8 percent) were held past their release dates. The median number of days an overdetained individual was held past their release date was 29; 31 percent were held over for at least 60 days; and 24 percent were held over for at least 90 days. In just this four-month period, LDOC had to pay parish jails an estimated $850,000, at a minimum, in fees for the days those individuals were incarcerated beyond their lawful sentences. At that

rate, this unconstitutional practice costs Louisiana over $2.5 million a year.

• **LDOC's failure to implement adequate policies and procedures causes systemic overdetentions.** LDOC has failed to implement policies and procedures to ensure the timely release of individuals in its custody. LDOC does not have a uniform system for receiving necessary sentencing documents from the Clerks of Court and Sheriff's offices. Nor does it establish a standard timeline for the delivery of those documents. LDOC maintains a time-consuming process for calculating release dates, which includes both manual calculations and automated processes using an antiquated data management system. And it lacks a standardized training or accountability process to ensure its staff have the ability to make sentencing computations accurately. These systemic deficiencies predictably result in delays and errors. Furthermore, LDOC effectively prevents itself from addressing these problems in an informed manner by failing to track overdetention-related data. LDOC's failure to remedy these deficiencies is the direct cause of its pervasive failure to release individuals from its custody on time.

• **LDOC is deliberately indifferent to the systemic overdetention of people in its custody.** For more than ten years, LDOC has been on notice of its overdetention problem and has failed to take adequate measures to ensure timely releases of incarcerated individuals from its custody. A 2012 Six Sigma report as well as Legislative Audits conducted in 2017 and 2019 revealed severe, systemic delays in the processing of the necessary records from courts and local facilities, inefficient data management, poorly defined procedures, and a lack of training and oversight that have all contributed to a consistent pattern of overdetention. In addition, LDOC and its officials have faced numerous private lawsuits alerting them to on-going deficiencies in their processes. Still, LDOC has never implemented the reform that constitutional violations of this magnitude requires. The reform it has pursued has been too narrow to correct the system-wide causes of overdetention, and some undertakings have failed entirely, as in LDOC's effort to implement a new Offender Management System in 2015.

As a result of the systemic deficiencies identified in our investigation, thousands of individuals annually suffer the significant harm of having their freedom unconstitutionally denied by their overdetention in LDOC's custody.

(*Id.* at 3–4.)

36

DOJ also concluded that DOC is responsible for due process violations arising from the systematic overdetention of individuals in their custody, explaining that: (1) DOC is legally responsible for all individuals sentenced to state custody; (2) deficiencies in DOC's policies and practices are the cause of systematic overdetentions, with such deficiencies including: (a) the failure to adopt policies related to the delivery of sentencing paperwork for individuals housed in local jails; (b) failure to adopt adequate time computations processes in that (i) DOC's time computation and release processes are unnecessarily time-consuming and prone to error; (ii) DOC does not track data related to time computation; and (iii) DOC's projected data modification projects will not prevent the overdetention of individuals in DOC custody; and (c) failure to train DOC staff; (3) DOC is acting with deliberate indifference because it has known for a decade that the policies were unconstitutional; and (4) DOC's inadequate efforts at reform do not mitigate the finding of deliberate indifference. (*Id.* at 11–21.)

### h. Further Evidence at the Hearing

Plaintiffs emphasize that the DOC has not instituted any rules concerning when or how the sheriffs must send the completed Pre-Class Packet to the DOC. (Tr. 19; *see also* Doc. 213 at 3.) Indeed, DOC does not impose any requirement on sheriffs to send complete pre-class packets, and sheriffs often send the information "piecemeal," with over half the packets deficient in some way. (Tr. 100–01, 139.)

Plaintiffs also adduced evidence of problems with processing the sentencing information. If DOC staff discovers that information or documents are missing from Pre-Class Packets, they use phone calls and emails to court clerks and sheriffs to obtain the information, which sometimes requires the clerks to speak with the judges, who sometimes have to bring the offender back to court to put something on the record. (Tr. 139–40.) But, there is no automated system for

prioritizing those inmates who are entitled to immediate release; rather, DOC waits until it gets a complete Pre-Class Packet before calculating the inmate's release date, and only then does DOC "prioritize" those entitled to immediate release. (Tr. 142–43, 152–53.)

Plaintiffs offered evidence of LeBlanc's knowledge, dating from the 2012 Lean Six Sigma Report, (Tr. 36–37, 39–40, 44), to the 2019 federal grant application, which demonstrated that the paperwork process caused overdetention, (Pl. Hr'g Ex. 3 at 3–4.)

Plaintiffs also discussed "pull documents," which are spreadsheets of data which DOC pulled from CAJUN related to inmate releases. (Tr. 71.) Specifically, Plaintiffs point to the February 2019 pull document, which reflected (with the exception of some improperly identified people) 231 inmates held past their release date that month, for an average of about 44 days each. (Tr. 74–75.) Other pull documents show a comparable widespread problem with overdetention; for example, from January to June of 2018, there were about 1,360 inmates overdetained for an average of 38.6 days. (Tr. 75, 85, Pl. Hr'g Ex. 13 at 3.)

Plaintiffs also cite the failure to adopt electronic transmission of sentencing information. (Doc. 213 at 5.) Undersecretary Bickham testified that an electronic system for sending the documents and information in the Pre-Class Packets was "central to resolving [DOC's] over-detention issues." (Tr. 177.) Yet, DOC failed to implement any such system between 2012 and 2019. (Tr. 160–66.) DOC tried to get a grant to accomplish this, but, when it failed, it still did not attempt to develop the system on its own; as of January 2022, LeBlanc testified that he had no written plans to set up the system. (Tr. 47–48.) In January 2023, DOJ finished its long-term investigation into the DOC's Pre-Class procedures and recommended, *inter alia*, that DOC implement an electronic submission portal so that clerks and sheriffs could send sentencing documents to the DOC electronically. (Tr. 183.)

Thereafter, DOC expedited developing such a system, and, once the DOC made it a priority, it took only 3.5 months, from March to July 2023, to develop this standalone electronic submission portal. (Tr. 184–87.) The new system lets clerks and sheriffs transfer Pre-Class Packets electronically, and it also established a new system for prioritizing immediate releases using metadata. (Tr. 169–72.) DOC could have created this system in 2012 or 2008, even without the implementation of the new offender management system now-called CIPRS, and, in fact, DOC is using the portal even though it relies on the legacy CAJUN system for its time computation data. (Tr. 166, 186–88.)

### 3. Defendant's Evidence of Efforts to Fix the Problem

Defendant's principal argument is essentially that he did not act with deliberate indifference to the overdetention problem. Defendant points to the following evidence.

Griffin testified that, in response to the Six Sigma Project, DOC tried to have legislation passed to mandate a time period for the clerks and sheriffs to provide the Pre-Class Packet to DOC. (Def. Ex. 1, Griffin Aff. ¶ 21, Doc. 118-1.) Further, "in October 2019, an Interactive Sentencing Workshop was conducted at the fall Judge's Conference through the Louisiana Supreme Court." (*Id.* ¶ 22.) The conference was aimed at helping judges with sentencing and correctly providing the required UCO to DOC. (*Id.*) DOC was a presenter at the conference. (*Id.*; Def. Ex. 1-D, Interactive Sentencing Workshop PowerPoint, Doc. 118-5.)

LeBlanc also testified that DOC developed a "case management system for the whole department, which when turned on, just completely failed." (Pl. Ex. 17, LeBlanc Dep. 67, Doc. 109-17.) DOC spent $2,000,000 on that project, which was "a big time-consuming issue." (*Id.*)

Defendant next notes that it did meet with the Executive Director of the Clerks of Court Association, but Defendant offers an explanation for why DOC did not implement these ideas. (Def. Ex. 1, Griffin Aff. ¶ 18, Doc. 118-1.) Specifically, Griffin stated:

> After analyzing the issues, we determined that receiving piecemeal paperwork from the clerk's office would not solve any issues and would only cause more confusion. To process time computation, Pre-Class needs the entire Pre-Class Packet from the local facility. Receiving just the Uniform Commitment Order electronically would not assist in time computation, especially if the local facility does not timely send the Pre-Class Packet.

(*Id.*)

Additionally, in November 2017, the Supreme Court issued a Memorandum to the District Court Judges and Court Administrators. (Def. Ex. 3, Doc. 118-10.) The memorandum noted a change in the law that removed the requirement that the court give a copy of the court minutes to the DOC but instead mandated that the Court provide a certified copy of the UCO in the format authorized by the Supreme Court. (*Id.*) The new law also allowed DOC to ask the sentencing court for any information about the sentence not in the UCO. (*Id.*) The memorandum stated that DOC officials met with the District Judges Association and Clerks of Court Association "to revise and adapt the UCO in accordance with the new law and to improve communication between the sentencing judge and [DOC]." (*Id.*)

Griffin also testified, "In 2017, [DOC] cooperated with the legislative auditors in reviewing time computation errors. [DOC] implemented a secondary review of every time computation, and conducts an additional random review of 25 time computations per month by each Pre-Class supervisor." (Def. Ex. 1, Griffin Aff. ¶ 19, Doc. 118-1.)

Defendant also points to the fact that the DOC applied for the DOJ grant in 2019 to obtain assistance as "the antithesis of deliberate indifference." (Doc. 118 at 9.)

Griffin further stated that, in January 2022, the Louisiana Office of Technology Services was "in the process" of commencing "a complete overhaul of the CAJUN system." (Def. Ex. 2, Griffin Dep. 154–155, Doc. 118-9.) The OTS was "building a system, which is called CIPRS (Corrections Information Program and Records System), and it's going to take the place of . . . the CAJUN system." (*Id.* at 155–56.) DOC will input the information in CAJUN—the offender's information, personal information, his sentence information, and his prior offense information— into CIPRS. (*Id.*) But Griffin said DOC began working on this around the same time the DOJ grant application was denied, which would've been a few years ago. (*Id.*) CIPRS is "an effort to investigate, assess, audit or remedy the detention of individuals beyond the date they were supposed to be released[.]" (*Id.* at 157.) This system will "help [DOC] calculate and be more accurate with calculations," but Griffin could not answer whether this system would result in everyone being released on time, as DOC still needs to receive the information and work and process the cases. (*Id.* at 157–58.)

Lastly, Griffin testified about a departmental regulation that purports to improve the situation:

> DPS&C has a department regulation that requires identification of offenders who are potential immediate releases, and gives those offenders priority for time computation. . . . If immediate release offenders are not released within two days of DPS&C receiving the paperwork, the Pre-Class employees must create a case narrative to explain the problems encountered during the time computation process.

(Def. Ex. 1, Griffin Aff. ¶ 20, Doc. 118-1; Def. Ex. 1-B, DOC Reg. No. IS-B-3, Doc. 118-3.) The regulation was implemented April 5, 2019. (Def. Ex. 1-B, DOC Reg. No. IS-B-3, Doc. 118-3.)

As to the DOJ report, Defendant says:

> Not only does DOC dispute the data cited by DOJ, but the DOJ report is <u>not tied to proposed class members</u>, i.e., inmates entitled to

release at the time of their sentencing. The DOJ report references <u>all</u> inmates released from DOC custody, which would necessarily include inmates who do not fit the class definition.

(Doc. 182 at 4.)

Finally, as stated above, after DOJ recommended in January of 2023 that DOC implement an electronic submission portal so that clerks and sheriffs could send sentencing documents to the DOC electronically, DOC expedited the system's development and released it in July 2023. (Tr. 183–87.) Again, the new system allows clerks and sheriffs to transfer Pre-Class Packets electronically, and it uses metadata to help DOC systematically prioritize immediate releases. (Tr. 169–72.)

### III.    RULE 23 STANDARD

This Court has explained:

> Class action is the exception to the usual rule that litigation is conducted by and on behalf of individual named parties only. [*Ibe v. Jones*, 836 F.3d 516, 528 (5th Cir. 2016) (internal citation omitted).] The requirements for class certification are governed by Rule 23 of Federal Rules of Civil Procedure. To obtain class certification, parties must satisfy Rule 23(a)'s four prerequisites:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of that class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.
>
> Assuming the proposed class satisfies the requirements of Rule 23(a), Plaintiffs must also establish the requirements of Rule 23(b)(1), (2), or (3). [*M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012) (citing *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 523 (5th Cir. 2007)).]

*Lewis v. Cain*, 324 F.R.D. 159, 166–67 (M.D. La. 2018) (Dick, J.). *Giroir* Plaintiff "seek[s] class

certification under Rule 23(b)(2), which permits certification if 'the party opposing the class has

acted or refused to act on grounds that apply generally to the class, so that final injunctive relief is

appropriate respecting the class as a whole." *Id.* at 167. *Humphrey* Plaintiffs seek class certification

under Rule 23(b)(3);

> [a] class action certified under this rule may be maintained if "the
> court finds that the questions of law or fact common to class
> members predominate over any questions affecting only individual
> members, and that a class action is superior to other available
> methods for fairly and efficiently adjudicating the controversy."

*Angell v. GEICO Advantage Ins. Co.*, 67 F.4th 727, 736 (5th Cir. 2023) (quoting Fed. R. Civ. P.

23(b)(3)).

"The Fifth Circuit has also articulated an 'ascertainability' requirement for Rule 23 class

actions." *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 933 (5th Cir.

2023) (citing *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) ("The existence

of an ascertainable class of persons to be represented by the proposed class representative is an

implied prerequisite of Federal Rule of Civil Procedure 23.")). "[T]o maintain a class action, the

class sought to be represented must be adequately defined and clearly ascertainable." *Braidwood*,

70 F.4th at 933 n.36 (quoting *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (per

curiam)).

*Lewis* continues:

> Plaintiffs, as the party seeking class certification, bear the burden of
> demonstrating that the requirements of Rule 23 have been met. [*Ibe*,
> 836 F.3d at 528 (citing *O'Sullivan v. Countrywide Home Loans,
> Inc*., 319 F.3d 732, 737–38 (5th Cir. 2003)).] "Rule 23 does not set
> forth a mere pleading standard." [*Wal–Mart Stores, Inc. v. Dukes*,
> 564 U.S. 338, 350 (2011).]

It is well-established that "[a] district court must conduct a rigorous analysis of the [R]ule 23 prerequisites before certifying a class." [*Perry*, 675 F.3d at 837 (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996)).] Generally, "a district court has broad discretion when deciding a motion for class certification." [*Dockery v. Fischer*, 253 F. Supp. 3d 832, 845 (S.D. Miss. 2015) (citing *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 408 (5th Cir. 1998.] Before concluding that a class has satisfied the requirements of Rule 23(a), an analysis will "[f]requently . . . entail some overlap with the merits of the plaintiff's underlying claim." [*Wal–Mart*, 564 U.S. at 351.] The Fifth Circuit has traditionally construed this directive to require a district court to "look beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Perry*, 675 F.3d at 837 (quoting *McManus v. Fleetwood Enters., Inc*., 320 F.3d 545, 548 (5th Cir. 2007) (internal quotations omitted)).]

However, Rule 23 does not require Plaintiffs to show that questions common to the class "will be answered, on the merits, in favor of the class." [*Cole v. Livingston*, No. 4:14-CV-1698, 2016 WL 3258345 (S.D. Tex. June 14, 2016) (quoting *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 459 (2013)).] "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." [*Amgen*, 568 U.S. at 466.]

324 F.R.D. at 167 (footnotes incorporated).

## IV.   CLASS DEFINITION ISSUES

### A.   Ascertainability

#### 1. Parties' Arguments

*Humphrey* Plaintiffs assert that "[t]he ascertainability requirement is easily met in this case." (Doc. 104-1 at 17–18.) CAJUN contains much of the information required to adjudicate these class action claims, "including the date an individual was admitted to custody; the date the individual was released; the individual's 'mathematically correct release date,' and the date on which the DOC obtained the paperwork necessary to compute the individual's sentence." (*Id.*)

"CAJUN also records an individual's 'must serve' information, which reflects how much time the inmate has left to spend in prison[,]" and "[a]nyone with a negative must serve number is eligible for immediate release." (*Id.*) This data will allow the Court to identify those who remain in custody at the time of sentencing or parole revocation but who remain in custody for over 24 hours. (*Id.*)

The above fields have been taken from CAJUN and compiled in a separate document called a "pull document," and DOC provided pull documents identifying over 1,700 individuals who have been overdetained from April 2019 through May 2020. (*Id.*) DOC has confirmed that the CAJUN data would allow the identification of those within the class (entitled to immediate release upon sentencing or parole revocation but who were released over 48 hours later). (*Id.*) Thus, through CAJUN, each class member can be identified with objective data, and that satisfies the ascertainability requirement. (*Id.*)

*Giroir* Plaintiffs likewise say they meet this requirement:

> The Court and the Parties, including class members themselves, will thus be able to determine an individual's membership in the class by answering two objective questions: (1) Was the individual entitled to release at the time of their sentencing? and (2) Is the individual being detained more than 48 hours past the date of their sentencing? Question 1 can be answered by a simple calculation of the individual's time served compared to their sentence, and if Question 1 is answered affirmatively, then Question 2 must also be answered affirmatively if the date of the person's sentencing is more than 48 hours past.

(*Giroir*, Doc. 25-1 at 21.) *Giroir* Plaintiffs say that it is no hinderance that members may be overdetained in the future, provided that the Court can identify the class members at some point and that membership is defined by objective criteria. (*Id.* at 21–22.)

Defendant responds that the "Negative Must Serve spreadsheet does not identify individuals who have bee[n] overdetained, as stated by Plaintiffs." (Doc. 118 at 17.) In any event, the "pull documents" and "Negative Must Serve spreadsheet" are not attached to Plaintiff's motion

and thus not proper evidence. (*Id.* at 17.) Further, Defendant says that there are "questions [that] demonstrate that there are unique facts of each sentence and release, as shown by the named Plaintiffs' circumstances[,]" including:

> (1) when did DPS&C receive the inmate's Pre-Class Packet for each purported class member?; (2) did DPS&C receive a complete packet with all necessary information?; (3) did the inmate have other pending charges that must be cleared prior to release?; (4) did the inmate have a detainer in another matter?; (5) were there other impediments to processing time computation?

(Doc. 118 at 18.) "Because it would be impossible to require DPS&C to process time computation within 48 hours where DPS&C is not aware of these offenders within 48 hours, ascertaining the purported class members is also impossible." (*Id.*)

Defendant in *Giroir* asks the same questions highlighted above. (*Giroir*, Doc. 27 at 25.) Otherwise, Defendant urges that 48-hours is an improper way to define the class and that *Giroir* Plaintiff fails to request specific injunctive relief.

In reply, *Humphrey* Plaintiffs argue, *inter alia*, that (1) they need not attach these documents to the class cert motion; (2) evidence at the class cert stage need not be admissible under the Federal Rules of Evidence; and (3) "[t]he Secretary ultimately offers no reason to doubt that data extracted from CAJUN can be used to ascertain class members . . . ." (Doc. 123 at 8.)

In pre-hearing briefing, Plaintiffs largely repeat what they say about CAJUN, the "pull documents," and the "negative must-serve documents." (Doc. 177 at 7–8.) They also note that some of those documents were recently de-designated as confidential, and Plaintiffs attach them to this brief. (*Id.* at 8.)

Defendant responds:

> A manual review of each inmates' record would be required to assess the data . . . . Absent auditing each entry, which would include reviewing the transfer and time computation records, the pull

> document spreadsheets do not identify a list of inmates who were
> eligible for immediate release and were released more than 48 hours
> after their sentence date.

(Doc. 182 at 2–3.) Further, "the raw release date listed on them does not include CTRP credits, meaning that many inmates will have additional time to serve with DOC at the time of their sentencing, and would therefore not meet the class definition." (*Id.* at 3.) Likewise, the pull documents may list one docket number even though an offender has multiple dockets. (*Id.*) Ultimately, "an individualized review of each inmate on the pull document is required to determine whether the inmate is even within the proposed class definition." (*Id.* at 3.)

In post-hearing briefing, Defendant reiterates that the pull documents are deficient and insufficient to justify certification. (Doc. 214 at 1–2.) That is, "the problem is that these documents, as presented by Plaintiffs in support of class certification, do not provide the necessary information to establish numerosity or ascertainability[.]" (*Id.* at 2.) There was no certification in the document that its contents were accurate, and, in fact, it was simply an internal document intended to aid in preparing for a proposal to the DOJ. (*Id.*) The pull documents are incomplete too, as they do not contain all of the specific, individual circumstances required to know if an inmate was overdetained. (*Id.* at 2–3.)

In their post-hearing reply, Plaintiffs argue that the Court should reject Defendant's position on the pull documents.

> Instead of showing that class members were unascertainable,
> Defendants showed that they can be determined in only a few
> minutes work per member. Defendants demonstrated this by
> highlighting the pull documents to show which rows represented
> class members, and which did not. Tr. 107:23-108:1. Then they
> introduced evidence that the class status of these putative class
> members had to be confirmed with a check of the person's
> underlying sentencing records—but their own witness confirmed
> that this check was a clerical task that could be accomplished with a
> straightforward review of the person's court records. *See* Tr. 97:12-

47

> 18; 109:21-115:17; 123:18-22. And, the witnesses confirmed, the
> record review could be accomplished quickly, taking on average 5.2
> minutes per member. *See* Tr. 124:8-18; 219:12-23. As Plaintiffs'
> counsel pointed out during the hearing, these facts favor class
> certification, as they confirmed that class members could easily be
> identified by a clerical review of court records. Tr. 198:2-200:10;
> 219:12-23.

(Doc. 216 at 1–2.)

### 2. Applicable Law

"[T]o maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable." *Braidwood Mgmt*, 70 F.4th at 933 n.36 (citation omitted). "Courts traditionally refuse to certify classes that are 'amorphous' or 'imprecise.'" *Id.* (citation omitted). "[T]he requirement that there be a class will not be deemed satisfied unless the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1760 (4th ed. 2023). "However, the court need not know the identity of each class member before certification; ascertainability requires only that the court be able to identify class members at some stage of the proceeding." *Seeligson v. Devon Energy Prod. Co., L.P.*, 753 F. App'x 225, 230 (5th Cir. 2018).

### 3. Analysis

In short, Plaintiffs have the better argument. Here, the two classes are adequately defined and ascertainable.

As to the definition, neither proposed class is "amorphous" or "imprecise." Again, the *Humphrey* proposed class is defined as:

> All persons who have been remanded to the custody of the DOC
> since April 16, 2019, and who were entitled to release at the time of
> their remand (either pursuant to sentencing or parole revocation),
> but who were released by the DOC more than 48 hours past the date

48

> that they were remanded to the DOC's custody due to Defendant's failure to implement and maintain an adequate process for timely releasing inmates.

(Doc. 213 at 7–8.) "The [*Humphrey*] Class seeks to recover damages for the injuries caused to each class member by this overdetention and false imprisonment." (*H-SAC* ¶ 65, Doc. 43.) The *Giroir* class is defined as:

> All persons who have been, or will be, sentenced to the custody of the Louisiana DOC, and who were, or will be, entitled to release at the time of their sentencing, but who nevertheless remain in custody, now or in the future, due to Defendants' failure to implement and maintain an adequate process for timely releasing inmates, for more than 48 hours past their sentencing dates.

(Doc. 213 at 7.) "The [*Giroir*] Class seeks declaratory and injunctive relief against this overdetention and false imprisonment." (*G-AC* ¶ 67, Doc. 46.) Both of these classes are "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." Wright & Miller, *supra*, at § 1760.

Moreover, Plaintiffs have demonstrated that the class members are ascertainable. Again, Plaintiff bases this conclusion on types of documents: the pull documents and the negative must-serve documents. Defendant complains that Plaintiffs did not attach these documents, but Plaintiffs attached both sets to their pre-hearing briefing, (Docs. 177-1 through 117-16), and that is sufficient.

As to the pull documents, these are a spreadsheet with the following columns: DOC Number, Last Name, First Name, Sentence Date, CRT CDE, ADMIT DATE, TMCOMP READY, CTRP LAST DTE, TMCOMP LAST DTE, RAW GTPS DTE, DOC SERVED, PREC RECEIV, SENT TO RECEIV, RECEIV TO COMP, TM REDY TO REL, TM TO LAST, CTRP TO REL, RAW TO RELEASE, JAIL CREDIT, CTRP EARNED. (*See, e.g.*, Doc. 117-2 at 1.) The pull

document does not create new data; it just pulls data from different places in CAJUN and places it into one document. (Ex. 14, Rule 30(b)(6) Dep. (Gueho) 58–59, Doc. 109-14.)

The DOC's Rule 30(b)(6) deponent testified that, with three pieces of data from the spreadsheet—(1) the GTPS date, which is the "inmate's mathematically correct release date not accounting for CTRP credit and time lost due to misbehavior" but which "does include jail credit and statutory good time credit"; (2) the release date; and (3) the admit date—she "could find most of the inmates whose sentence was complete at the time of their sentencing, but who were released more than 48 hours later[.]" (*Id.* at 54, 57.) Further, if the Court needs to know how much of the time was after the DOC received the inmate's paperwork, the additional data point would be the pre-class received date. (*Id.* at 57–58.)

The testimony at the hearing was consistent with the pre-hearing submissions; pre-class employees can verify the data in the pull documents using objective criteria from court records and DOC's records. (*See, e.g.*, Tr. 97 (testifying that reviewer can determine outliers (i.e., those not properly in the spreadsheet) "using DOC records and the systems of [Pre-Class] personnel"); Tr. 106–07 (highlighting outliers on a pull document); Tr. 109–15 (describing process of identifying outliers); Tr. 111–12 (Pre-Class can "check and see if it was accurate"); Tr. 114 (discussing another example of an outlier identified using DOC's records); Def. Hr'g Ex. 22 (Jan. 2020 pull document identifying some outliers with highlights); Tr. 111 (admitting that DOC has the correct data for particular outlier); Tr. 123 (stating that DOC could determine the class members by going through each file).) As Plaintiffs argue, "This review requires minimal work. It only took Angela Griffin about five minutes per person to verify the data for the 231 inmates identified in the February 2019 pull document." (Doc. 213 (citing Tr. 124 ("roughly 20 hours" to evaluate 231 inmates, or 5.2 minutes each); Tr. 74–75; Doc 177-3).) Thus, DOC could identify

most inmates who were entitled to immediate release at sentencing but were released more than 48 hours later with only three bits of data: the raw GTPS date, the release date, and the sentencing date. (Tr. 91.) And they could verify who can be included in the class work quickly through objective criteria.

Additionally, CAJUN also records "Must Serve" data, which is an inmate's sentence, minus good time. (Ex. 15, Rule 30(b)(6) Dep. (Griffin) 86–87, Doc. 109-15.) It is the number of days an inmate has left to spend in prison. (*Id.*) A "negative must serve date" happens when the jail credit exceeds the original sentence. (*Id.*) Anyone with a negative must serve number is eligible for immediate release. (*Id.*; *see also* Ex. 19, Rule 30(b)(6) Dep. (Gueho) 24–26, Doc. 109-19 (stating that inmates with only a negative must serve number are eligible for immediate release, whereas those with a negative and some positive must serve numbers might not be so eligible).) DOC's corporate deponent created a spreadsheet with the negative must-serve numbers covering a year's worth of data from April 2019 to May 2020. (Ex. 19, Rule 30(b)(6) Dep. (Gueho) 25, Doc. 109-19.) The spreadsheet contained only those who had negative must serve numbers and screened out those with some negative and some positive. (*Id.* at 26.) That list showed "just over 1,700 inmates between April 2019 and May 2020 who, when their time was computed, [ ] had only negative must serve numbers[.]" (*Id.* at 26.) Again, Plaintiffs attached this spreadsheet to later briefing. (Doc. 177-16.)

Again, "the court need not know the identity of each class member before certification; ascertainability requires only that the court be able to identify class members at some stage of the proceeding." *Seeligson*, 753 F. App'x at 230. The above documents and testimony show that DOC has the data available to ascertain who is a member of the class.

Defendant also complains that there are unique circumstances in each case that the spreadsheets do not take into account. While that may be true in the strictest sense, as shown above, the DOC's own corporate deponent said that the pull documents and negative must serve documents could be used to "find most of the inmates whose sentence was complete at the time of their sentencing, but who were released more than 48 hours later[.]" (Ex. 14, Rule 30(b)(6) Dep. (Gueho) 57, Doc. 109-14.) Moreover, Defendant himself used the numbers in the February 2019 pull document in its application to the federal government about the number concerning DOC's estimate of the number of overdetained persons. (Tr. 71; Pl. Hr'g Ex. 3.) And, again, the information can be verified with objective criteria through a review that takes about 5 minutes per inmate. (Tr. 124.)

In sum, Defendant is letting the perfect be the enemy of the very good. *See Voltaire 1694– 1778*, OXFORD ESSENTIAL QUOTATIONS, https://www.oxfordreference.com/display/10.1093/acref/9780191843730.001.0001/q-oro-ed5-00011218 (last visited September 21, 2025) ("The best is the enemy of the good." (quoting VOLTAIRE, CONTES (1772), 'La Begueule' l. 2 (deriving from Italian proverb))). For all these reasons, the ascertainability requirement is satisfied.

## B.  48-Hour Requirement & *Healey*

### *1. Parties' Arguments*

Related to ascertainability and the definition of the class, *Humphrey* Plaintiffs say that "the Supreme Court identified 48 hours as the outer bounds of reasonable time to perform the administrative tasks and release a person entitled to be free, and since then 'the great weight of precedent suggests that release must occur within a matter of hours after the right to it accrues[.]'" (Doc. 104-1 at 5 (citations omitted).)

Defendant calls this a "flawed legal premise." (Doc. 118 at 14.) First, these plaintiffs seek to hold LeBlanc liable even when the individual is in the custody of the sheriff until the date of sentencing and DOC has no knowledge of the length of these detentions. (*Id.*) Second, the legal standard is incorrect; the Supreme Court case Plaintiffs rely upon—*County of Riverside v. McLaughlin*, 500 U.S. 44 (1991)—dealt with a county's alleged failure to provide prompt judicial determination of probable cause to those arrested without a warrant, all in violation of the Fourth Amendment. (*Id.* at 14–15.) According to Defendant, the Supreme Court provided a 48-hour presumption of reasonableness. (*Id.* at 15.) This case is different because (1) we are not faced with a pre-trial detainee's right to a probable cause hearing; (2) *McLaughlin* involved the Fourth Amendment, not the Fourteenth; (3) *McLaughlin* measured time from the point of arrest; and (4) the jailer cannot be held liable for the actions of third parties. (*Id.*) Defendant urges that this creates a "fail-safe" class which improperly gets around the standing requirement. (*Id.* at 16.)

In reply, *Humphrey* Plaintiffs assert first that the Fifth Circuit specifically rejected this argument in *Crittindon*; that is, the Fifth Circuit found that the DOC was responsible for the local jails once they house prisoners. (Doc. 123 at 2.) Second, again, "[c]ourts apply *McLaughlin* to the length of detention after court authority ends as a matter of routine." (*Id.* (citing Doc. 104-1 at 3–4).) And third, Plaintiffs do not seek an "impermissible 'fail-safe' class." (*Id.* at 3.) "[T]he term 'eligible' defines class membership in terms of liability. . . . In the proposed class, however, 'eligible' characterizes the release date of a person's sentence, not a presumption of legal liability." (*Id.*)

> A person who is sentenced to "time served," for example, is "eligible" for release at the time of sentencing, because the court authority to imprison them has ended. The definition does not assume liability, and does not negate the reasonable period to effectuate such a person's release that is contemplated in

> *McLaughlin* and other overdetention cases. This is not a fail-safe
> class.

(*Id.*)

In *Giroir*, Plaintiffs largely make the same argument about *McLaughlin*, though they cite to different case law. (*Giroir*, Doc. 25-1 at 2 (citations omitted).) Defendant's argument is identical. (*Giroir*, Doc. 27.) In reply, *Giroir* Plaintiff states that, while Defendant is correct about *McLaughlin*'s holding, "in the context of overdetention, courts have consistently reasoned that *McLaughlin*'s holding establishing a 48-hour rule for determining probable cause following arrest requires at least as strict a standard when a person is legally entitled to release." (*Giroir*, Doc. 30 at 3–5 (citing *Barnes v. District of Columbia*, 793 F. Supp. 2d 260 (D.D.C. 2011).) "Defendants do not address *Barnes* or the federal consensus that the district court in *Barnes* recognized and joined. Nor do Defendants offer any alternative case law or standard by which their overdetention should be measured." (*Id.*) As to the fail-safe argument, *Giroir* Plaintiff notes:

> The Fifth Circuit has expressly "rejected a rule against fail-safe classes" on several occasions. *In re Rodriguez*, 695 F.3d 360, 370 (5th Cir. 2012) (collecting cases). Regardless, Plaintiff's proposed class definition does not create not [sic] a fail-safe class because membership in the class depends on an objective fact— overdetention for at least 48 hours—rather than success on the merits of the underlying claim—constitutional harm caused by LeBlanc's deliberate indifference. *Id.* at 369–70 ("A fail-safe class is a class whose membership can only be ascertained by a determination of the merits of the case because the class is defined in terms of the ultimate question of liability."); *see also Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012) (explaining that a fail-safe class is one "that cannot be defined until the case is resolved on its merits").

(*Id.* at 4 n.2.)

Both parties also discuss at length *Healey v. Louisville Metro Gov't*, No. 17-71, 2021 WL 149859 (W.D. Ky. Jan. 15, 2021). This case also warrants further discussion.

In post-hearing briefing, Defendant contends that *Healey* is inapplicable. (Doc. 214 at 3.) There, defendant's goal was to release the inmates within two to four hours, and the class definition's time period was tailored to the evidence in that case. (*Id.*) Here, Defendant rejects the premise of a 48-hour time period, and the Fifth Circuit has declined to set a definite amount of time to qualify as reasonable. (*Id.*) In any event, the 48-hour period is based on *McLaughlin*, and, under that case, anything beyond 48 hours is presumptively unreasonable, and the burden then shifts to defendant to prove that the delay was reasonable. (*Id.*) This necessarily hinges on individualized issues. (*Id.* at 4.)

Further, in *Healey*, the facts were different. (*Id.*) There were no issues with inmates who served time before trial in a local jail or who received jail credits that equaled or exceeded their prison sentences. (*Id.*) Additionally, *Healey* did not involve a situation like this one, where the DOC does not have complete control over jailtime but shares that responsibility with the sheriffs and clerks of court. (*Id.*)

Finally, the evidence is different in the two cases. (*Id.* at 5.) Here, Plaintiff relies on pull documents, but Defendant showed that these are inadequate for class certification purposes. (*Id.*)

Conversely, Plaintiffs sought to amend their class definitions in post-hearing briefing to conform to *Healey*. (Doc. 213 at 7–8.) *Giroir* Plaintiff now tries to certify a class under Rule 23(b)(2) as follows, with modifications in underline:

> All persons who have been, or will be, sentenced to the custody of the Louisiana DOC, and who were, or will be, entitled to release at the time of their sentencing, but who nevertheless remain in custody, now or in the future, <u>due to Defendants' failure to implement and maintain an adequate process for timely releasing inmates,</u> for more than 48 hours past their sentencing dates.

(*Id.* at 7.) *Humphrey* Plaintiffs seek to certify a class under Rule 23(b)(3):

> All persons who have been remanded to the custody of the DOC since April 16, 2019, and who were entitled to release at the time of their remand (either pursuant to sentencing or parole revocation), but who were released by the DOC more than 48 hours past the <u>date</u> that they were remanded to the DOC's custody <u>due to Defendant's failure to implement and maintain an adequate process for timely releasing inmates</u>.

(*Id.* at 7–8.)

In his post-hearing reply, Defendant responds that Plaintiffs' amended classes create more individualized determinations; "to even determine whether each individual is a class member, there would have to be a determination as to the cause of the alleged overdetention." (Doc. 215 at 1–2.) "An individualized review of inmate files would be required to assess whether the individual meets the class definition, i.e., whether the alleged overdetention was caused by DPS&C's alleged failure to implement and maintain an adequate process for timely releasing inmates, or by some other reason." (*Id.* at 2.) "A case-by-case determination would be required for causation[,]" as Defendant would seek to dispute whether each cause of the alleged overdetention was caused by him or something else.

In their post-hearing reply, Plaintiffs note that they have applied *Healey*'s reasoning to modify their class definition to allege a systematic cause of the over-detentions. (Doc. 216 at 5.) This makes Defendant's reliance on the Seventh Circuit misplaced, as *Portis* denied certification because the class did not include a cause of overdetention. (*Id.*)

Defendant also argues against *Healey* because, there, the municipality admitted that 4 hours was unreasonable and Defendant here makes no such concession, but Plaintiffs dispute this as well. (*Id.*) "A jailor, however, does not get to define what is a reasonable time for release. As the Court noted on October 19, 'that's what juries do.'" (*Id.* (quoting Tr. 212).)

> At the certification stage, the question is whether a jury's determination of that question can be applied to the entire class. In

56

this regard, the evidence presented at the October 19 hearing is
notable for its universality: the DOC's sentencing calculation
practices, including its "cumbersome" paperwork process, impact
the time it takes to calculate the sentence of every person remanded
to DOC custody. That is the focus of Plaintiffs' modified proposed
classes, and it is the definition of a predominant, common issue.

(*Id.*)

Defendant also tries to distinguish *Healey* because that case involved delay after receipt of

a court order while this one involves delay from the time of sentencing, but that too is unavailing.

(*Id.* at 5–6.) *Crittindon* rejected the idea that DOC has no responsibility until it receives a complete

pre-class packet and instead said it could be liable for its awareness of the delay in receiving

paperwork from local jails. (*Id.* (citing *Crittindon*, 37 F.4th at 188).)

Finally, *Healey* is not distinguishable because of the need for individualized review. (*Id.* at

6.) Under *Healey*, and unlike the Seventh Circuit, individualized review does not bar certification

where the class is based not on the amount of time the defendant is overdetained but on the

municipal policy that caused the delay. (*Id.*)

[F]or class certification purposes, the difference is dispositive:
Plaintiffs seek to certify a class of people who were over-detained
by more than 48 hours because of the cumbersome paperwork policy
maintained by the DOC (to which, Plaintiffs charge, the Defendants
have been deliberately indifferent). That policy, as the evidence
introduced at the October 19 hearing showed, caused over-detention
measured not in hours, but weeks. Every single class member
identified by Defendants at ECF 214 at 6-7, regardless of the
individual circumstances they may encounter, will have been
impacted as a result of that policy. The predominant question in all
of their cases, and those of all other proposed class members, is
whether the DOC's cumbersome paperwork process caused a delay
in their release, and whether that delay was reasonable. Those
questions are common.

(*Id.* at 7.)

### 2. Law and Analysis

The Fifth Circuit "has recognized the 'clearly established right to timely release from prison.'" *Crittindon*, 37 F.4th at 186 (quoting *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011)). "Of course, 'timely release' is not the same as instantaneous release: it is reasonable for jailers to have some administrative delay in processing an inmate's discharge." *Id.* (quoting *Whirl v. Kern*, 407 F.2d 781, 792 (5th Cir. 1968)).

"[C]ourts have declined to define the amount of delay that is reasonable[.]" *Id.* (citing *Berry v. Baca*, 379 F.3d 764, 771 (9th Cir. 2004) ("Courts have not settled on any concrete number of permissible hours of delay in the context of post-release detentions.")); *see also Barnes v. D.C.*, 793 F. Supp. 2d 260, 275 (D.D.C. 2011) ("Courts have declined to adopt a bright-line rule for the maximum permissible delay in the overdetention context." (citing *Berry*, 379 F.3d at 771)). "This contrasts with the Supreme Court's approach, in the Fourth Amendment context, to detentions pending probable cause determinations after warrantless arrests, where the Court adopted a 48–hour rule." *Barnes*, 793 F. Supp. 2d at 275 (citing *McLaughlin*, 500 U.S. at 56). "In the overdetention context, the potential consequences for overdetained inmates are similar, while the societal interests involved are very different."[7]

---

[7] *Barnes* explained some of these competing interests:

> Here, there has already been a judicial determination that the inmate is entitled to freedom from imprisonment. In the eyes of the law, this person is no longer a prisoner. *Sullivan v. County of Los Angeles*, [ ] 527 P.2d 865, 868 (1974). As a result, the jail has every reason to believe that the person's continued detention is unlawful and no reason to believe that some other basis for the detention—for example, a warrant or detainer in a separate matter—exists, other than the fact that this person is being held by a correctional institution and at one point was legitimately incarcerated. While society has an interest in preventing the release of an inmate when an alternative basis for his confinement exists, and in administrative tasks aimed at preventing such releases, these interests are simply not as weighty as the interests involved in the probable cause context, where the individual who is subjected to administrative delays is personally suspected of criminal activity.

The Fifth Circuit has found that "it is without question that holding without legal notice a prisoner for a month beyond the expiration of his sentence constitutes a denial of due process." *Crittindon*, 37 F.4th at 188 (citations omitted); *see also id.* at 191 ("This Court recognizes that overdetention by thirty days is a per se deprivation of due process." (citing *Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980) ("Detention of a prisoner thirty days beyond the expiration of his sentence in the absence of a facially valid court order or warrant constitutes a deprivation of due process."))). But, the Fifth Circuit has not definitively set a time less than that.

Plaintiffs principally reply on *Barnes*, where the District of Columbia stated that, "courts appear to agree that the maximum permissible administrative delay in the overdetention context likely falls well short of the 48–hour horizon set out in *McLaughlin*." *Barnes*, 793 F. Supp. 2d at 276. But *Barnes*'s authority on this seems slightly (though not completely) shaky.[8]

---

> Furthermore, the "administrative burden of accelerating the release process—in particular, running a computer check on wants and holds within less than forty-eight hours—does not seem as weighty as the burden of establishing probable cause under a tight timeline." *Berry*, 379 F.3d at 772. This burden is even further reduced given that many, if not most, of the administrative tasks incident to an inmate's release can be undertaken prior to the expiration of a sentence or before a jail's receipt of a paper court order authorizing release—unlike in the probable cause context, where all of the administrative tasks must necessarily follow the detainee's arrest.

*Barnes*, 793 F. Supp. 2d at 275–76.

[8] On the one hand, *Barnes* relied upon the following: (1) *Berry*, 379 F.3d at 771–72 (declining to find that overdetentions ranging from twenty-six to twenty nine hours were presumptively reasonable); and (2) *Brass v. County of Los Angeles*, 328 F.3d 1192, 1202 (9th Cir. 2003) ("One might conclude that when a court orders a prisoner released—or when, for example, a prisoner's sentence has been completed—the outer bounds for releasing the prisoner should be less than 48 hours. We need not determine that question here, however, since we have concluded that in the circumstances of this case, the 39–hour delay in releasing Brass was reasonable and did not violate his constitutional rights."). On the other hand, *Barnes* also relied upon *Davis v. Hall*, 375 F.3d 703, 713 (8th Cir. 2004), which said that, "[E]ven a thirty-minute detention after being ordered released could work a violation of a prisoner's constitutional rights under the Fourteenth Amendment."

In another case, *Lewis v. O'Grady*, 853 F.2d 1366, 1370 (7th Cir. 1988), the appellate court said that, given that the administrative tasks necessary to release an inmate (including "transportation, identity verification, and processing") "may require some time to accomplish," "[i]t is virtually impossible to establish an absolute minimum time to meet all potential circumstances which might exist. What is a reasonable time for detaining a prisoner in custody is a question best left open for juries to answer based on the facts presented in each case." *Lewis* found that "a reasonable

One law review article summarized the problem well:

> Courts usually examine the specific circumstances under which the plaintiff's release was delayed in order to determine if there was any constitutional violation. Only two reported cases have held that overdetentions of a particular length of time are unreasonable as a matter of law. See Douthit v. Jones, 619 F.2d 527, 532 (5th Cir. 1980) ("Detention of a prisoner thirty days beyond the expiration of his sentence in the absence of a facially valid court order or warrant constitutes a deprivation of due process."); Whirl v. Kern, 407 F.2d 781, 792 (5th Cir. 1969) ("It may safely be said that Kern's ignorance for nine long months after the termination of all proceedings against Whirl was, as a matter of law, ignorance for an unreasonable time."). These cases are extreme--thirty days in one and nine months in the other--making it nearly impossible to argue that the delays in release were reasonable. Things become muddled, however, when the overdetention is shorter.
>
> Most cases discussing overdetention assert that what is a "reasonable time" for out-processing "is a question best left open for juries to answer based on the facts presented in each case." Lewis v. O'Grady, 853 F.2d 1366, 1370 (7th Cir. 1988); see also Berry v. Baca, 379 F.3d 764, 771 (9th Cir. 2004) (concluding that what length of time is a reasonable delay "is a factual determination that is appropriately left to the jury to decide"); Green v. Baca, 306 F. Supp. 2d 903, 918 (C.D. Cal. 2004) (refusing to adopt a per se rule that a 12.5-hour delay was reasonable as a matter of law and stating instead that "the court must . . . look to the circumstances of the case" (citing Brass v. County of L.A., 328 F.3d 1192, 1202 (9th Cir. 2003))).
>
> Operating under this theory, courts have declined to comment on the reasonableness of overdetentions ranging from fifty minutes to twenty-nine hours. See Berry, 379 F.3d at 773 (reversing the district court's grant of summary judgment for defendants on twenty-six- to twenty-nine-hour overdetentions and stating "[w]e find that this question of reasonableness is properly conceived of as a jury determination"); Lewis, 853 F.2d at 1372 (reversing the district court's directed verdict for defendants on an eleven-hour overdetention and concluding "based on the facts in this case, it is a question for the jury to determine whether the time involved in processing the release of Sandy Lewis was reasonable"); Green, 306

---

jury could find that the 'administrative' delay in Lewis' release [of 11 hours] was unreasonable," so the "the district court's order granting a directed verdict was improper." *Id.*

> F. Supp. 2d at 919 (denying defendant's motion for summary judgment on plaintiff's claim of excessive detention in violation of Fourteenth Amendment for a 12.5-hour overdetention); Muick v. Jasso, No. 3:02-CV-1089-L, 2003 WL 22054226, at *1 (N.D. Tex. Apr. 3, 2003) (labeling plaintiff's claim for fifty-minute overdetention as nonfrivolous).

Patricia E. Simone, *A Presumptive Constitutional Time Limit for Administrative Overdetention of Inmates Entitled to Release*, 81 Notre Dame L. Rev. 719, 745 (2006).

More recently, Judge Feldman summarized the problem in *Traweek v. Gusman*, 414 F. Supp. 3d 847, 867–69 (E.D. La. 2019).[9] There, plaintiff argued that a jail official was not entitled to qualified immunity because "controlling precedent renders it beyond debate that any reasonable official would know that failing to process [plaintiff's] release within at least several hours or at most several days of receiving paperwork making it obvious that he was overdue for release violated his Fourteenth Amendment right to timely release." *Id.* at 867. Defendant responded that the law was "not clearly established that taking some time less than 24 hours to process an inmate's release constitutes deliberate indifference." *Id.* at 868. "However, [plaintiff] identifie[d] a body of persuasive authority that clearly establishes that what amount of time is reasonable is context-specific such that continuing to detain an inmate entitled to release for as few as several hours might be unreasonable as a matter of law." *Id.* Judge Feldman wrote:

> That an inmate has a due process right to "timely" release from custody after a judicial determination that he is entitled to release begs the question: how much time is reasonable and how much tolerance is there for administrative delay attendant to processing an inmate's release? "Courts have not settled on any concrete number of permissible *hours* of delay in the context of post-release detentions." Berry v. Baca, 379 F.3d 764, 771 (9th Cir. 2004)(emphasis added). Persuasive authorities have declined to endorse a presumptive reasonable number of hours. See, e.g., Berry v. Baca, 379 F.3d 764 (9th Cir. 2004)(reversing district court's grant of summary judgment dismissing official capacity claims, finding a

---

[9] Lead counsel for *Humphrey* Plaintiffs was also lead counsel in *Traweek*.

fact issue as to whether application of county policies which resulted in 29-hour overdetentions was unreasonable under the circumstances and thus amounted to a policy of deliberate indifference to arrestees' constitutional rights); <u>Davis v. Hall</u>, 375 F.3d 703, 719-20 (8th Cir. 2004)(affirming denial of summary judgment as to those defendants invoking qualified immunity who had knowledge of the court order calling for inmate's release but nonetheless failed to act and noting that "even a thirty-minute detention after being ordered released could work a violation of a prisoner's constitutional rights under the Fourteenth Amendment."); <u>Brass v. Cty. of Los Angeles</u>, 328 F.3d 1192, 1201-02 (9th Cir. 2003)(affirming dismissal of arrestee's <u>Monell</u> claim for failure to state a claim, finding that the 39-hour delay resulting from the discretionary custom of processing court-ordered releases at the end of the processing day after it had processed all other releases did not unreasonably violate his constitutional rights and acknowledging that the Fourteenth Amendment "permits a reasonable postponement of a prisoner's release" to allow time for processing); <u>cf.</u> <u>Lewis v. O'Grady</u>, 853 F.2d 1366 (7th Cir. 1988)(reversing district court's order granting a directed verdict in favor of the sheriff sued in his official capacity and remanding for the jury to consider whether the 11 hours it took the sheriff to discharge Lewis was reasonable, but granting summary judgment in favor of defendants sued in their individual capacities on the basis of qualified immunity); <u>Barnes v. District of Columbia</u>, 793 F. Supp. 2d 260, 276 (D.D.C. 2011)("courts appear to agree that the maximum permissible administrative delay in the overdetention context likely falls well short of the 48-hour horizon [applied in the Fourth Amendment context to detentions pending probable cause determinations after warrantless arrests in [<u>Cnty. of Riverside v. McLaughlin</u>, 500 U.S. 44 [ ] (1991).]").

*Id.* Judge Feldman found:

> Insofar as [defendant] argues that, as a matter of law, she could not be instantly liable for [plaintiff's] overdetention, of course the Court agrees. <u>See</u>, <u>e.g.</u>, <u>Whirl v. Kern</u>, 407 F.2d 781, 792 (5th Cir. 1968)(a jailer does not commit "an instant tort at the moment" the prisoner should have been released, but, rather, a jailer's "duty to [her] prisoner is not breached until the expiration of a reasonable time for the proper ascertainment of the authority upon which his prisoner is detained"). However, the Court declines [defendant's] invitation to embrace a *per se* rule of reasonableness where persuasive case literature (which [defendant] ignores) has reasonably declined to adopt one. At this stage of the proceedings, the Court need only consider the alleged facts and ask whether [plaintiff's] allegations

overcome her assertion of qualified immunity; that is, whether Mr. [plaintiff] alleges facts that, if proved, demonstrate that [defendant] acted objectively unreasonably in light of clearly established law. Although [defendant] suggests that the plaintiff fails to allege that she knew he was being detained beyond his release date, [plaintiff] indeed alleges facts suggesting that she subjectively knew or should have known that he was entitled to release once she saw his paperwork on May 21, but that she nevertheless failed to generate his certificate of release until the afternoon of the following day. [plaintiff] alleges facts, if proved, that a simple comparison of the jail credit letter to [plaintiff's] sentence made it unmistakably clear that he had spent more than two weeks in custody beyond his court-ordered release date; it is [defendant's] failure to certify his release despite her knowledge that he was overdue for release that he claims constitutes deliberate indifference to a known consequence of her action, which violated his clearly established right to timely release. In essence, [plaintiff] alleges that [defendant's] conduct delayed the processing of his release and that this action (or inaction) was objectively unreasonable in light of clearly established law; he alleges facts that, if proved, demonstrate that [defendant] was plainly incompetent or knowingly violated the law. This suffices to overcome her invocation of qualified immunity at this stage of the proceedings.

*Id.* at 868–69.

Judge Feldman's decision contains positives for both sides. On the one hand, as Defendant argues, the Fifth Circuit and other courts have declined to adopt a per-se basis for liability short of the 30-day requirement. But, on the other hand, Judge Feldman and Plaintiffs are also right that unconstitutional overdetentions are, by and large, measured in *hours* and not days.

This is precisely why Plaintiffs' proposed class, as amended in their most recent filings, is ideally suited for certification. As Plaintiffs argue, the key is *not* the number of hours class members were overdetained. Rather, the key is what *caused* those overdetentions—namely, LeBlanc's alleged policies and deliberate indifference.

*Healey* encapsulates this distinction. There, the named plaintiffs alleged that the Louisville government and its officials regularly detained people longer than ordered by courts by more than

one day after they were due to be released. *Healey*, 2021 WL 149859, at *1. They sought to certify a class of "[a]ll persons who, since February 3, 2016, were imprisoned, detained or incarcerated more than four hours after: (a) entry of an order directing their release; and/or (b) satisfaction of their term of incarceration set by prior court order." *Id.* at *2. The Court surveyed caselaw of overdetention class actions (including the Seventh Circuit cases highlighted by Defendant) and devised the following "synthesis of precedent"):

> From its survey of the relevant precedent on this issue, the Court can distill four general principles applicable to this case. First, courts have been reluctant to certify classes based on whether the amount of delay is unreasonable. *See* [*Harper v. Sheriff of Cook Cnty.*, 581 F.3d 511, 515 (7th Cir. 2009); *Portis v. City of Chicago*, 613 F.3d 702, 705 (7th Cir. 2010).] This theory of over-detention liability is generally not amenable to class treatment because determining whether a given detention rises to the level of a constitutional violation requires individualized determinations about the reason the inmate's release was delayed.
>
> Second, courts have been willing to certify over-detention classes where the class can answer questions about whether a municipality's policy (or lack of one) for releasing inmates caused over-detentions. Put differently, an over-detention class may be certified if it alleges a systemic issue—which impacts all inmates—with the municipality's release process. *See* [*Driver v. Marion Cnty. Sheriff*, 859 F.3d 489, 494 (7th Cir. 2017)]; *see also Berry*, 379 F.3d at 768 ("They claim that the County's unreasonably inefficient implementation of its administrative policies amounts to a policy of deliberate indifference . . . As a matter of law, the County's system of administrative processing cannot be immune [from such allegations]").
>
> Third, courts that have certified over-detention classes have done so based on statistical, not anecdotal, evidence. *See Driver*, 859 F.3d at 494; *see also* [*Wharton v. Danberg*, 854 F.3d 234, 238 (3d Cir. 2017).] And fourth, the class definitions of over-detention classes premised on a municipal policy, practice, or custom should contain the cause of the over-detention. *See Driver*, 859 F.3d at 494.
>
> These general principles are largely distilled from the trilogy of cases from the Seventh Circuit. As a result, the Court finds persuasive the Seventh Circuit's reasoning in *Harper, Portis,* and

>*Driver.* The Seventh Circuit has carefully considered and explored
>the contours of over-detention classes in three separate published
>opinions. Of most assistance to this Court, the Seventh Circuit has
>provided examples of the types of over-detention claims that are
>certifiable and those that are not.

*Id.* at *16–17.

Based on these principles, *Healey* examined the requirements for the class definition. *Id.* at *18–19. Defendant objected that certain delays were beyond their control, including those caused by the need to interpret court orders for detained individuals. *Id.* at *19. "The Court acknowledges that Defendants process a large volume of orders each day (and year) and that sometimes there are delays in the system outside their control." *Id.* "But the Court also recognizes that inmates have a right to be released 'promptly' after LMDC receives the release order. . . . Defendants sworn testimony is that, barring extenuating circumstances, releases should be accomplished within two to four hours." *Id.* (citations omitted).

Consequently, the Court modified the class. First, it created two subclasses—"one for imprisoned inmates and one for detained ones." *Id.* Second, the Court "increase[d] the over-detention threshold for detained inmates from four hours to twelve hours." *Id.* "Defendants ha[d] produced no evidence that delays of more than twelve hours could be because of individual issues." *Id.* (citation omitted). The Court continued:

>Twelve hours is a "practical compromise" between the rights of
>detained inmates and the realities of processing release orders for
>detained inmates in LMDC. *McLaughlin,* 500 U.S. at 53. By tripling
>the maximum time allowed under Defendants' goal, the new class
>definition provides time to resolve issues that may arise, such as
>clarification of court orders.

*Id.* Finally, the Court modified the definitions "to include what Plaintiffs have affirmatively demonstrated is the cause of a substantial majority of over-detentions: Defendants' failure to

implement and maintain an adequate process for timely releasing detained inmates and imprisoned

inmates." *Id.* (citations omitted). Thus, the class definitions were as follows:

> **Subclass A:** All persons who from February 3, 2016 to present were imprisoned in the Louisville Metro Department of Corrections for more than four hours after satisfaction of their term of imprisonment set by prior court order due to the failure of Defendants to implement and maintain an adequate process for timely releasing imprisoned inmates.

> **Subclass B:** All persons who from February 3, 2016 to present were detained in the Metro Government Department of Corrections for more than twelve hours after receipt of an order directing their release due to the failure of Defendants to implement and maintain an adequate process for timely releasing detained inmates.

*Id.*

*Healey* demonstrates why certification is appropriate in this case. First, and perhaps most

importantly, as in *Healey*, Plaintiffs do not attempt to certify a class based on how many hours the

class members were overdetained or whether the amount of delay is reasonable; instead, Plaintiffs

try to certify a class based on whether DOC's "policy (or lack of one) for releasing inmates caused

over-detentions." 2021 WL 149859, at *16–17. Second, like *Healey*, the alleged policies

articulated by Plaintiff (and summarized in Section II.C.2, *supra*) are the cause of the

overdetentions, and that is reflected in the definitions of the classes.[10] Third, Plaintiffs rely on

---

[10] Again, for *Humphrey*, that is:

> All persons who have been remanded to the custody of the DOC since April 16, 2019, and who were entitled to release at the time of their remand (either pursuant to sentencing or parole revocation), but who were released by the DOC more than 48 hours past the date that they were remanded to the DOC's custody due to Defendant's failure to implement and maintain an adequate process for timely releasing inmates.

(Doc. 213 at 7–8.) And for *Giroir*, the class is defined as:

> All persons who have been, or will be, sentenced to the custody of the Louisiana DOC, and who were, or will be, entitled to release at the time of their sentencing, but who nevertheless remain in custody, now or in the future, due to Defendants'

statistical rather than anecdotal evidence, namely in the form of the pull-documents and negative must-serve documents compiled from CAJUN data. And fourth, the 48-hour demarcation is a "'practical compromise' between the rights of detained inmates and the realities of processing release orders for detained inmates," *Id.* at *19, particularly in light of Judge Feldman's observation that overdetentions are typically measured in hours.

Defendant claims that this definition and 48-hour compromise fail to take into account matters over which DOC has no control, but this begs the question. Defendant cites to third-party conduct like that of clerks and local sheriffs, but Plaintiffs submitted substantial evidence, detailed above, that LeBlanc knowingly failed to implement better systems with the clerks of court and local sheriffs, including that LeBlanc did in fact have the power over the sheriffs to require timely relief. (*See* Section II.C.2.d, e, *supra*.) Further, Defendant also relies on the ice storm suffered by one of the named Plaintiff, but critically, that Plaintiff was entitled to immediately release on January 26, 2021, and yet (a) his Pre-Class Packet was not received until February 12, 2021, and (b) the ice storm did not cause all state offices in Avoyelles Parish to close until February 15 to 19, 2021. (Def. Ex. 1, Griffin Aff. ¶¶ 24a, 24b, 24d, Doc. 118-1; Pl. Ex. 20, Giroir Decl. ¶¶ 3–8, Doc. 104-20.) That is, Giroir can make a very reasonable argument at trial that the ice storm would have played no role but for LeBlanc's unconstitutional policies.

For all these reasons, the Court again finds that the Plaintiffs' class definitions (except with a minor exception described below) satisfy the ascertainability requirement and that the 48-hour number included in those definitions is no hinderance to certification.

---

failure to implement and maintain an adequate process for timely releasing inmates, for more than 48 hours past their sentencing dates.

(Doc. 213 at 7.)

## C. Numerosity

### 1. Parties' Arguments

*Humphrey* Plaintiffs point to two main pieces of evidence to support their numerosity argument: (1) the CAJUN "pull document" which purportedly shows that 1,700 individuals were overdetained between April 2019 to May 2020, (Doc. 104-1 at 16–17); and (2) the DOJ Report (Doc. 158-1) reflecting high numbers of overdetained individuals, (Doc. 158).

Defendant responds that (1) no such CAJUN "pull document" exists, (Doc. 118 at 18); (2) the spreadsheet Plaintiffs rely upon does not reflect who was detained more than 48 hours from release, (*id.*); and (3) the DOJ Report is merits-based and does not support a finding of numerosity, (*id.* at 165).

*Humphrey* Plaintiffs reply that Defendant used the same spreadsheet in their funding application to the DOJ. (Doc. 123 at 7–8.)

*Giroir* Plaintiff estimates the class at 200 and also relies on the pull document and DOC 30(b)(6) testimony. (*Giroir*, Doc. 25-1 at 11–12.) Further, the population change of the prison is fluid, and this further supports class certification. (*Id.*) Finally, incarcerated class members cannot bring lawsuits easily, thus making numerosity even more compelling.

In response, Defendant again urges that the pull documents are not reliable. (*Giroir*, Doc. 27 at 22.) Defendant further points to Griffin's affidavit, where she addresses problems with the pull documents. (*Id.* at 23.)

In reply, *Giroir* Plaintiff says that Defendant fails to respond to most of his arguments, including his reliance on DOC's corporate deponent. (*Giroir*, Doc. 30 at 9.) Moreover, even with Defendant's carping, the pull documents still show a sufficient number to warrant certification. (*Id.* at 9–10.)

In their pre-hearing briefing, Plaintiffs largely repeat prior arguments. (Doc. 117 at 9.) Defendant urges that the DOJ Report "is <u>not tied to proposed class members</u>," as it shows "<u>all</u> inmates released from DOC custody," which necessarily includes members outside the class. (Doc. 182 at 4.)

In post-hearing briefing, Defendant largely lumps the numerosity arguments with the ascertainability ones. (Doc. 214 at 1–3.) Both center on the inadequacy of the pull documents. (*Id.*)

In Plaintiffs' post-hearing reply, they urge the Court to reject Defendant's argument that the pull documents are insufficient because a handful showed some inmates who were not entitled to immediate release. (Doc. 216 at 2.) Plaintiffs need not show a precise count; they only need to provide some evidence of a reasonable estimate of how many are in the proposed class. (*Id.*) Numerosity is clearly satisfied considering that Defendant himself used the numbers in the February 2019 pull document in its grant application to the DOJ. (*Id.*)

### 2. Applicable Law

In *Lewis v. Cain*, Chief Judge Dick wrote:

> Under Rule 23(a)(1), certification is only appropriate where "the class is so numerous that joinder of all members is impracticable." The numerosity requirement "requires examination of the specific facts of each case and imposes no absolute limitations." [*Dockery*, 253 F. Supp. 3d at 846 (quoting *General Tel. Co. of the NW., Inc. v. EEOC*, 446 U.S. 318, 329 (1980)).] However, the Fifth Circuit has repeatedly noted that "the number of members in a proposed class is not determinative of whether joinder is impracticable." [*Ibe*, 836 F.3d at 528 (quoting *In re TWL Corp.*, 712 F.3d 886, 894 (5th Cir. 2013)).] In addition, courts must consider "the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." [*Dockery*, 253 F. Supp. 3d at 846 (quoting *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981)).] . . . In addition, the fluid nature of a plaintiff class, as in prison-litigation context, counsels in favor of certification of all present and future members. Although there is no strict threshold, classes containing more than 40 members are generally large enough to warrant

certification. [*Braggs v. Dunn*, 321 F.R.D. 653, 661 (M.D. Ala. 2017).]

*Lewis*, 324 F.R.D. at 167–68 (footnotes incorporated).

### *3. Analysis*

Plaintiffs satisfy their burden on numerosity. First, the Court will examine the relevant evidence, and then the Court will draw its conclusions.

### *a.* Relevant Evidence

As Plaintiffs argue, the DOJ Report stated that its "investigation determined that LDOC incarcerates thousands of individuals each year beyond their legal release dates in violation of the Fourteenth Amendment of the United States Constitution." (Doc. 158-1 at 3.) The report also stated that:

> LDOC routinely confines people far past the dates when they are legally entitled to be released from custody. Since at least 2012, more than a quarter of the people set for release from LDOC's custody each year are instead held past their release date, in violation of the due process protections of the Constitution.

(DOJ Report, Doc. 158-1 at 3.) The DOJ Report continued in its summary:

> **LDOC denies individuals' due process rights to timely release from incarceration.** LDOC violates the constitutional rights of people in its custody by detaining them for weeks and often months past their release dates. According to the most recent available data, of the 4,135 people released from LDOC's custody between January and April 2022, 1,108 (or 26.8 percent) were held past their release dates. The median number of days an overdetained individual was held past their release date was 29; 31 percent were held over for at least 60 days; and 24 percent were held over for at least 90 days.

(*Id.*) The summary continues, "As a result of the systemic deficiencies identified in our investigation, thousands of individuals annually suffer the significant harm of having their freedom unconstitutionally denied by their overdetention in LDOC's custody. (*Id.* at 4.)

Lastly, in *Giroir*, Plaintiff points to the testimony of another Rule 30(b)(6) deponent, who said that the DOC found in 2017 that it had an average of 200 inmates per month held an average of 49 days past the end of their sentence. (*Giroir*, Rule 30(b)(6) Dep. (Ellis) 38, Doc. 1-8 at 11.)

Defendant, on the other hand, submitted evidence in *Giroir* to dispute the reliability of the pull documents. Specifically, Defendant points to Griffin's affidavit. (*Giroir*, Def. Ex. 1, Griffin Aff., Doc. 27-1.) Again, she is a Program Manager for DOC who oversees the department's Pre-Classification Department, which handles time computation of inmates' sentences to DOC custody and release of inmates. (*Id.* ¶ 1.) Griffin stated that, after *Humphrey* was filed, Griffin and another DOC employee reviewed the information contained in one of the pull documents (February 2019), reviewing the CAJUN data and pre-class paperwork to "fully understand the contents and information provided" therein. (*Id.* ¶ 17.) Griffin tried to determine if each inmate was entitled to immediate release. (*Id.*) She created a "modified pull document," with new headings and notes. (*Id.* ¶ 18; Ex. 1-B.) Griffin stated that one column she created was "# of days owed at sentence date," which "provide[d] the number of days that each inmate was to serve at the time of sentence." (*Id.* ¶ 19.) "Any inmate with a positive number in that column owed [DOC] time, and was not entitled to 'immediate release' on the sentencing date." (*Id.*) Griffin concluded:

> Because the original February 2019 pull document listed the 'raw release date,' which did not include CTRP credits, many of the inmates included on the document had additional time to serve with [DOC] at the time of their sentencing. In addition, some of the information on the original February 2019 pull document was incorrect, it did not account for multiple docket numbers."

> [ ] Even reviewing the original February 2019 pull document and the modified February 2019 pull document, information is still needed to determine the facts and circumstances surrounding each inmate's release. For example, the "Pre-class received" column indicates the date that the first piece of paperwork compiling the Pre-Class Packet was received by [DOC], not the date that [DOC] received the entire Pre-Class Packet needed to complete an inmate's

> time computation. If the local jail failed to provide any of the documents required by the Louisiana Code of Criminal Procedure Article 892, [DOC] cannot perform time computation. As such, the original February 2019 pull document does not provide all information about each inmate's release process, which can only be obtained through individual and manual review and analysis of the pre-class paperwork.

(*Id.* ¶¶ 20–21.)

Additionally, Defendant also points to Gueho's affidavit. (*Giroir*, Ex. 2, Gueho Aff., Doc. 27-5.) She stated,

> When I created the pull document, I matched information contained within several records in CAJUN. I did not check each inmate's file in depth. The Pre-Classification Department of the DOC would better understand the information contained within the pull document, and the pre-class record would explain the circumstances surrounding release and time computation of each inmate. Further examination by the Pre-Class Department would be required to verify information pulled from the code search within CAJUN.

(*Id.* ¶ 11.)

However, the conclusion of *Hicks II* bears repeating:

> "There isn't always an explanation for everything." Indeed, as our Court remains plagued by claims arising from inexplicable and illegal overdetention in Louisiana prisons, explanations scarcely arise, let alone satisfy scrutiny upon our review. The problem is endemic in Louisiana, where the process for calculating release dates is so flawed (to put it kindly) that roughly one in four inmates released will have been locked up past their release dates—for a collective total of 3,000-plus years.

2023 WL 5694871, at *9 (citations omitted).

Moreover, as Plaintiffs argue, the modified pull document referenced above still shows a very large number of individuals with *negative* numbers in the column "# of days owed at sentence date." (*See Giroir*, Ex. 1-B, Doc. 27-3.) *Giroir* Plaintiff counted 146 (Doc. 30 at 9), while the Court

counted about 150. But, ultimately, the precise number does not matter—there are still a very large number entitled to immediate release *in a single month* (February 2019).

Indeed, Plaintiffs elicited testimony at the hearing that the February 2019 pull document reflected (with the exception of some improperly identified people) 231 inmates held past their release date that month, for an average of about 44 days each. (Tr. 74–75.) Other pull documents show a comparable widespread problem with over-detention; for example, from January to June of 2018, there were about 1,360 inmates overdetained for an average of 38.6 days. (Tr. 75, 85, Pl. Hr'g Ex. 13 at 3.) Defendant complains about the accuracy of the pull documents, but, ultimately, again, Defendant himself used the numbers in the February 2019 pull document in its application to the federal government concerning DOC's estimate of the number of overdetained persons. (Tr. 71; Pl. Hr'g Ex. 3.)

*b.* Conclusions

Weighing all of this evidence together, the Court finds that the numerosity requirement is satisfied. Defendant's minor carping in *Humphrey* about the disparity between the total number of overdetention cases in the DOJ Report and the class definitions' restriction to 48 hours or more seems overblown, particularly in light of (1) the fact that the DOJ Report itself agrees with Plaintiffs that overdetentions of 48 hours or more can constitute constitutional violations, (Doc. 158-1 at 9); (2) *Hicks II*'s conclusion; and (3) the *Healey* discussion above. Additionally, Defendant's evidence in *Giroir* (namely, Griffin and Gueho's affidavits) strike the Court as after-the-fact efforts to contradict Rule 30(b)(6) depositions. The fact remains that the DOC said in their corporate deposition that the pull documents would identify "most" of those held over 48 hours. Moreover, as Plaintiffs pointed out in their reply, even if the "modified pull document" was used, that still showed over 140 inmates in one month who were entitled to immediate release at the time

of sentencing, and that translates to a high number for a two-year period. Finally, the evidence brought out by Plaintiff at the hearing, recapped above, provides further support that the numerosity requirement is easily met.

In addition, "courts must consider 'the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, [ ] the size of each plaintiff's claim[,]'" and "the fluid nature of a plaintiff class, as in prison-litigation context, [which] counsels in favor of certification of all present and future members." *Lewis*, 324 F.R.D. at 168. Here, at least three of these factors weigh easily in favor of Plaintiffs, as (1) the nature of the action and size of the classes' claims are such that there are many plaintiffs with small claims who would likely file suit in different jurisdictions and whose joinder would be difficult, and (2) this action arises in the prison context. Likewise, the ease with which class members can be identified was covered above in the ascertainability section. Finally, geographic dispersion strikes the Court as self-evident and clear from *Hicks II*, 2023 WL 5694871, at *9 ("The problem is endemic *in Louisiana . . . .*").

Considering the fact that "[a]lthough there is no strict threshold, classes containing more than 40 members are generally large enough to warrant certification," *Lewis*, 324 F.R.D. at 168, here the numbers are easily met. Thus, the Court finds this requirement satisfied.

### D. Adequacy

#### 1. Parties' Arguments

*Humphrey* Plaintiffs argue that they meet the adequacy requirement. (Doc. 104-1 at 21.) They contend that their interests are "entirely aligned with the interests of the other class members, who each have the same basic claims." (*Id.* at 21–22.) *Humphrey* Plaintiffs are members of the class. (*Id.* at 22.) They also do not have interests antagonistic to the claims of the class. (*Id.*) "They assert the same legal claims, seek the same litigation outcomes, and would benefit from the relief

compensating persons detained without legal authority for times exceeding 48 hours, for all persons technically remanded to the custody of the DOC, but who in reality are eligible for immediate release." (*Id.*) There is no financial conflict either. (*Id.*) Lastly, class counsel have devoted a substantial amount of time investigating the facts and law and are experienced in handling these claims. (*Id.*)

Defendant devotes a single paragraph to this issue, arguing that "[N]amed Plaintiffs cannot adequately represent the class where each [N]amed Plaintiff has unique factual circumstances surrounding their sentence and release[]" and when each "will claim unique tort damages." (Doc. 118 at 23.)

*Humphrey* Plaintiffs respond to typicality and adequacy together, arguing that the Secretary "assumes that the proposed class turns on the reasonableness of each overdetention, rather than the policy choices attributable to Secretary LeBlanc, which *caused* the DOC to engage in widespread overdetention." (Doc. 123 at 8.) "There is no indication that [individual circumstances] will impact Mr. Giroir's ability to represent the class members." (*Id.*)

*Giroir* Plaintiff largely makes the same arguments as the *Humphrey* ones. (*See Giroir*, Doc. 25-1 at 17.) The sole difference is that *Giroir* Plaintiff notes that he does not seek monetary damages and therefore has no financial conflict. (*Id.*)

Defendant in *Giroir* again pounds Plaintiff's individual circumstances. (*Giroir*, Doc. 27 at 24.) Defendant also states, "The named Plaintiff, Giroir, cannot adequately represent the unnamed members of the class where he cannot identify injunctive relief that would provide the requested relief to the entire class." (*Id.*)

In prehearing briefing, Plaintiffs reiterate arguments made earlier. (Doc. 177 at 11.) Defendant makes no mention of this in their prehearing briefing. (Doc. 182 at 7.) Neither side mentions adequacy in post-hearing memoranda. (*See* Docs. 213–16.)

### 2. Law and Analysis

Again, Rule 23(a)(4) requires that the "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "A court considers three factors when adjudging the adequacy of named plaintiffs:"

> (1) the zeal and competence of the representatives' counsel; (2) the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees; and (3) the risk of conflicts of interest between the named plaintiffs and the class they seek to represent.

*Angell*, 67 F.4th at 737 (cleaned up).

Here, Plaintiffs easily satisfy these requirements. As to the first, the Court is very familiar with William Most and his work in the overdetention cases, and he submitted a declaration highlighting his and his associate's credentials. (Pls.' Ex. 4, Most Decl., Doc. 109-4.) Plaintiff's co-counsel Stephen H. Weil also submitted a declaration, (Pls.' Ex. 16, Doc. 109-16), and he showed the qualifications of his firm Loevy & Loevy, which is one of the "nation's largest and most successful civil rights law firms." (*Id.* ¶ 5; *see also id.* at ¶¶ 5–8.) Weil also highlighted the firm's resources and the capabilities of its lawyers, particularly in civil rights and class action cases. (*Id.* ¶¶ 9–21.)

As to the second requirement, Giroir submits a declaration evidencing his active role in the litigation, how he has worked with his attorneys on the case, and how he will "continue working zealously with [them] on behalf of other individuals in Louisiana as long as [he is] named

plaintiff." (Giroir Decl. ¶ 9, Doc. 104-21.) Bryant White submits an affidavit with identical language. (White Decl. ¶ 7, Doc. 104-22.)

As to the third requirement, there is no conflict of interest between Plaintiffs and the class. In their declarations, both White and Giroir attested to the fact that they are or were in the custody of the DOC and are or were overdetained despite being eligible for immediate release. (White Decl. ¶¶ 2–6, Doc. 104-22; Giroir Decl. ¶¶ 2–8, Doc. 104-21.) Thus, as Plaintiffs argue, they have identical claims to the classes they seek to represent.

Defendant provides no law for the fact that minor variations in individual circumstances somehow create a conflict. Moreover, as Plaintiffs argues, the key question is the harm caused by LeBlanc's unlawful policies, not individual circumstances for each Plaintiff. On the whole, Defendant's objections here seem pro forma and borderline frivolous. This requirement is met.

### E. Commonality and Typicality

#### 1. Parties' Arguments

*Humphrey* Plaintiffs contend that they share legal and factual issues with the class that more than adequately satisfy the commonality requirement. (Doc. 104-1 at 19.)

> The central question driving this case is whether the DOC's pattern and practice of overdetaining individuals in DOC custody violates the rights of people imprisoned without legal authority, and whether, as of April 2019 and going forward, the DOC's continued practice of overdetaining thousands of people per year was caused by Secretary LeBlanc's failure to change the practices leading to overdetention, even though he learned about the problem in 2012. Those core facts are common to the Named Plaintiffs and the absent class members alike.

(*Id.*) Thus, all class members "share the common claim that Defendant's pattern and practice of overdetention violates their rights . . ." under the federal and state constitution and subjects them to the same torts (false imprisonment, negligence, and IIED). (*Id.*) *Humphrey* Plaintiffs assert:

Here, the common questions of fact shared by all class members include:

• Whether the DOC is responsible for calculating the release date of people sentenced or revoked to DOC custody from the day they are sentenced or revoked

• Whether the DOC has had a pattern of overdetaining people in its custody

• Whether Secretary LeBlanc has been aware of the DOC's pattern of overdetaining people

• Whether, despite his knowledge, Secretary LeBlanc has failed to implement a policy or policies to put an end to the problem

Questions of law that are common to all members of the class include, but are not limited to:

• Whether the DOC has the legal authority to hold persons past their release dates under the United States Constitution

• Whether persons have a liberty interest in their immediate release upon sentencing and parole revocation under the United States Constitution

• Whether Secretary LeBlanc's failure to adopt a policy or policies to mitigate overdetention constitutes deliberate indifference

• Whether people have a liberty interest in their immediate release upon sentencing and parole revocation under the Louisiana Constitution

• Whether the DOC's detention of people past their legal release dates constitutes false imprisonment under state law

(*Id.* at 19–20.) All of these questions are central to the class's claims, and, critically, "all these common questions are amenable to a common answer." (*Id.* at 20 (citations omitted).)

78

As to typicality, *Humphrey* Plaintiffs contend that they are members of the proposed class and share the same claims. (*Id.* at 21.) That is, the claims of the Plaintiffs and class "arise from a similar course of conduct and share the same legal theor[ies]." (*Id.* (citations omitted). Each Plaintiff's situation will differ from the class members in a few ways (e.g., where they were detained, their underlying criminal charges, and how long they were overdetainded), "[b]ut the basis of liability in this case is not dependent upon such individual circumstances. Rather, it turns on . . . LeBlanc's longstanding failure to put an end to the DOC's practice of detaining individuals well past their legal release dates." (*Id.*)

*Giroir* Plaintiff largely echoes what is in *Humphrey*, except that he emphasizes that "*McLaughlin* established a 'bright-line' 48-hour limit . . . which all class members will meet or exceed, ensuring that the constitutionality of their overdetention can indeed be amenable to resolution on a class-wide basis." (*Giroir*, Doc. 25-1 at 14.) This plaintiff also stresses that DOC's responsibility to the inmates is the same, as is DOC's response to the problems. (*Id.*) As in *Humphrey*, *Giroir* Plaintiff closes by highlighting case law supporting his position. (*Id.* at 15.) As to typicality, he largely echoes *Humphrey*. (*Id.* at 15–16.)

Defendant responds:

> In this case, given the time computation process, the numerous courts, clerks and sheriffs involved for each offender, and the myriad of issues the DPS&C could encounter in any given release, the individualized issues preclude a finding of commonality. As discussed at length above, there could be numerous reasons why an inmate was not released within 48 hours of his sentencing, which could include delay in receiving paperwork from the sheriff, missing information required to perform time computation, or various issues encountered during the release process. Any alleged delay would necessarily turn on individual issues.

(Doc. 118 at 20–21 (citations omitted).) Defendant also emphasizes that each of the Plaintiffs had individual issues in their time computation process different from each other, and this simply

demonstrates that the facts and circumstances of the class members would differ from the Plaintiffs. (*Id.*) Defendant also cites case law of its own. (*Id.* at 21–22.)

As to typicality, Defendant argues (1) each Plaintiff had numerous individual issues that will not be typical of the class, such as Giroir's ice storm, and (2) they cannot show a "pattern" of overdetention when DOC "relies on 57 different sheriffs to provide necessary paperwork." (*Id.* at 22–23.)

In *Giroir*, Defendant largely repeats the first part of the *Humphrey* brief. (*Giroir*, Doc. 27 at 23.) However, he adds that commonality is not satisfied because "Plaintiff's attempt to impose liability on DPS&C for any release after 48 hours, despite the fact that [DOC] would have no knowledge or control over the release of an offender in some instances well past the 48 hour period, cannot circumvent his burden to show commonality." (*Giroir*, Doc. 27 at 24.) Typicality arguments are also repeated here.

> In reply, *Humphrey* Plaintiffs contend:
>
> The proposed class . . . does not center on the unreasonableness of each particular class member's detention exceeding 48 hours. Rather, it is grounded on the fact that Secretary LeBlanc has adopted unlawful policies that have caused the DOC to overdetain thousands of people past the 48-hour threshold set out in *McLaughlin*. Overdetention classes centered on such policy claims are routinely certified by courts, because they turn on common questions about whether a defendant-government's policies caused numerous people to be overdetained.

(Doc. 123 at 4.) These plaintiffs then cite to *Healey*, discussed above, which they claim surveyed overdetention class decisions, drew this distinction, and found, "an over-detention class may be certified if it alleges a systemic issue—which impacts all inmates—with the municipality's release process." (Doc. 123 at 4–5 (quoting *Healey*, 2021 WL 149859, at *17).).

As to commonality specifically, Plaintiffs say that, when Defendant argues that he *has* made policy choices to mitigate the overdetention issue, he further underscores that there are issues common to the class. (*Id.* at 5.) A factfinder can examine Defendant's argument and determine, for the class as a whole, whether Defendant's conduct was deliberate indifferent or not. (*Id.*) The same could be said of the Defendant's policy of waiting for the delivery of sentencing paperwork by sheriff and courts and the Defendant's policy about waiting to release inmates while it gathers pre-class documents. (*Id* at 6.) Further, Defendant's typicality argument presupposes "that the proposed class turns on the reasonableness of each overdetention, rather than the policy choices attributable to Secretary LeBlanc, which *caused* the DOC to engage in widespread overdetention." (*Id.* at 8.) In any event, individualized events do not matter because "[t]he typicality requirement does not require that an identical harm result from the same type of practice." (*Id.* (citation omitted).)

*Giroir* Plaintiff likewise emphasizes that Defendant's focus on the impossibility of meeting a 48-hour release date and their lack of knowledge demonstrate a uniform policy that satisfies the commonality requirement. (*Giroir*, Doc. 30 at 5–6.) Plaintiff also urges that his claims are typical of the class, regardless of the individual circumstances involved in his own detention. (*Id.* at 6.)

> Defendants go on to describe hypothetical circumstances under which a person would not be entitled to release upon sentencing. [ ] But Defendants ignore the fact that by definition, such individuals are not included in Plaintiff's proposed class, which is limited to: all persons who have been, or will be, sentenced to the custody of the Louisiana DOC, **and who were, or will be, entitled to release at the time of their sentencing**, but who nevertheless remain in custody, now or in the future, for more than 48 hours past their sentencing dates.

(*Id.*) Likewise, Defendant is not exempted from the 48-hour release date merely because of the administrative burden he claims he faces. (*Id.* at 7.) Defendant maintains that he is not responsible

for a variety of reasons, but: "Through these many admissions, Defendants admit that they have failed to set up systems by which the DOC would be timely informed about the people in its custody—people the DOC is paying the local sheriffs to hold." (*Id.* at 8.) "Defendants' concession that they know nothing about thousands of people per year in their custody does not exonerate them, it indicts them." (*Id.* at 8.) Ultimately, whether Defendant violated the class members' constitutional rights is a common question of law that applies to all class members, but it is a question for liability, not the class certification stage. (*Id.* at 9.)

In pre-hearing briefing, Plaintiffs argue:

> Critically, the policies and practices at issue here—including the DOC's failure to adopt policies to mitigate overdetention and ensure the timely release of class members—applies uniformly to every class member and has caused each class member to suffer the same injury (overdetention). As a result, both the *Humphrey* and *Giroir* classes can "generate common answers apt to drive the resolution of litigation," [*Dukes*, 131 S. Ct. at 2551], including:
>
> (1) Whether DOC detained individuals for longer than was legally permissible;
>
> (2) Whether Defendants knew that individuals in DOC custody were not being timely released;
>
> (3) Whether Defendants failed to adopt, implement, and maintain adequate processes for timely releasing individuals from DOC custody;
>
> (4) Whether Defendants' failure to implement adequate policies and procedures causes systemic overdetentions; and
>
> (5) Whether Defendants have acted with deliberate indifference to the known certainty that not adopting measures to ensure timely release will result in constitutional violations.
>
> Each of these questions apply equally to all class members and can be answered "in one stroke." [*Dukes*, 131 S. Ct. at 2551].

(Doc. 177 at 10.) Thus, the commonality requirement has been satisfied. (*Id.*) On typicality, Plaintiffs again argue that their claims arise "from the same legal theory as the class members: Defendants violated their rights by over-detaining them." (*Id.*) "If the fact finder determines that Defendants have an inadequate process for timely releasing individuals held in DOC custody, such a determination would further the interest of each class member. (*Id.* at 10–11.)

Defendant responds that Plaintiffs are mistaken to focus on the lack of policies, as their own authority "requires <u>individualized review to determine whether a 48 hour plus delay for release was reasonable</u>." (Doc. 182 at 5 (citing, *inter alia*, *Portis*, 613 F.3d at 705).) Defendant then continues to argue that the 48-hour deadline is merely a presumption that can be rebutted; "each inmate's individual circumstances are relevant to a determination of whether each inmates' rights were violated (or not)." (*Id.* at 6.)

> While the Fifth Circuit has noted that a 30-day delay in release is a per se constitutional violation, there has been no such determination as to alleged delays between 48 hours and 30 days. In fact, the Western District has held that a 12-day delay was reasonable. See *Joseph Babineaux, et. al v. Mark Garber, et al.*, Western District of Louisiana, 18-cv-00233, R.Doc. 64.

(*Id.*) Defendant then goes on to highlight the individualized circumstances of Giroir's case. (*Id.*) "At any trial on the merits, [DOC] would be required to rebut the presumption of a constitutional violation for each inmate in the proposed class. This determination would result in mini-trials, which is the exact reason why class certification is inappropriate." (*Id.*)

### 2. Applicable Law

*Lewis v. Cain* again provides the appropriate standard:

> The Supreme Court, in *Wal–Mart Stores, Inc. v. Dukes*, further defined the contours of the "rigorous analysis" required by Rule 23. [*Perry*, 675 F.3d at 837 (citing *Wal–Mart*, 131 S. Ct. at 2551–52).] Under *Wal–Mart*, "[w]hat matters to class certification . . . is not the

raising of common 'questions'—even in droves—but, rather the capacity of a class wide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." [131 S. Ct. at 2551 (citation omitted)].

The *Wal–Mart* decision has heightened the standards for establishing commonality under Rule 23(a)(2) demanding more than the presentation of questions that are common to the class "because any competently crafted class complaint literally raises common questions." [131 S. Ct. at 2551 (citation omitted)]. Furthermore, members of a proposed class do not establish that "their claims can productively be litigated at once," merely by alleging a violation of the same legal provision by the same defendant. [*Id.*] Thus, as evident in *Perry*, the commonality test requires more than establishing that there is "at least one issue whose resolution *will affect all or a significant number* of the putative class members." [675 F.3d at 840 (quoting *Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101, 1106 (5th Cir. 1993)) (original emphasis) (internal quotation marks and citation omitted).]

In order to satisfy commonality under *Wal–Mart*, the claims of every class member must "depend upon a common contention . . . that is capable of class wide resolution," meaning that the contention is "of such a nature . . . that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." [131 S. Ct. at 2551.] Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury." [*Id.* (quoting *Gen. Tel. Co. of SW. v. Falcon*, 457 U.S. 147, 161 (1982)).] Yet, the Fifth Circuit has clarified that "this contention need not relate specifically to the damages component of the class members' claims. Even an instance of injurious conduct, which would usually relate more directly to the defendant's liability than to the claimant's damages, may constitute 'the same injury.'" [*Cole v. Livingston*, No. 14–698, 2016 WL 3258345 (S.D. Tex. June 14, 2016).]

*Lewis*, 324 F.R.D. at 168–69 (footnotes included). Phrased another way, the commonality "requirement 'can be satisfied by an instance of the defendant's injurious conduct, even when the resulting injurious effects—the damages—are diverse." *Seeligson v. Devon Energy Prod. Co., L.P.*, 761 F. App'x 329, 334–35 (5th Cir. 2019) (per curiam) (quoting *In re Deepwater Horizon*, 739 F.3d 790, 810–11 (5th Cir. 2014)).

> As to typicality, "Rule 23(a) requires that the named representatives' claims be typical of those of the class." [*Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 314 (5th Cir. 2007).] Prior to *Wal–Mart*, the typicality test was "not demanding." [*Cole*, 2016 WL 3258345 at *8, (quoting *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999)).] The extent to which *Wal–Mart* changed the threshold for typicality in unclear. The Court noted that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." [131 S. Ct. at 2551 n.5.] As the Fifth Circuit has described it, "typicality is commonality addressed from the perspective of the named plaintiffs. Commonality requires showing that, in fact, all members of the proposed class share a common claim. . . .Typicality requires showing that, in fact, the proposed representatives have that claim." [*M.D. v. Perry*, 294 F.R.D. 7, 29 (S.D. Tex. 2013).] The claims of all class members need not be identical. [*Cole*, 2016 WL 3258345 at *8 (citing *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001)).] However, typicality demands that claims "arise from a similar course of conduct and share the same legal theory." [*Id.*]

*Lewis*, 324 F.R.D. at 169; *see also Angell*, 67 F.4th at 736 ("A complete identity of claims is not required; rather, the critical inquiry is whether the named plaintiff's claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality" (cleaned up)).

### 3. Analysis

Here, the Court should find that the commonality and typicality requirements are satisfied, for the reasons largely cited by Plaintiffs. Again, for commonality, the key question under *Wal-Mart* is whether

> the claims of every class member [ ] depend upon a common contention . . . that is capable of class wide resolution, meaning that the contention is of such a nature . . . that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke.

*Lewis*, 324 F.R.D. at 169 (cleaned up). Plaintiffs are correct that the claims of each class member depend on a finding that (1) LeBlanc had certain policies in the DOC (a) that were applicable to

all class members, and (b) that were the moving force of the overdetention crisis; and (2) through those policies, LeBlanc was deliberately indifferent (a) in knowing that these policies created a substantial risk of harm to those in DOC's custody or control and (b) in failing to take steps to abate this risk, despite such knowledge. Indeed, deliberate indifference is the central issue in this case, and variations in individual circumstances do not change that fact.

Likewise, the typicality requirement is satisfied. Again, "[i]f the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *Angell*, 67 F.4th at 736 (cleaned up). Here, Plaintiffs share the same legal theory as the class members: namely, that LeBlanc's policies caused overdetentions and that LeBlanc was deliberately indifferent to the deficiencies. A similar course of conduct by LeBlanc pervades these claims. Thus, individual factual differences between the Plaintiffs' detentions and the class members' will not change this.

Plaintiffs again rely on *Healey*, and this case again warrants further discussion. In *Healey*, the named plaintiffs alleged that the Louisville government and its officials regularly detained people longer than ordered by courts by more than one day after they were due to be released. 2021 WL 149859, at *1. They sought to certify a class of "[a]ll persons who, since February 3, 2016, were imprisoned, detained or incarcerated more than four hours after: (a) entry of an order directing their release; and/or (b) satisfaction of their term of incarceration set by prior court order." *Id.* at *2. After providing the four-part synthesis highlighted above,[11] the *Healey* court went on to find the commonality requirement met:

---

[11] Again, that synthesis was: (1) "courts have been reluctant to certify classes based on whether the amount of delay is unreasonable. . . . [because] whether a given detention rises to the level of a constitutional violation requires individualized determinations about the reason the inmate's release was delayed"; (2) "courts have been willing to certify over-detention classes where the class can answer questions about whether a municipality's policy (or lack of one) for releasing inmates caused over-detentions"—that is, "an over-detention class may be certified if it alleges a

> Here, the subclasses can "generate common answers apt to drive the resolution of litigation." *Dukes*, 564 U.S. at 350. The respective subclasses can answer common questions such as: whether LMDC held inmates for more than four hours, or twelve hours, longer than they legally could; whether Defendants failed to implement and maintain an adequate process for timely releasing detained inmates or imprisoned ones; whether Defendants knew that detained and imprisoned inmates were not being timely released; whether Defendants failed to implement the recommendations of the internal audit; whether Defendants' failure to implement and maintain an adequate process constitutes deliberate indifference; and whether Defendants caused the constitutional injuries of the members of the subclasses.

*Id.* at *21. *Healey* also rejected Defendant's typicality argument:

> Here, the Named Plaintiffs' claims against Defendants are typical of the respective subclasses because they stem from the same legal theory as the class members: Defendants violated their constitutional rights by over-detaining them. If the fact finder determines that Defendants have an inadequate process for timely releasing detained inmates and imprisoned ones, such a determination would further the interest of each member of the subclasses. Thus, Rule 23(a)(3)'s typicality requirement is met.

*Id.* at *23. The same reasoning on both issues applies here.

Defendant's arguments seem to echo what they said of the class definition—that 48 hours is too soon to take into account the individual circumstances and that *Healey* is distinguishable. But, as stated above, this argument largely ignores that the class is being certified not based on the reasonableness of the number of hours detained (where individual circumstances might make a difference) but rather on LeBlanc's overall policies and how those policies led to constitutional violations. Such a class largely obviates any individual analysis, except with respect to damages. In short, the commonality and typicality requirements are met.

---

systemic issue—which impacts all inmates—with the municipality's release process"; (3) "courts that have certified over-detention classes have done so based on statistical, not anecdotal, evidence"; and (4) "the class definitions of over-detention classes premised on a municipal policy, practice, or custom should contain the cause of the over-detention." *Healey*, 2021 WL 149859, at *16–17.

## V.    *HUMPHREY*: PREDOMINANCE UNDER RULE 23(B)(3)

### A. Parties' Arguments

*Humphrey* Plaintiffs assert that Rule 23(b)(3) requires (1) that common questions of fact or law predominate over questions affecting only individual members, and (2) that a class action is superior to the other methods of resolving the controversy. (Doc. 104-1 at 22–23.) These plaintiffs urge they satisfy both requirements.

As to predominance, *Humphrey* Plaintiffs begin first by explaining the elements of their claims:

> Named Plaintiffs allege that they, and the absent class members, were detained for more than 48 hours after an adjudication (sentence / parole revocation) to zero incarceration time, which entitled them to immediate release. This is a well-established violation of both the Fourteenth Amendment's due process guarantee and Louisiana's prohibition against false imprisonment.

(*Id*. at 24.) Plaintiffs then rehash much the law, articulated above, stressing the inflexibility of the 48-hour rule, explaining how the law allows for administrative delays but that such periods are "measured in hours, not days or weeks." (*Id.* at 25–26.) Plaintiffs also rely upon *Powell v. Barrett*, 376 F. Supp. 2d 1340, 1354 (N.D. Ga. 2005), which said:

> The Court has been unable to find any case, whether within or outside of the Eleventh Circuit, in which the detainment of a properly identified individual for days beyond his scheduled release date was held constitutionally permissible. . . . Accordingly, based on the arguments and record currently before the Court, dismissal of Plaintiffs' over-detention claims on qualified immunity grounds would be improper.

(Doc. 104-1 at 26 (quoting *Powell*, 376 F. Supp. 2d at 1354).) *Humphrey* Plaintiffs then go into how the tort of false imprisonment echoes the false detention claim and requires: (1) proof of imprisonment, (2) without legal authority. (*Id.* at 27.)

*Humphrey* Plaintiffs then state that, under both federal and state law, "issues common to the class predominate. The evidence of Secretary LeBlanc's longstanding indifference to the DOC's widespread practice of overdetention is a common issue at the forefront of this case, since he is the DOC's ultimate decisionmaker." (*Id.* at 28.) These plaintiffs then highlight the different courts that have found LeBlanc potentially liable as a supervisor. (*Id.* (citations omitted).) *Humphrey* Plaintiffs also point to the *Crittindon* case. (*Id.*) They conclude the predominance analysis:

> In short, multiple authorities have held that policy claims are proper based on the evidence Plaintiffs have assembled here and that [ ] LeBlanc can be held liable. [ ] LeBlanc's misconduct was not directed to the plight of any particular person, but amounted to a stance of indifference to the fates of people entitled to immediate release from DOC custody generally. Indeed *Hicks*, *Taylor*, *McNeal*, and *Crittindon* serve as a test-proof of the common nature of the deliberate indifference claims against Secretary LeBlanc: each case involved a different plaintiff, with a different sentence, different jail credits, and a different criminal history, yet in each case the court held that Secretary LeBlanc could be held liable for their overdetention, based on essentially the same evidence that Named Plaintiffs propose to offer in this case—that LeBlanc, as a supervisor, was indifferent to practices of the DOC that caused hundreds of people per month to be unlawfully overdetained.

(*Id.* at 29.)

As to superiority, *Humphrey* Plaintiffs say, "[p]erhaps most importantly, the claims of its members are small enough that it is unlikely many of the members' rights will be vindicated in individual suits. The history of the DOC's overdetention practice is proof enough of that." (*Id.* at 30.) After referencing the statistics highlighted above about the number of overdetentions since 2012, these plaintiffs say that "only a handful of lawsuits have been filed" during that time and that, "[u]nless a class is certified, there is every reason that the rights of the vast majority of the

proposed class members will never be vindicated, and little call for each class member to control their own cases." (*Id.*)

> The proposed class also has none of the features that sometimes cut against superiority. The acts and omissions at issue in this case are largely concentrated in the DOC's headquarters where he is officed, the claims of all class members involve the same bodies of law (federal and Louisiana), and the claims in this case are against a single supervisor, operating a single agency, causing the same basic injury, in the same manner. The amount of damages suffered by different class members may vary from individual to individual, but "it uniformly has been held that differences among the members as to the amount of damages incurred does not mean that a class action would be inappropriate." 7AA Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure§ 1781 (3d ed. 2022). The Rule 23(b)(3) class action devices is an efficient and fair—and superior—means of adjudicating the claims at issue in this case.

(*Id.* at 30–31.)

Defendant responds that "Plaintiffs fail to prove that any common issues of fact predominate over the individualized issues and unique factual circumstances surrounding the release and time computation process for each purported class member." (Doc. 118 at 24.) Plaintiffs' reliance on *McLaughlin* for the 48-hour rule underscores why the predominance requirement fails, as *McLaughlin* establishes a presumption which can be rebutted upon a showing that the delay was reasonable. (*Id.* at 24–25.) "Such a reasonableness standard would necessarily require individual issues, i.e., determining whether any alleged delay for each purported class member was reasonable," and *Crittindon* acknowledges that inmates are entitled to "timely release," not instantaneous release. (*Id.* at 25.) Defendant highlights the individual factual issues related to each of the *Humphrey* Plaintiffs and contend that such unique determinations would be required for every member of the class. (*Id.*)

Defendant relies on case law from the Seventh Circuit, some of which was highlighted above. (*Id.* at 25–27.) Moreover, in *Kozlowicz v. State, Dep't of Pub. Safety & Corr.*, 2008-1806 (La. App. 1 Cir. 3/27/09), 9 So. 3d 1000, 1006, the state court found no due process violation because the inmate had not been released because he did not have an approved residence plan, as required for sex offenders by La. R.S. 15:574.4.3. "An individualized inquiry with each potential class member is required to identify whether an individual has been 'overdetained' or whether that individual's due process rights were violated. These individualized issues predominate over any common issues." (*Id.* at 27.) Defendant also cites to case law where class certification was denied because, while there was a large number of inmates who were detained, there was insufficient evidence of a policy or practice. (*Id.* at 28.)

Perhaps most importantly, Defendant says, "[c]lass certification may not be appropriate where damages must be calculated independently for each class member without reference to a common formula" or where "the potential exists that the class action may 'degenerate in practice into multiple lawsuits separately tried." (*Id.* at 28–29 (citations omitted).) Here, Plaintiff admits that the damages will vary by class member, as each will be entitled to a separate claim for loss of income, mental anguish, emotional pain, and compensatory damages. (*Id.* at 29.) "Where, as here, damages must be calculated independently, and the damages sought by Plaintiffs necessarily 'focus almost entirely on facts and issues specific to individuals rather than the class as a whole,' Plaintiffs have failed to meet their burden of proof that common issues predominate over individualized issues." (*Id.* at 30.)

Defendant also contends that this class fails the superiority requirement. (*Id.*) Defendant claims Plaintiffs' arguments are conclusory, and the fact that other plaintiffs can bring claims for damages and recover attorney's fees undercuts Plaintiffs' position. (*Id.* (citation omitted).)

91

In reply, *Humphrey* Plaintiffs say that Defendant misconstrues the case law; "in the cases cited by the Secretary, the questions of whether the defendant's conduct caused a class member to suffer an injury or to suffer damage are interrelated." (Doc. 123 at 9.) Conversely:

> The injuries in this case do not present such a problem: each of the proposed class members, by definition, spent days or weeks in a cage when they should have been free. Such wrongful incarceration is a concrete, indisputable injury, and while individual class members may be called on to prove the *amount* of damages caused by such incarceration, that showing is not required to prove that a wrongful incarceration caused *some* injury as a threshold matter. In such circumstances, the need for damage calculations and evidence alone cannot defeat class certification on the ground that individual questions predominate over common questions. *Menocal v. GEO Group, Inc.*, 882 F.3d 905 (10th Cir. 2018). This case, moreover, presents a ready measure of damages: damage caused by time spent in a cage. That measure may make damage calculations practicable, [*See, e.g., Driver v. Marion Cnty. Sheriff*, No. 1:14-cv-02076-RLY-MJD (S.D. Ind.) (https://mariondetentionsettlement.com/FAQ settlement administration page ("Class Members who file a valid claim will be paid $40 per hour of over-detention."),] and if it is not, "'the question of damages can be severed from that of liability and tried on an individual basis.'" *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 n. 16 (5th Cir. 2003) (quoting 7B Charles Alan Wright *et al.*, Federal Practice and Procedure § 1781 (2d ed. 1986)). Common issues predominate in this class.

(*Id.* at 9–10.) On superiority, *Humphrey* Plaintiffs say that Defendant again misses the point; individual cases have been filed, but "those cases represent a miniscule fraction of the thousands of cases of overdetention since at least 2012." (*Id.* at 10.) In the past five years, there have been about a dozen overdetention cases in Louisiana, but there have been about ten thousand overdetained individuals. (*Id.*) While attorney's fees may, in theory, be a basis for rejecting *Humphrey* Plaintiff's superiority argument, "the reality here shows that not to be the case." (*Id.*)

In their pre-hearing briefing, on predominance, Plaintiffs say that they are not asserting that the overdetentions occurred because of individualized circumstances but instead because of "Defendants' deliberate failure to implement and maintain adequate time computation and release

processes." (Doc. 177 at 12–13.) "Even if the amount of damages may vary slightly among class members, the operative facts are the same: all proposed class members were detained by DOC beyond their legal release dates and without justification." (*Id.*) Superiority is met because:

> Many putative class members would be unmotivated to prosecute their claims because proving up the DOC's systematic practice of overdetention and LeBlanc's deliberate indifference to it will require considerable resources that are difficult for formerly incarcerated individuals to muster, and would likely outweigh the recovery obtained. And class adjudication resolves the claims and more efficiently than proving LeBlanc's liability, over and over, on an individual basis.

(Doc. 177 at 113.)

Defendant's largely repeats himself in pre-hearing briefing. (Doc. 182 at 5–6.)

In post-hearing briefing, Plaintiffs again reiterate that there is "a common cause for the DOC's widespread over-detention problem: the Defendants' longstanding indifference to a slow-moving paperwork process that causes widespread over-detention." (Doc. 213 at 8.) Plaintiffs point to the following issues which will "generate answers common to every class member's claims, including:"

> (1) Whether the DOC's data modernization project, including the development of a stand-alone electronic submission portal and the eventual implementation of CIPRS and/or Mi-CASE, will resolve the DOC's over-detention problem;
>
> (2) Whether the DOC could have implemented data modernization tools sooner; and
>
> (3) Whether, and to what extent, the DOC could have sped up the transmission of pre-class documents from the clerks and/or sheriffs.

(*Id.*) "Without class treatment, class members would have to introduce this same systemic evidence, over and over, to prove Defendants' liability for each member's own over-detention. Rule 23 was enacted precisely avoid such a wasteful outcome." (*Id.* at 9.)

93

According to Plaintiffs, Defendant urges that the Court should reject certification because a manual review of DOC records is needed to identify class members, but Plaintiffs dispute this. The key, say Plaintiffs, is whether the factual determinations can be done using "computer records, clerical assistance, and objective criteria[,]" and that is exactly the case here; the DOC's witness stated that it took "only about 5.2 minutes per inmate to determine if they 'would meet the class definition.'" (*Id.* (citing Tr. 124).)

Individual damages also do not affect predominance. (*Id.*) The Fifth Circuit has found no abuse of discretion in certifying a class where every issue other than damages was common, and the same is true here. (*Id.* at 9–10.) If necessary, the Court could bifurcate the proceedings and maintain certification. (*Id.* at 10.)

In post-hearing briefing, Defendant again attacks the 48-hour time period; Defendant says that *McLaughlin* provides a presumption only which then necessarily requires individualized determinations. (Doc. 214 at 5.) As the Seventh Circuit has said, reasonableness must be decided one case at a time. (*Id.* (citing *Portis*, 613 F.3d at 705).)

Defendant also contests Plaintiffs' characterization of the needed review as "clerical." (*Id.* at 5–6.) Griffin's testimony shows that each inmate's file and paperwork need to be reviewed to make a definitive determination of whether he was overdetained. (*Id.* at 6.) This so-called clerical work "require[s] the specific knowledge of pre-class employees." (*Id.*)

Further, a review is needed to determine *why* an inmate has been overdetained to satisfy *McLaughlin*'s reasonableness analysis. (*Id.*) For example, an inmate could be overdetained because of a clerk of court error, and Defendant would not be responsible for this. (*Id.*) Mini-trials would be needed, and that should defeat certification. (*Id.* at 7.)

Defendant contends that other issues also weigh against certification. (*Id.*) Plaintiffs also cite to other cases like *Hicks*, *Parker*, and *Grant*, but these decisions turn on qualified immunity and thus an individual analysis. (*Id.* at 7–8) Moreover, as Plaintiffs conceded at oral argument, damages are an obstacle to certification and require specific individualized proof, and this should defeat certification. (*Id.* at 8.) The Fifth Circuit has also stated that damages cannot be severed to allow certification. (*Id.* at 9 (quoting *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996).) Ultimately, damages are intertwined with liability and predominate over common issues. (*Id.*)

In post-hearing reply, Defendant reiterates that qualified immunity requires individualized determinations of the facts and circumstances of each class member. (Doc. 215 at 2.) This is not proper for class certification. (*Id.* at 2–3.)

In their post hearing reply, Plaintiffs argue that the clerical record check from the pull documents does not defeat predominance. (Doc. 216 at 3.) This case, Plaintiffs say, is remarkably like *Souter v. Equifax Info. Services, LLC*, 307 F.R.D. 183 (E.D. Va. 2015), which also held that individualized review of class records was allowed. (*Id.*) There, the review required the reviewer to know how to compare different sets of documents, but the Court still found that this did not defeat certification because the class could be determined based on objective criteria. (*Id.* at 3–4.) That is the key—"that the individualized review can be done using *objective criteria.*" (*Id.* at 4.) "Identifying the length of a sentence might require several steps and reference to a handful of documents, but a court's sentencing orders are ultimately objective. Individualized review of files and court documents does not defeat predominance." (*Id.*)

Plaintiffs also say that Defendant's reliance on the other overdetention cases and their various findings on qualified immunity is misplaced. (*Id.* at 7–8.)

> Plaintiffs in this case do not purport to remedy all forms of the DOC's over-detention, only a specific subset that is driven by a common cause. Plaintiffs have identified that specific, common cause of over-detention, and the relevant matter at class certification is whether legal questions impacting the claims of the class will be decided the same for all members.

(*Id.* at 8.)

Damages are also not a barrier to certification. (*Id.*) First, Defendant mischaracterizes Plaintiffs' concession at the hearing; Plaintiffs admitted that their IIED claims would be difficult to quantify, but the *other* claims would not. (*Id.*) Plaintiffs no longer seek certification of their IIED claims; they are for their others. (*Id.*)

> Every class member was unlawfully deprived of liberty: they spent days or weeks behind bars when they should have been free to live their lives in the open world. That injury—loss of liberty—is the relevant injury in this case, and Plaintiffs charge that it was caused by Defendants' unlawful over-detention practices. Whether each class member was injured, whether Defendants caused that injury, and whether Defendants are liable for that injury are all common questions that will be decided with common evidence.

> That leaves *only* calculation of damages resulting from the loss of liberty and prolonged incarceration. As Plaintiffs' counsel noted during the hearing, damages in this case are susceptible to a simple and obvious measure: time wrongfully incarcerated. Tr. 205:5-6. And to the extent that "class members' damage calculations give rise primarily to individual questions that are not capable of classwide resolution," *In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir. 2014) predominance is still "satisf[ied]" where "virtually every issue prior to damages is a common issue." *Id.* at 816 (quotations omitted). Liability and injury turn on common evidence in this case. Damages are discrete. Individual damage calculations do not defeat predominance.

(*Id.* at 9–10.)

## B. **Applicable Law**

Certification is proper under Rule 23(b)(3) if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members,

and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

> "The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."

Fed. R. Civ. P. 23(b)(3). "[T]his list is not meant to be exhaustive and the court has discretion to consider whatever other factors it deems relevant to the determination." *In re TWL Corp.*, 712 F.3d 886, 895–96 (5th Cir. 2013) (quoting 7AA Charles Alan Wright et al., *Federal Practice and Procedure* § 1777 (3d ed. 2005)).

First, as to predominance:

> "Determining whether legal issues common to the class predominate over individual issues requires that the court inquire how the case will be tried." *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003). "This entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class." *Id.*

> > An individual question is one where "members of a proposed class will need to present evidence that varies from member to member," while a common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."

> *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 [ ] (2016) (alteration in original) (quoting 2 William B. Rubenstein, Newberg on Class Actions § 4:50 (5th ed. 2012)). "Even where plaintiffs seeking class certification show that common issues predominate on questions of liability, they must also present a damages model 'establishing that damages are capable of measurement on a classwide basis.'" *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 258 (5th Cir. 2020) (quoting *Comcast Corp. v. Behrend*, 569

97

U.S. 27, 34 [ ] (2013)). Some degree of individual calculation, however, is not fatal to satisfying predominance. *See In re Deepwater Horizon*, 739 F.3d 790, 815–16 (5th Cir. 2014) ("[N]othing in *Comcast* mandates a formula for classwide measurement of damages in all cases."); *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 298 (5th Cir. 2001) (reasoning that "[a]lthough calculating damages will require some individualized determinations, it appears that virtually every issue prior to damages is a common issue" in holding that predominance was satisfied).

*Angell*, 67 F.4th at 739.

Additionally, both sides cite to *Bell Atlantic*, which stated:

> We realize that relatively few motions to certify a class fail because of disparities in the damages suffered by the class members. Even wide disparity among class members as to the amount of damages suffered does not necessarily mean that class certification is inappropriate, *see Gold Strike Stamp Co. v. Christensen,* 436 F.2d 791, 798 (10th Cir. 1970), and courts, therefore, have certified classes even in light of the need for individualized calculations of damages.

339 F.3d at 306. "The courts' ability to sever the damages portion of a class action suit from the liability portion is the principal reason why variations among class members in the amount of damages suffered frequently does not defeat predominance." *Id.* at 306 n.16 (citations omitted).

But, as Defendant argues, *Bell Atlantic* also stated:

>  Class treatment, however, may not be suitable where the calculation of damages is not susceptible to a mathematical or formulaic calculation, or where the formula by which the parties propose to calculate individual damages is clearly inadequate. Thus . . . where the issue of damages does not lend itself to . . . mechanical calculation, but requires separate "mini-trials"' of an overwhelmingly large number of individual claims, the need to calculate individual damages will defeat predominance . . . .

*Id.* at 307 (cleaned up).

Ultimately, however:

> [I]t uniformly has been held that differences among the members as to the amount of damages incurred does not mean that a class action

would be inappropriate. Rather, the question of damages can be severed from that of liability and tried on an individual basis. Allowing split proceedings furthers the Rule 23 purpose of promoting judicial economy since the main issue will be tried only once, rather than for each class member, and damage claims only need be determined in the event liability is found.

7AA Charles Alan Wright, Arthur R. Miller, et al., *Federal Practice and Procedure* § 1781 (3d ed. 2025) (older edition quoted with approval by *Bell Atlantic*, 339 F.3d at 306–07 n.16).

Finally, *Souter* provides excellent guidance on the predominance requirement. There, the Court stated:

> This [Rule 23(b)(3)] requirement is "even more demanding than Rule 23(a)," *Comcast Corp. v. Behrend,* 569 U.S. ——, 133 S. Ct. 1426, 1432 [ ] (2013), and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," [*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).] This is not simply a matter of counting common versus noncommon questions and checking the final tally. "Rule 23(b)(3)'s commonality-predominance test is qualitative rather than quantitative." [*Stillmock v. Weis Markets, Inc.,* 385 F. App'x 267, 272 (4th Cir. 2010)] (citing *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 429 (4th Cir. 2003)]). In other words, Rule 23(b)(3) "compares the quality of the common questions to those of the noncommon questions." [William B. Rubenstein, *Newberg on Class Actions* § 3:27 (5th ed. 2013).]
>
> If the "qualitatively overarching issue" in the litigation is common, a class may be certified notwithstanding the need to resolve individualized issues. *See* [*Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 305 (4th Cir. 2013)] ("Indeed, common issues of liability may still predominate even when some individualized inquiry is required."). For example, if "common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain." *Stillmock,* 385 [F. App'x] at 273 (citing *Smilow v. Southwestern Bell Mobile Systems, Inc.,* 323 F.3d 32, 40 (1st Cir. 2003)). This is because class certification in such cases will still "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Gunnells,* 348 F.3d at 424 (citing *Amchem,* 521 U.S. at 615, [ ]); *see also id.* at 426 ("Proving these issues in individual trials

> would require enormous redundancy of effort, including duplicative discovery, testimony by the same witnesses in potentially hundreds of actions, and relitigation of many similar, and even identical, legal issues. Consolidation of these recurring common issues will also conserve important judicial resources.").

*Soutter*, 307 F.R.D. at 214. Critically, *Soutter* recognized from *Newberg*:

> Although the existence of individualized inquiries are considered a negative factor in the analysis, the weight upon the scale is greatly influenced by the difficulty of the inquiry. "Common issues will predominate if 'individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria—thus rendering unnecessary an evidentiary hearing on each claim.'" *Newberg* § 4:50.

*Id.* Thus, in *Soutter*, where one of the issues was the "inaccuracy of [ ] consumer report[s]," *id.* at 209, the court concluded that the predominance requirement was still met despite individual inquiries:

> [A] plaintiff does not fail the predominance inquiry simply based on the existence of some individualized issues or factual inquiries. *See* [*Gomez v. Kroll Factual Data, Inc.*, No. 13-CV-0445-WJM-KMT, 2014 WL 1456530, at *3 (D. Colo. Apr. 14, 2014)] (citing *Cook v. Rockwell Intern. Corp.,* 151 F.R.D. 378, 388 (D. Colo. 1993) ("[W]hen one or more of the central issues in the action are common to the class and can be said to predominate, the action will be considered proper under Rule 23(b)(3) even though other important matters have to be tried separately.")). The Court does not believe that the inaccuracy inquiry here is an individualized one. *But even if it were, the determinations required in this case would simple, straightforward, and objective.* That is the epitome of a qualitatively insignificant question under the predominance test.

*Id.* at 215 (emphasis added).

Second, as to superiority, "[i]n requiring a court to find 'that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy,' Fed. R. Civ. P. 23(b)(3), Rule 23 necessarily suggests a comparative process . . . ." *In re TWL Corp.*, 712 F.3d at 896.

> This plain reading of the Rule is reinforced by an associated advisory committee's note, which states that the court "ought to assess the relative advantages of alternative procedures for handling the total controversy." Fed. R. Civ. P. 23(b)(3) advisory committee's note to 1966 amendment. "As is the case with Rule 23(b)(3) generally, the superiority analysis is fact-specific and will vary depending on the circumstances of any given case." *Robertson v. Monsanto Co*., 287 [F. App'x] 354, 361 (5th Cir. 2008) (per curiam) (unpublished).

*Id.*

 "The most compelling rationale for finding superiority in a class action [is] the existence of a negative value suit[.]" *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996). A "negative value suit" as one in which "the cost to each [plaintiff] to litigate his or her own . . . claim would almost certainly outweigh the value of the claim." *In re TWL Corp*., 712 F.3d at 903 (Graves, J., concurring). But, the expense of litigation does not automatically turn a case into a negative value suit, particularly if individual damage claims are high, punitive damages are available, or a party may recover attorneys' fees. *See Castano*, 84 F.3d at 748 (stating that superiority analysis should wait when each class member could recover millions of dollars, making individual trials preferable). Nevertheless, a district court does not abuse its discretion in finding that the negative-value nature of claims establishes the superiority of a class when there a large number of relevant claims "that are likely to be too small to engage in separate litigation." *Mitchell v. State Farm Fire & Cas. Co.*, 954 F.3d 700, 712 (5th Cir. 2020).

Superiority may not be met "where the plaintiffs [seek] to recover for 'emotional and other intangible injuries'" because

> "The very nature of these damages, compensating plaintiffs for emotional and other intangible injuries, necessarily implicates the subjective differences of each plaintiff's circumstances; they are an individual, not class-wide, remedy. The amount of compensatory damages to which any individual class member might be entitled cannot be calculated by objective standards."

*Robertson*, 287 F. App'x at 362 (in the mass tort context) (quoting *Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598, 602 (5th Cir.2006)).

Other factors also play a role. "Severe manageability problems and the lack of a judicial crisis are [additional] reasons why superiority [may be] lacking." *Castano*, 84 F.3d at 748. Additionally, "[t]he procedural device of Rule 23(b)(3) class action was designed not solely as a means for assuring legal assistance in the vindication of small claims but, rather, to achieve the economies of time, effort, and expense." *Id.* at 749 n.27 (citations omitted). Thus, superior judicial efficiency is also a factor. *Id.*

Nevertheless, "[s]uffice it to note . . . the [superiority] requirement has been found to be satisfied in a wide range of actions, including suits seeking damages for the violation of various constitutional and civil rights . . . ." Wright & Miller, *supra*, at § 1779 (citing, *inter alia*, *Stinson v. City of New York*, 282 F.R.D. 360 (S.D.N.Y. 2012) (certifying class against city and police alleging that they had a policy of issuing summons without probable cause because class consistent of hundreds of thousand and doing so would promote judicial economy and prevent inconsistent results); *Garrison v. Asotin Cnty.*, 251 F.R.D. 566 (E.D. Wash. 2008) (superiority requirement satisfied by detainees alleging that a county jail's policy of assessing a booking fee without notice or hearing deprived them of due process because individual actions were not a viable action, the fact that the class members' claims were small would likely prevent them from seeking individual relief, and this would unnecessarily and inefficiently use judicial time and resources); *McBean v. City of New York*, 228 F.R.D. 487 (S.D.N.Y. 2005) (finding predominance and superiority requirement satisfied for class action of pretrial detainees challenging city policy of strip searches because (1) there was the common legal theory that a blanket intake strip-search policy was unconstitutional, and common facts that each class member was subject to at least one

102

predominated over individual reasonable suspicion defenses; and (2) class was most efficient way of resolving claims of over 55,000 individuals falling into the class).

### C. Analysis

In sum, the Court finds that *Humphrey* Plaintiffs largely satisfy the predominance and superiority requirements. As a result, the Court will certify the class as sought, except with respect to damages for mental anguish.

As to predominance, the Court begins with the claims asserted: (1) a due process violation by Secretary LeBlanc under federal and state law, and (2) false imprisonment and negligence under state law.[12] (*H-SAC* ¶¶ 82–108, Doc. 43.) The due process analysis was covered extensively above. For the requirements of supervisor liability:

> A supervisory official may be held liable . . . only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury. In order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor act[ed], or fail[ed] to act, with deliberate indifference to violations of others' constitutional rights committed by their subordinates.

*Skinner v. Ard*, 519 F. Supp. 3d 301, 317 (M.D. La. 2021) (deGravelles, J.) (cleaned up).

Likewise, the state law claims have elements conducive to class-wide determination. "Under Louisiana law, false . . . imprisonment . . . is restraint without color of legal authority." *Imani v. City of Baton Rouge*, 614 F. Supp. 3d 306, 381 (M.D. La. 2022) (deGravelles, J.) (cleaned up). A negligence claim of course requires the Court to examine whether LeBlanc failed to act like a reasonably prudent person under the circumstances. *See id.* at 383.

The key questions in this case are: (1) did LeBlanc have certain policies or customs; (2) which caused the overdetentions of the class members; and (3) did LeBlanc act with deliberate

---

[12] Again, *Humphrey* Plaintiffs are no longer seeking certification for their IIED claim. (*See* Doc. 216 at 8.)

indifference by (a) being aware of facts from which the inference could be drawn that a substantial risk of harm existed, and (b) deliberately choosing to not correct it. *See Skinner*, 519 F. Supp. 3d at 317–19. All of these overarching issues predominate over any question related to the individual class members' circumstances. Indeed, *Humphrey* Plaintiffs identify a myriad of common issues, factual and legal, which were quoted above, with which the Court agrees, and which predominate, including (1) whether the DOC's latest efforts and electronic submission portal resolved the DOC's overdetention crisis; (2) whether the DOC could have engaged in those efforts and implemented those systems sooner; and (3) whether, and the extent to which, the DOC could have required or otherwise encouraged the clerks and/or sheriffs to transmit pre-class documents faster. And, as explained, the key is not, as Defendant argues, whether an individual detention was reasonable, but rather whether LeBlanc's policies caused constitutional violations and whether he acted with deliberate indifference through those policies.

Likewise, the Court agrees with Plaintiff's argument on superiority: while, as a general matter, the availability of attorney's fees and other damages may work against a finding of superiority, as a practical matter, that has not happened here, as there are thousands of overdetentions and only a handful of claims. Further, adjudicating liability in a single class action rather than multiple separate cases furthers the interests of judicial economy and eliminates the risk of inconsistent liability; as Plaintiffs say, "The acts and omissions at issue in this case are largely concentrated in the DOC's headquarters where he is officed, the claims of all class members involve the same bodies of law (federal and Louisiana), and the claims in this case are against a single supervisor, operating a single agency, causing the same basic injury, in the same manner." (Doc. 104-1 at 30–31.) Finally, these overdetention cases strike the Court as negative

value suits, as the cost of bringing the action—particularly those challenging the systematic policies of LeBlanc—outweigh any individual recovery.

The question of damages is much closer. On the one hand, Plaintiff seek to recover mental anguish, which involves individualized assessment of emotional distress. (*See H-SAC* ¶ 108, Doc. 43.) This triggers the case law highlighted above about the difficulty of awarding such damages on a class-wide basis. While the Court is very sympathetic to Plaintiff's argument that damages could be formulated in such a way as to provide a certain amount of money per hour or day of overdetention (in an amount determined by the jury), that formulation for damages still would not work for mental anguish claims of any kind, given the variations in individual experience.[13]

But that does not defeat certification. Again:

> Some degree of individual calculation, however, is not fatal to satisfying predominance. *See In re Deepwater Horizon*, 739 F.3d [at 815–16] ("[N]othing in *Comcast* mandates a formula for classwide measurement of damages in all cases."); [*Bertulli*, 242 F.3d at 298] (reasoning that "[a]lthough calculating damages will require some individualized determinations, it appears that virtually every issue prior to damages is a common issue" in holding that predominance was satisfied).

*Angell*, 67 F.4th at 739. And, again:

> [I]t uniformly has been held that differences among the members as to the amount of damages incurred does not mean that a class action would be inappropriate. Rather, the question of damages can be severed from that of liability and tried on an individual basis. Allowing split proceedings furthers the Rule 23 purpose of promoting judicial economy since the main issue will be tried only once, rather than for each class member, and damage claims only need be determined in the event liability is found.

---

[13] The Court passes on the question of whether this would be feasible for purposes of a settlement class.

Wright & Miller, *supra*, at § 1781. Thus, even with the mental anguish awards adjudicated separately, the predominance requirement is satisfied because "virtually every issue prior to damages" will be decided on a class-wide basis. *Angell*, 67 F.4th at 739.

Further, Defendant complains at length about the individual reviews required to determine who is and who is not correctly on the pull documents (and thus in the class), but the court rejects this argument. Again, "[c]ommon issues will predominate if 'individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria—thus rendering unnecessary an evidentiary hearing on each claim.'" *Soutter*, 307 F.R.D. at 215 (quoting *Newberg* § 4:50). As *Humphrey* Plaintiffs pound, Angela Griffin needed only about five minutes per person to verify the data for the 231 inmates identified in the February 2019 pull document. (Tr. 124 ("roughly 20 hours" to evaluate 231 inmates, or 5.2 minutes each).) Indeed, DOC could identify most inmates who were entitled to immediate release at sentencing but were released more than 48 hours later with only three bits of date: the raw GTPS date, the release date, and the sentencing date. (Tr. 74–75, 91.) Thus, "the determinations required in this case would [be] simple, straightforward, and objective[,]" which is "the epitome of a qualitatively insignificant question under the predominance test." *Soutter*, 307 F.R.D. at 215.

In sum, the Court finds that the predominance and superiority requirements have been met. As a result, the Court will certify the *Humphrey* Plaintiffs' class, as amended, with the limited exception of damages involving emotional distress.

## VI.  *GIROIR*: RULE 23(B)(2): PREDOMINANCE AND SPECIFICITY

### A.  Parties' Arguments

*Giroir* Plaintiff argues that the class satisfies the requirements of Rule 23(b)(2) because "[Defendants] [have] acted [and] refused to act on grounds that apply generally to the class, so that

final injunctive relief [and] corresponding declaratory relief [are] appropriate respecting the class as a whole." (*Giroir,* Doc. 25-1 at 17 (quoting Fed. R. Civ. P. 23(b)(2)).) This plaintiff contends that they have been harmed in the same way and that they seek specific injunctive relief. (*Id.*) The same reasoning which supports Plaintiff's commonality arguments apply here, as there is a common policy or practice that is the cause of their harm, so a single injunction will provide relief to the entire class. (*Id.* at 18.) Further, this type of class is ideal for "transient claims" that are "capable of repetition yet evading review." (*Id.* (citation omitted).) "For these reasons, the Rule 23(b)(2) class action device has been frequently approved in cases challenging relatively short periods of detention or detention of those with conditions yet to be ascertained, such as disability or indigence." (*Id.* at 19.) Rule 23(b)(2) classes are also appropriate where there is a common practice or pattern with respect to a class, making the injunctive or declaratory relief establish the legality of the State's behavior to the class as a whole. (*Id.* at 19–20 (citations omitted).)

> Here, the entire class seeks a declaratory judgment that Defendants violate class members' rights by failing to ensure that they are released on time and an injunction requiring Defendants to take the steps necessary to ensure timely releases. Among other relief, Named Plaintiff asks that this Court order Defendants to establish procedures to prevent all overdetention and to calculate sentences and release persons within a time not to exceed 48 hours, for all persons sentenced to the custody of the DOC who are eligible for immediate release upon sentencing. *See* Compl., ECF No. 1 at 20. This relief would apply equally to the entire class.

(*Id.* at 20.)

Defendant responds that Rule 23(b)(2) classes require that class members be harmed in the same way and that the injunctive relief sought be specific. (*Giroir*, Doc. 27 at 12–13.) The latter requirement means that (1) the class has to be sufficiently cohesive that any class-wide injunctive relief can satisfy the limits of Rule 65(d) (i.e., that the injunction "state its terms specifically; and describe in reasonable detail . . . the act or acts restrained or required"), and (2) the relief cannot

be such that it has to be specifically tailored to each class member to correct the wrongful conduct. (*Id.* at 14 (citations omitted). Defendant maintains that many courts have refused to certify classes when the plaintiffs' relief focused on the delay rather than specific policies by the defendant. (*Id.*) Here, Plaintiffs' proposed relief fails to specify what steps Defendant should take and what specific procedures Defendant should implement (and how), so it is "impossible for a court to define injunctive relief as requested here." (*Id.* at 18.)

Defendant hammers again that it lacks knowledge of who is eligible for immediate relief until the sheriff provides it with paperwork and that it has no control over the sheriffs. (*Id.* at 18–19.) This applies in Plaintiff's situation as well, making release in 48 hours impossible. (*Id.*) Further, DOC often must deal with Pre-Class Packets missing information, which requires DOC to get that information from 57 different sheriff's offices and 102 local jail facilities and courts across the state. (*Id.*) Thus:

> As such, this Court cannot fashion injunctive relief to release an offender within 48 hours of sentencing where: (1) DPS&C has no knowledge of, and cannot release an offender, until the Pre-Class Packet is received; (2) DPS&C has no authority or control over sheriff's offices to provide the Pre-Class Packets within 48 hours of sentencing; and (3) DPS&C has no authority or control over sheriff's office to provide all necessary paperwork required under Article 982 within 48 hours.

(*Id.* at 19.) Defendant again hammers that Plaintiff focuses on the unreasonable relay rather than specific policies causing overdetention. (*Id.* at 19–20.) Any focus on unreasonable delay "necessarily contemplates individualized issues." (*Id.* at 20.) Finally, Plaintiff's desire for DOC to "take steps" necessary to ensure timely release is too vague and impossible, given the restraints posed by third parties. (*Id.*)

*Giroir* Plaintiff responds that this case is ideally suited for a Rule 23(b)(2) class. (*Giroir,* Doc. 30 at 1.) According to this plaintiff, Defendant's argument that it lacks knowledge and responsibility for people in its custody

> is an argument for certification, not against it. Because Defendants have long been aware of this precise problem, Defendants' failure to take basic steps to learn who has been sentenced to their custody is itself an admission of deliberate indifference—and is a failure that is common to the entire proposed class. Defendants' argument only further proves that class certification is appropriate given their systematic disregard for the constitutional rights of the class as a whole.

(*Id.* at 2.) Most of the remainder of the brief focuses on Defendant's claimed ignorance rather than the specificity argument raised by Defendant.

In the pre-hearing briefing, *Giroir* Plaintiff returns to Defendant's point concisely, saying:

> Here, Plaintiffs complain of a pattern or practice that is generally applicable to every member of the proposed *Giroir* class. And if unlawful, that pattern or practice subjects all class members to overdetention and serious harm. Finally, all class members seek the same injunctive relief enjoining Defendants from their current unlawful course of conduct. Rule 23(b)(2) is satisfied.

(*Giroir*, Doc. 91 at 11–12.) Defendant responds, "Plaintiff Giroir raises no new arguments as to the requirements of Rule 23(b)(2) and again reiterates the conclusory statement that Rule 12(b)(2) is satisfied." (*Giroir*, Doc. 96 at 7.)

In post-hearing briefing, Defendant argues that certification is improper. (*Giroir*, Doc. 117 at 9.) First, the DOC has implemented procedures that have effectively mooted the relief *Giroir* Plaintiffs seek. (*Id.*) In any event, the procedures will vary by parish, so Plaintiffs cannot established they were harmed the same way by the same policy. (*Id.* at 10.)

In post-hearing reply, *Giroir* Plaintiffs say that, while they are "heartened" by the DOC now having an electronic submission portal, Undersecretary Bichkam testified at the hearing that

he did not know if that tool solved the overdetention problem in those parishes in which it had been implemented. (*Giroir*, Doc. 119 at 10 (quoting Tr. 187).) "If the DOC's actions in recent months completely solve a problem that has been 'endemic in Louisiana,' [*Hicks II*, 81 F.4th at 510,] that will show up in the data. Such evidence is not before the Court. The Rule 23(b)(2) class should be certified." (*Id.*)

### B. Applicable Law

*Giroir* Plaintiff "seek[s] class certification under Rule 23(b)(2), which permits certification if 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole." *Lewis*, 324 F.R.D. at 167. The Fifth Circuit has said the following of this requirement:

> [T]he key to [Rule 23(b)(2)] is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360 [ ] (internal quotation marks and citation omitted). Rule 23(b)(2) certification is warranted if the following three requirements are satisfied: "(1) class members must have been harmed in essentially the same way; (2) injunctive relief must predominate over monetary damage claims; and (3) the injunctive relief sought must be specific." [*Yates v. Collier*, 868 F.3d 354, 366–67 (5th Cir. 2017)] (quoting *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007)) (internal quotation marks omitted). We note that satisfaction of these requirements is premised on "common behavior by the defendant toward the class," as opposed to the presence of common issues. *Id*. at 366 (quoting *In re Rodriguez*, 695 F.3d 360, 365 (5th Cir. 2012) ) (internal quotation marks omitted). Thus, this court has found purported class members to have been "harmed in essentially the same way" where they have each been subject to the same allegedly wrongful *policy*, despite variations in the degree of damages suffered by each. *See Yates*, 868 F.3d at 367-68 (finding that state prisoners who were "subject to the *same* policy on climate control" were "harmed in essentially the *same* way," *i.e.*, "by exposure to a substantial risk of serious harm because of exposure to excessive heat").

> With respect to the Rule 23(b)(2) requirement that the injunctive relief sought be specific, we have recognized that plaintiffs must "give content to the injunctive relief they seek so that final injunctive relief may be crafted to describe in *reasonable detail* the acts required." *Yates*, 868 F.3d at 367 (quoting *Perry*, 675 F.3d at 848) (internal quotation marks and citation omitted) (emphasis added). While plaintiffs seeking class certification are not required to spell out "every jot and tittle of injunctive relief" at the class certification stage, *id*. at 368, they must be able to explain "how a court could define or enforce meaningful injunctive relief." *Maldonado*, 493 F.3d at 525. We note, therefore, that to comply with Rule 23(b)(2), Plaintiffs will, at minimum, have to describe in some kind of detail from what actions or inactions Defendant should be restrained. A general request that Defendant be restrained from violating Plaintiffs' Fourteenth Amendment protections is insufficient.

*Ward v. Hellerstedt*, 753 F. App'x 236, 249 (5th Cir. 2018) (per curiam). *Compare Yates*, 868 F.3d at 368 (finding specificity requirement satisfied because, "[w]hile Plaintiffs requested that the district court 'enjoin Defendants to maintain a safe indoor apparent temperature' (which admittedly offers little content), they *also* identified specific relief in 'reasonable detail' that would fit this standard: 'maintaining a heat index of 88 degrees or lower,'" and "[t]he district court—of course aware of Plaintiffs' requested relief—identified air-conditioning as a remedy that 'would provide relief to each member of the class.'"), *with Ward*, 753 F. App'x at 249 n. 23 (finding that district court failed to satisfy Rule 23(b)(2)'s requirements when it held that "[i]f Plaintiffs can establish that Hellerstedt violates the due-process rights of the proposed class members, the court may render an injunction that will state with specificity the acts to be restrained or required without the need for specific relief tailored to each class member"); *Maldonado*, 493 F.3d at 524–25 (finding specificity requirement not met when plaintiffs attempted to compel defendants to offer "mutually affordable healthcare" because plaintiffs did not "identify any way to determine what a reasonable or 'mutually affordable' rate is for the wide variety of medical services offered by [the defendant]").

In *Alex A. by & through Smith v. Edwards*, No. 22-573, 2023 WL 5628592 (M.D. La. Aug. 31, 2023) (Dick, C.J.), in a case involving housing juveniles at Angola, this Court found that the following requested relief was "very specific":

> B. Enter a declaratory judgment that Defendants are violating Named Plaintiffs' and class members' constitutional rights (and, for proposed disability subclass members, federal statutory rights) by transferring them to the OJJ site at Angola where they will not receive lawful conditions of confinement, counseling, education, other rehabilitative services, and sufficient safety from adults incarcerated at LSP; [and]
>
> C. Issue a preliminary injunction and permanent injunction, requiring Defendants to cease plans to transfer Plaintiffs and class members to the OJJ site at Angola, and to immediately release to the community or transfer Plaintiffs and any class members who have already been moved to the OJJ site at Angola back to one of OJJ's pre-existing secure care or other facilities[.]

*Id.* at *10. Chief Judge Dick concluded, "Essentially, the relief requested is specific and quite simple: forbid OJJ from transferring youth to BCCY-WF," which was the facility on the grounds of Angola. *Id.*; *see also id.* at *2.

Similarly, in *Valentine v. Collier*, No. 20-1115, 2020 WL 3491999 (S.D. Tex. June 27, 2020), the Court also found no problem with specificity:

> First, Defendants argue that Plaintiffs did not "explicitly detail the injunctive relief they seek in their motion [for class certification]." (Doc. No. 132, at 32). However, there is no requirement that Plaintiffs spell out the injunctive relief requested in this specific motion**. Rather, through months of litigation, and after this Court issued a preliminary injunction that Defendants argued was *too* detailed, it should be quite apparent from pleadings, briefings, expert testimony, and oral argument exactly what Plaintiffs seek.** The Fifth Circuit has indeed noted that "Rule 23(b)(2) does not require that every jot and tittle of injunctive relief be spelled out at the class certification stage; it requires only 'reasonable detail' as to the 'acts required.'" *Yates*, 868 F.3d at 368 (quoting *Perry*, 675 F.3d at 848). Accordingly, in *Yates*, the Fifth Circuit evaluated the plaintiffs' requested relief in their Amended Complaint and upheld this Court's finding that the plaintiffs had

112

requested specific enough relief, because they had described their requested relief with "reasonable detail"—by seeking maintenance of heat index of 88 degrees or lower—and this Court identified air-conditioning as relief sought by the plaintiffs, even if it was not stated in their complaint. *Id.* **Similarly, Plaintiffs have asserted with reasonable detail the relief requested in their complaint and subsequent filings; they need not reassert it in their motion for class certification. Any "jot" or "tittle" may be filled in later as this case proceeds as well.**

*Id.* at \*14 (bold added, italics in original)

### C. Analysis

The *Giroir* Plaintiff satisfies this requirement. The first two requirements under Rule 23(b)(2) have been adequately addressed throughout this opinion and need not be repeated here; the *Giroir* "class members must have been harmed in *essentially* the same way"—through LeBlanc's policies and deliberate indifference—and, for this class, "injunctive relief . . . predominate[s] over monetary damage claims[.]" *Ward*, 753 F. App'x at 249 (emphasis added) (citation omitted).

This leaves only the third requirement—that "the injunctive relief sought must be specific," *id.*—and the Court finds this element satisfied as well. The operative complaint prays for the following relief:

> (a) An order and judgment declaring that Defendants' practice of routinely allowing individuals to be incarcerated past their legal release dates violates Plaintiff's rights under the United States Constitution as well as the state law rights of the class Plaintiff seeks to represent;
>
> (b) An order and judgment enjoining Defendants from continuing to allow individuals to be incarcerated past their legal release dates and ordering Defendants to establish procedures to prevent all such overdetention;
>
> (c) An order and judgment requiring Defendants to calculate sentences and release as soon as reasonably feasible, and in no event longer than 48 hours after the person is sentenced, for all persons

113

> sentenced to the custody of the DOC who are eligible for immediate release upon sentencing;
>
> (d) An order and judgment ordering Defendants to release Plaintiff and all members of the class Plaintiff seeks to represent . . . .

(*G-AC*, Doc. 46 at 20.) Thus, as in *Alex*, Plaintiff's relief is "specific and quite simple": to end the practice of overdetention beyond forty-eight hours due to Defendant's unconstitutional policies.

And, just in case there was any doubt, *Giroir* Plaintiff provides an added level of specificity in their pre-hearing briefing. They assert:

> Specifically, the long-standing and widespread overdetention of DOC prisoners is the result of DOC's failures in three areas: (a) failure to adopt adequate policies related to the delivery of sentencing paperwork to DOC for individuals in DOC custody who are housed in parish jails; (b) failure to adopt adequate time computation and data management processes; and (c) failure to adequately train DOC employees.

(*Giroir*, Doc. 91 at 4.) Thus, as in *Valentine*, "it should be quite apparent from pleadings, briefings, expert testimony, and oral argument exactly what Plaintiffs seek. . . . Any 'jot' or 'tittle' may be filled in later as this case proceeds as well." 2020 WL 3491999, at *14.

Defendant claims that this case is now mooted because of recent developments. (*Giroir*, Doc. 117 at 9–10), but the Court rejects this argument. As Plaintiffs point out, Undersecretary Bickham was asked, "Has the document submission portal solved the over-detention problems in Jefferson Parish and East Baton Rouge Parish?", and he responded, "I don't know." (Tr. 187.) The Court agrees with Plaintiffs that it is too premature in this case to decide that the case is moot, particularly given the Fifth Circuit's admonition that overdetention is "endemic in Louisiana." *Hicks*, 81 F.4th at 510.

For all these reasons, the Court finds that *Giroir* Plaintiff has satisfied the requirements of Rule 23(b)(2). The *Giroir* class will be certified as requested.

VII.    CONCLUSION

Accordingly,

**IT IS ORDERED** that the *Motion for Class Certification* (*Humphrey*, Doc. 104) is

**GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** in that a class will

be certified as follows:

> All persons who have been remanded to the custody of the DOC
> since April 16, 2019, and who were entitled to release at the time of
> their remand (either pursuant to sentencing or parole revocation),
> but who were released by the DOC more than 48 hours past the date
> that they were remanded to the DOC's custody due to Defendant's
> failure to implement and maintain an adequate process for timely
> releasing inmates.

The motion is **DENIED** in that claims for emotional distress and mental anguish shall be severed.

**IT IS FURTHER ORDERED** that the *Motion for Class Certification* (*Giroir*, Doc. 25) is

**GRANTED**, and a class will be certified as follows:

> All persons who have been, or will be, sentenced to the custody of
> the Louisiana DOC, and who were, or will be, entitled to release at
> the time of their sentencing, but who nevertheless remain in custody,
> now or in the future, due to Defendants' failure to implement and
> maintain an adequate process for timely releasing inmates, for more
> than 48 hours past their sentencing dates.

Signed in Baton Rouge, Louisiana, on <u>September 22, 2025</u>.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**